**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE WALGREENS BOOTS ALLIANCE, INC. SECURITIES LITIGATION | Case No.: 1:24-cv-05907-JBG<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Hon. Joan B. Gottschall |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 2

II. PARTIES ..... 10

A. Plaintiffs ..... 10

B. Defendants ..... 10

III. JURISDICTION AND VENUE ..... 13

IV. OVERVIEW OF THE FRAUD ..... 14

A. Walgreens Struggled Amid An Industrywide Downturn, And Largely Stood On The Sidelines As Its Largest Competitors Turned To Healthcare To Drive Growth ..... 14

B. At The Beginning Of The Class Period, Walgreens Boasts That VillageMD Would "Drive Sustainable, Long-Term Profitable Growth" And Create The "Next Growth Engine" For The Company ..... 20

C. During The Class Period, Defendants Repeatedly Assure Investors That The VillageMD Rollout Was Being Executed Successfully And That "Demand For Healthcare Services In Our Stores Has Never Been Higher" ..... 25

D. Walgreens Invests Another $3.5 Billion Into VillageMD And Defendants Continue To Assure Investors That The VillageMD Rollout Was Making "Great Progress" And Driving Growth In The New U.S. Healthcare Segment ..... 31

E. In Truth, Defendants Knew VillageMD Was Substantially Underperforming Targets And The Co-Located Clinics Faced Severe Obstacles ..... 34

1. The "Vast Majority" Of Co-Located Clinics Underperformed Because Physicians Were Unwilling To Work At And Patients Were Unwilling To Be Treated At Walgreens Stores ..... 37

2. Walgreens' VillageMD Initiative Was Such An Obvious, Unmitigated Disaster That Defendants Secretly Abandoned The Clinic Rollout In Mid-2022, Mere Months Into The Class Period, And Then Fired Everyone Responsible For Opening New Clinics ..... 54

3. The VillageMD Debacle Was Progressing So Poorly That In Mid-2023, Walgreens Laid Off Hundreds Of Employees Who Were Directly Involved In Opening And Overseeing VillageMD Clinics ..... 60

4. Defendants Were Regularly Informed Of VillageMD's Underperformance And Had Ready Access To Its Key Financial And Operational Metrics ..... 61

F. The Truth Gradually Emerges ..... 69

1. The Q3 2023 Earnings Release ... 69

2. The Sudden Resignations Of Walgreens' CEO And CFO, Defendants Brewer And Kehoe ... 73

3. Defendants Continue To Falsely Reassure Investors Regarding VillageMD And The State Of The Company's Business ... 75

4. The Q1 2024 Earnings Release ... 77

5. The Q3 2024 Earnings Release ... 79

V. POST CLASS PERIOD EVENTS ... 81

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ... 83

A. October 2021 False Statements ... 84

B. November 2021 False Statements ... 88

C. January 2022 False Statements ... 90

D. March 2022 False Statements ... 94

E. June 2022 False Statements ... 98

F. October 2022 False Statements ... 101

G. January 2023 False Statements ... 106

H. March 2023 False Statements ... 109

I. June 2023 False Statements ... 111

J. September 2023 False Statements ... 113

K. October 2023 False Statements ... 115

L. January 2024 False Statements ... 117

M. March 2024 False Statements ... 119

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ... 120

VIII. LOSS CAUSATION ... 130

IX. PRESUMPTION OF RELIANCE ... 133

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ... 134

XI. CLASS ACTION ALLEGATIONS ... 135

XII. CLAIMS FOR RELIEF ... 137

XIII. PRAYER FOR RELIEF ... 141

XIV. JURY DEMAND ... 142

Court-appointed Lead Plaintiff Christopher G. Collins ("Lead Plaintiff"), and additional plaintiff the Fire & Police Employees' Retirement System of the City of Baltimore ("Baltimore F&P," and together with Lead Plaintiff, "Plaintiffs"), by and through the undersigned counsel, bring this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the common stock of Walgreens Boots Alliance, Inc. ("Walgreens" or the "Company") between October 14, 2021 and June 26, 2024, inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs assert claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants (defined below).

Plaintiffs allege the following upon personal knowledge as to Plaintiffs and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon the investigation conducted by and through their attorneys, which included, *inter alia*, review and analysis of: (a) Walgreens' public filings with the SEC; (b) the Company's press releases, reports, and postings on the websites of Walgreens and Village Practice Management Company, LLC ("VillageMD"); (c) shareholder communications, conference calls, and investor presentations; (d) research reports concerning Walgreens by securities analysts and financial media; (e) additional media reports concerning Walgreens and competing pharmacy chains; (f) data reflecting the price of Walgreens' common stock; (g) interviews with over twenty former employees of Walgreens, VillageMD, and Summit Health-CityMD (defined below); (h) consultation with industry and financial consultants; and (i) additional materials concerning Walgreens, the Individual Defendants (defined below), and the healthcare services markets.

Plaintiffs' investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Walgreens is one of the largest retail pharmacy chains in the world. In recent years, the retail pharmacy industry as a whole has struggled amidst pricing pressures, online competition and other operational challenges. While Walgreens' top competitors responded by successfully expanding into the healthcare market as an avenue for growth, the Company stood on the sidelines and saw its stock price languish. Ultimately, Walgreens decided it would follow suit and go "all in" as a full-fledged provider of primary healthcare. To that end, in the months leading up to the Class Period, Walgreens announced that it would invest billions of dollars in a partnership with VillageMD—a startup primary care provider with a network of thousands of physicians—to enable the roll out of doctor-staffed, full-service primary care clinics at roughly 1,000 of Walgreens' 9,000 U.S. stores, which the Company dubbed "Village Medical at Walgreens." Throughout the Class Period, Defendants touted Walgreens' VillageMD partnership as "***the key to unlock material, enhanced, long-term growth***" for the Company that would provide synergies in its core business through an "uplift" in prescriptions and retail purchases from VillageMD patients.

2. On October 14, 2021, the first day of the Class Period, Defendants announced a $5.2 billion investment in VillageMD—an amount so large that it exceeded the Company's earnings for the prior three years combined—to significantly increase the pace and scale of the clinic rollout. Defendants hailed the investment as furthering Walgreens' "***transformational***" new healthcare strategy by accelerating the opening of "at least 600 Village Medical at Walgreens primary care practices in more than 30 U.S. markets by 2025 and 1,000 by 2027." Significantly,

Defendants highlighted the fact that all of its clinics would be staffed by practicing physicians, proclaiming that "***Walgreens will be the first national pharmacy chain to offer full-service doctor offices co-located at its stores at a large scale***," and in the Company's own SEC filings, Defendants specifically highlighted to investors that the number of newly-opened VillageMD clinics represented a "***key performance indicator[]***" that should be closely watched "***when analyzing the core operating performance of the Company***." Indeed, Defendants hyped clinic openings to such an extent that when Walgreens opened a new cluster of VillageMD clinics, Walgreens promptly issued a press release updating investors on the exact count of clinic openings—and during the Class Period, Defendants repeatedly assured investors that VillageMD was a resounding success; the rollout was "***tracking well against all of our key milestones***"; the "***VillageMD model works***"; and "***[o]ur strategy is working***." Fueled by these positive statements, Walgreens stock price soared to a Class Period high of $54.33 per share on January 11, 2022.

3. However, Defendants' statements were utterly false and omitted highly material facts. Unbeknownst to investors, from the inception of the clinic rollout, VillageMD was the greatest debacle in Walgreens' history. Indeed, as a direct result of the Company's disastrous foray into healthcare, Walgreens has suffered billions of dollars in losses; its CEO and CFO both suddenly resigned within 40 days of each other under highly suspicious circumstances; and the massive losses caused by VillageMD forced Walgreens to completely abandon the healthcare market and close thousands of its stores across the country. Moreover, these losses decimated the Company's stock price, causing it to lose more than three-quarters of its value during the Class Period, and according to recent reports in *The Wall Street Journal*, the Company is now in discussions to sell itself to a private equity firm at a fraction of the price it used to trade at. The severe problems that plagued the VillageMD rollout were no surprise to Defendants. Indeed,

Plaintiffs' independent investigation—which included interviews of dozens of former Walgreens and VillageMD employees who spanned virtually every level of both organizations, from regional managers to executives; who worked at locations throughout the nation, including in Walgreens' and VillageMD's corporate headquarters; and who were tasked with overseeing the launch of the VillageMD clinics—confirmed that Defendants knew throughout the Class Period that the VillageMD rollout was an abject disaster.

4. Remarkably, these former employees of Walgreens and VillageMD stated that the Company could not execute on the VillageMD initiative's most fundamental task: staffing its clinics with doctors. Indeed, while Defendants repeatedly boasted about the number of clinics opened and operating throughout the Class Period, these former employees recounted that physicians overwhelmingly refused to relocate their primary care practices to a Walgreens drug store, recoiling at the notion of being relegated to a "***doc-in-a-box***," and as a result, there were "***no doctors to staff [clinics]***," so "***they sat empty for months***." For example, a former Executive Director and Market President for VillageMD who was personally responsible for opening 30 clinics in Arizona in 2021, reported that "all of them" underperformed and "***the problem was finding providers***." Similarly, a VillageMD Practice Manager responsible for 40 clinics stated that Defendants' "***model was not sustainable***" precisely because "***[t]hey couldn't hire physicians as fast as they were building [clinics] in Walgreens***," and as a result, he was "***never able to staff***" those clinics. In fact, as one former Business Development Director for VillageMD stated, "***there were significant staffing issues across the country and the issues never improved***"—to the extent that "***well upwards of 50% of Village clinics [nationwide] had staffing shortages***." Thus, Defendants' statements touting new clinic openings during the Class Period served no other purpose but to allow Defendants to superficially "***cook the books and look super profitable***."

5. Chronic physician understaffing also led to what former employees described as an even "***bigger issue***": ***the VillageMD clinics had virtually no patients***. While Walgreens had hoped to recruit physician practices with an established "patient panel"—meaning a practice with existing patients that could be seen at a new Walgreens clinic—physician understaffing was so dire that, as former employees confirmed, VillageMD had no choice but to recruit physicians who "***didn't have any [patient] panels to speak of at all***." A former VillageMD Business Development Director responsible for recruiting physician practices to Walgreens clinics estimated that a ***full 70%*** of clinics nationwide were "***dismal failures***" with so few doctors and patients they did not come close to meeting Walgreens' targets and were simply "***dead weight***."

6. Former employees also made clear that the true state of the Company's VillageMD business completely contradicted Defendants' public representations to investors. Specifically, while Defendants were repeatedly emphasizing to investors the number of VillageMD clinics that the Company was opening as a "key performance indicator" supporting Walgreens' purportedly positive operating performance, in reality the exact opposite was true: the Company's healthcare strategy was such an unmitigated disaster that ***Walgreens' management secretly decided to shut down the VillageMD rollout in mid-2022***. Similarly, while Defendants were continuing to tout the purported success of the VillageMD rollout and its "clear path to profitability" in 2023, behind the scenes, starting in April 2023, the Company quietly fired the ***entire*** "Implementation Team" that had been responsible for building out VillageMD clinics nationwide.

7. Significantly, Plaintiffs' investigation further confirms that throughout the Class Period, the Individual Defendants knew of VillageMD's staggering underperformance, but misrepresented and concealed this material information from investors. As an initial matter, several senior Walgreens executives, including Defendants Brewer, Driscoll and Mahajan, were

on the VillageMD Board of Directors and received regular operational reports concerning clinic performance. Multiple former employees further confirmed that the Individual Defendants and other Walgreens executives had access to a wealth of data and advanced analytical software showing in "***very precise***" detail that the "***vast majority***" of clinics were in dire financial shape from their inception until their closure. Former employees describe weekly, monthly, quarterly, and annual meetings during the Class Period—both within and between the companies, including their C-Suites—where VillageMD's underperformance was specifically and regularly reported. Notably, this included a Company-wide leadership meeting held in mid-2022—*i.e.*, at the same time that Walgreens was publicly touting the success of the VillageMD rollout but internally deciding that it would abandon the initiative—where Defendants Brewer and Kehoe openly discussed that VillageMD was "***struggling, underperforming, and not meeting targets***."

8. The truth emerged over a series of corrective disclosures beginning on June 27, 2023, when—rather than reporting earnings growth and accelerated profitability as Defendants had claimed just two months prior—Walgreens disclosed that, due to VillageMD's poor performance, the Company's U.S. healthcare segment suffered an adjusted operating ***loss*** of $175 million during the third quarter of fiscal 2023, and as a result, Walgreens significantly ***lowered*** its EPS guidance for fiscal year 2023.[1] On this news, Walgreens' stock price plunged 10% to close at $28.64 per share on June 27, 2023. Tellingly, Defendants attempted to minimize the poor results, continuing to falsely assure investors that VillageMD remained on an accelerated "***path to profitability***," that the initiative was still a "***key factor that will influence 2024 performance***," and that VillageMD would still be a "***significant profit driver***" for the Company as early as fiscal 2024.

[1] Walgreens' fiscal year ("FY") begins September 1 and ends August 31.

9. Then, shortly thereafter, over the span of just 40 days from July to September 2023, Walgreens announced the sudden and immediate departures of the Company's CEO and CFO, Defendants Brewer and Kehoe, without any planned replacements. The suspicious circumstances of these senior executive resignations prompted analysts to remark that they could not "recall a time in our coverage experience where we have seen both the CEO and the CFO depart a large-cap company in such a short span where there were not other issues at the company." Nevertheless, Defendants continued to assure investors that there were no such issues, reiterating that Walgreens remained on track to deliver the VillageMD milestones that Defendants had previously promised.

10. Thereafter, while Walgreens periodically announced negative news regarding VillageMD over the ensuing months, Defendants made clear that the clinic rollout remained successful and on track to profitability, and that the Company was in no way abandoning the VillageMD strategy. For example, when Walgreens announced on October 12, 2023 that it was closing approximately 60 clinics in fiscal 2024, Defendants assured the market that this was because those clinics were located in "nonstrategic markets"; that the Company's healthcare initiatives remained "***the most meaningful drivers of growth in fiscal 2024***"; that Walgreens remained poised to "***enhance VillageMD growth and value***" by focusing on its "highest opportunity markets"; and that, in no uncertain terms, the "***VillageMD model works***."

11. Similarly, when Walgreens announced poor results for the first quarter of fiscal 2024 on January 4, 2024, Defendants went out of their way to assure investors that they were ***not*** abandoning VillageMD, that they were "making progress to accelerate profitability at VillageMD," and that "***there's no question***" that VillageMD was "***on a good path, both in terms of [] costs and [] footprint, getting to a place where they're going to be meaningfully growing and profitable***." Even as late as March 28, 2024—just three months before the truth would be revealed—

Defendants still spoke positively about VillageMD's progress and growth prospects, touting the "***important milestone***" that the U.S. Healthcare segment had achieved positive adjusted EBITDA "***driven by growth from VillageMD***," while celebrating "***positive financial impacts***" from VillageMD, which had purportedly "***accelerate[d] profitability***."

12. The market was therefore stunned on June 27, 2024, when *The Wall Street Journal* published an article featuring an interview with Walgreens' new CEO, Defendant Wentworth, that finally revealed the truth about VillageMD. Specifically, after years of staunchly touting the success and profitability of VillageMD, Wentworth now admitted that VillageMD was a complete disaster, and that the Company's healthcare initiative was so unsalvageable and unfixable that Walgreens was throwing in the towel on its $10 billion investment and abandoning the VillageMD model altogether. As Wentworth made clear in *The Wall Street Journal* interview, Walgreens would divest itself of VillageMD because providing primary healthcare was "***a strategy that we are no longer pursuing***." Moreover, the staggering losses incurred by Walgreens as a result of the VillageMD debacle were so severe and pervasive that the Company was in ruins, reporting a 37% decline in adjusted EPS for the quarter and a 12% cut to full year 2024 EPS guidance. As a result of these massive losses, Walgreens disclosed that it would be forced to close upwards of ***2,000 stores over the next three years***, or almost 25% of the Company's stores nationwide.

13. In response to this stunning news, Walgreens' stock price plunged by ***more than 22%***, falling to a closing price of just $12.19 per share on June 27, 2024—***the largest single-day decline in Company history, making Walgreens the day's worst performer in the S&P 500 and wiping out $3 billion in shareholder value***. The Company's stock price has never recovered, and now trades well below $10 per share.

14. By the end of the Class Period, VillageMD was virtually worthless, and Walgreens was in freefall, with the Company reporting its first annual losses in its 123-year history. As the chart below reflects, until the Company acquired its majority interest in VillageMD, Walgreens had never reported an annual loss in its corporate history, and afterwards, it suffered ***billions of dollars in losses***. Indeed, Walgreens was so decimated by VillageMD that *The Wall Street Journal* recently reported that the Company is in discussions to sell itself to a private equity firm—meaning the end of its history as a public company.




15. In sum, as a direct result of Defendants' fraud, Walgreens' stock price declined over 77% from its Class Period high. Walgreens' shareholders have been significantly harmed by Defendants' fraud. This action seeks redress on their behalf.

## II. PARTIES

### A. Plaintiffs

16. Lead Plaintiff Christopher G. Collins purchased Walgreens common stock during the Class Period and suffered damages as a result of the misconduct alleged herein, as reflected in his Certification of Plaintiff Pursuant to Federal Securities Laws (ECF No. 14-1).

17. Additional plaintiff the Fire and Police Employees' Retirement System of the City of Baltimore, is a contributory, defined benefit plan based in Baltimore, Maryland that manages approximately $3.1 billion in assets and provides service retirement, disability retirement, and death benefits on behalf of over 10,000 active and retired uniformed Baltimore City fire and police personnel. Baltimore F&P purchased a significant amount of Walgreens common stock during the Class Period and suffered damages as a result of the misconduct alleged herein, as set forth in its certification attached hereto.

### B. Defendants

18. Defendant Walgreens is a retail pharmacy store chain headquartered in Deerfield, Illinois. Founded in 1901, Walgreens has grown from a neighborhood drug store to become one of the world's largest pharmacy store chains in the world with over 12,000 stores across the United States, Latin America, and Europe. Walgreens common stock trades on the Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "WBA."

19. Defendant Rosalind Brewer ("Brewer") served as Walgreens' CEO and a member of its Board of Directors from March 15, 2021 until August 31, 2023. In addition, from at least April 2022 until August 2023, Brewer served as a member of VillageMD's Board of Directors.

20. Defendant James Kehoe ("Kehoe") served as Walgreens' Executive Vice President ("VP") and Global CFO from June 2018 until mid-August 2023.

21. Defendant John Driscoll ("Driscoll") served as Executive VP and President of Walgreens' U.S. Healthcare segment from October 2022 until February 2024, when he transitioned to a "senior advisory role." In addition, since 2023, Driscoll has served as a member of VillageMD's Board of Directors.

22. Defendant John Standley ("Standley") served as an Executive VP and President of Walgreens from August 2020 to November 2022.

23. Defendant Tim Wentworth ("Wentworth") has served as Walgreens' CEO since October 2023 and is a member of Walgreens' Board of Directors.

24. Defendant Manmohan Mahajan ("Mahajan") served as Walgreens' interim CFO from July 2023 through February 2024 and has served as Walgreens' Executive VP and Global CFO since February 2024. In addition, since 2024, Mahajan has served as a member of VillageMD's Board of Directors.

25. Defendants Brewer, Kehoe, Driscoll, Standley, Wentworth, and Mahajan are referred to collectively as the "Individual Defendants," and, together with Walgreens, as "Defendants."

26. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Walgreens, were privy to confidential, proprietary and material adverse non-public information concerning Walgreens (including its majority owned asset, VillageMD), its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them. Because of their possession of such

information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

27. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Walgreens' business.

28. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

29. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and is traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information about Walgreens' financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Walgreens common stock would be based on truthful and accurate information.

The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

30. The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Walgreens' publicly traded common stock by disseminating materially false or misleading statements and/or concealing material adverse facts.

## III. JURISDICTION AND VENUE

31. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

32. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

33. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.

34. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## IV. OVERVIEW OF THE FRAUD

### A. Walgreens Struggled Amid An Industrywide Downturn, And Largely Stood On The Sidelines As Its Largest Competitors Turned To Healthcare To Drive Growth

35. From the time of its founding in 1901 until Defendants' fraud began to be revealed, Walgreens had ***never*** reported an annual loss and maintained profitability with a steady growth trend. At the start of the Class Period, the Company's U.S. Retail Pharmacy segment consisted of approximately 9,000 stores in all 50 states and represented more than 75% of its annual revenue, with three quarters derived from pharmaceutical sales.

36. However, in recent years profit margins for the retail pharmacy industry have increasingly come under pressure. As a result, although Walgreens generates a massive amount of revenue, its profit margins are relatively small. For instance, in fiscal year 2021, Walgreens' $132.5 billion in sales generated only $2 billion of net profit. As *The Wall Street Journal* reported on December 10, 2024, "Walgreens and its closest peer, CVS Health, have both faced stagnating margins on their core function of dispensing prescription drugs, with pressure on payments from pharmacy-benefit managers, which negotiate drug prices on behalf of insurers and employers. Meanwhile, sales from retail products at the front of stores have been squeezed by Amazon and other e-commerce sites."

37. As a result of these significant headwinds, the industry began to evolve beyond the traditional retail and pharmacy business into the larger and more lucrative healthcare services industry, which brought the opportunity of a multi-trillion-dollar market and steep profit margins. Notably, Walgreens' top competitors, such as CVS and Walmart, moved toward this trend before Walgreens. CVS, for example, began transforming its retail pharmacy business and entering the healthcare market through, among other things, its landmark 2007 merger with Caremark, making it the country's leading pharmacy benefit manager, and its 2018 merger with health insurer Aetna,

the biggest healthcare merger in U.S. history. And in the fall of 2019, Walgreens' other major competitor, Walmart, piloted the first "Walmart Health" center, which offered urgent care, dentistry, behavioral health, optometry and audiology in one location adjacent to a Walmart supercenter in Dallas, Georgia. Within one year, Walmart had developed six additional "Walmart Health" centers in Georgia and announced the concept's expansion to three more states.

38. Accordingly, in the run-up to the Class Period, Walgreens faced mounting pressure from analysts and investors alike to catch up to its competitors and make a bold strategic shift into the lucrative, multi-trillion-dollar healthcare industry. For example, during a Walgreens earnings call in May 2018, an analyst from RBC Capital Markets commented that "the pendulum seems to be clearly swinging more towards vertical integration in the U.S. health care system" and asked Walgreens' management to "help us reconcile why your strategy of going it alone … is the right one as CVS is buying a health plan, Cigna is merging with Express, United is buying providers?" Additionally, Morningstar Equity Research commented plainly in a November 2018 report that Walgreens "would be better served investing in creating a more healthcare-centric operating model." As Walgreens stood on the sidelines, its stock price continued a downward slide. In the five years leading up to the Class Period, Walgreens' stock price lost nearly 50% of its value.

39. In early 2019, Walgreens finally began to meaningfully explore a strategic shift to healthcare. While the Company had previously dipped its toe in this space through a variety of pilot programs and explored partnerships with health insurers, lab testing services, and managed care companies, the Company finally decided to go "all-in" on healthcare by becoming a primary healthcare provider. Walgreens would seek to provide full-service, primary care practices with actual doctors, working together with Walgreens pharmacists, all under one roof. To accomplish

this strategy, in April 2019 the Company entered into a partnership with VillageMD, a physician-led, national network of primary healthcare providers.

40. At the time, VillageMD purported to deliver high-quality healthcare at lower costs through a new operating model called "value-based care" – an increasingly popular model following passage of the Affordable Care Act of 2010 that utilized an integrated approach involving doctors, pharmacists, and other medical professionals with the goal of reducing costs and improving the overall quality of care. Under this value-based care business model, a lump-sum amount was paid to a healthcare provider to cover the treatment of its patients. If the provider could treat its patients for an amount lower than that lump sum, the provider could log those savings as revenue. This payment method differed from the traditional, fee-for-service ("FFS") form of payment, in which a healthcare provider was compensated for each office visit, test or service performed for a patient.

41. On April 10, 2019, Walgreens announced a pilot program with VillageMD to launch doctor-staffed, value-based, primary healthcare at clinics attached to or set inside existing Walgreens stores. The pilot program consisted of VillageMD operating five of these "co-located" primary care clinics at Walgreens stores in Houston, Texas (the "Houston Pilot Program"). Through these clinics – dubbed "Village Medical at Walgreens" – Walgreens aimed to become the first national drugstore chain to offer full-service primary care practices staffed by actual doctors, in-person at the same physical location as the drug store, on a large scale. In addition to making a "bold" move into the healthcare industry, Walgreens promoted the initiative as providing numerous synergies for Walgreens' traditional retail pharmacy business.

42. In particular, Walgreens told investors that its partnership with VillageMD would provide three new principal revenue streams for Walgreens: (1) an increase in prescription fills

from VillageMD patients, including greater capture of refills through enhanced patient "adherence" to medication treatment plans; (2) an increase on sales of retail products (such as groceries, seasonal decoration, household supplies and toiletries) through greater foot traffic in the "front" of Walgreens' stores by VillageMD patients; and (3) an increase in rental income because, as Defendant Kehoe explained, "we're giving up space in the store" to the VillageMD primary care clinic.

43. Having clinics adequately staffed with doctors and other medical professionals was absolutely critical to the success of the primary healthcare strategy. Not only would doctors and nurse practitioners be needed to treat patients' common health conditions, but under VillageMD's multi-disciplinary, value-based care model, the pharmacist was also a critical member of the primary care team. Walgreens' pharmacists would, in addition to providing patient care, rapidly fill and refill prescriptions originating from the Village Medical at Walgreens clinic, which would be prioritized over other Walgreens customers "under the same roof" as where the patient received treatment. This would enable Walgreens to capture the principal purported synergy of the shift, namely, prescription uplift.

44. Roughly one year after the launch of the Houston Pilot Program, on July 8, 2020, Walgreens trumpeted a $1 billion investment in VillageMD to fund an expansion of the partnership to enable the rollout of hundreds of new co-located clinics nationwide. With the investment, Walgreens acquired a nearly 30% ownership interest in VillageMD. Eighty percent of the $1 billion investment, or $800 million, was specifically earmarked for VillageMD to build and open these doctor-staffed, primary care clinics inside of or adjacent to Walgreens stores. The partnership called for VillageMD to recruit doctors to staff the co-located practices and for Walgreens to select the site of each co-located VillageMD clinic.

45. In its July 8, 2020 press release announcing the investment, Walgreens hailed the Company's bold pivot into healthcare, and in particular highlighted the fact that all of its clinics would be staffed by practicing physicians, proclaiming: "***Walgreens will be the first national pharmacy chain to offer full-service doctor offices co-located at its stores at a large scale***." What's more, Walgreens announced it would implement the VillageMD clinic rollout with remarkable speed and scale, boasting that "[t]his expanded partnership will open 500 to 700 'Village Medical at Walgreens' [] primary care clinics in more than 30 U.S. markets in the next five years, with the intent to build hundreds more thereafter."

46. The market applauded Walgreens' belated, yet aggressive, change in strategy. For example, following the Company's Q3 2020 earnings call on July 9, 2020, Morgan Stanley reported that "the VillageMD partnership may signal a light at the end of the tunnel and the first indication of a commitment to transforming its strategy from retail centric to healthcare focused." Cowen analysts likewise praised the Company's entry into the healthcare market, reporting that "we like where the L-T [long-term] strategy is going with the expanded partnership with VillageMD," and emphasized that "the VillageMD partnership deepens WBA back into health care, which we think is a must in the current evolving landscape for healthcare services."

47. The partnership was supposedly off to such a strong start that, on January 6, 2021, the Company announced it was accelerating payment of its initial $1 billion investment "to increase the pace and scale of the rollout of the clinics," such that Walgreens would now open 600 to 700 clinics in just four years. Further highlighting the strategic significance of the VillageMD partnership to Walgreens, weeks later on January 26, 2021, the Company announced with great fanfare that Rosalind Brewer—who had "a proven track record of leadership and operational expertise at multi-national corporations, most recently as Chief Operating Officer of Starbucks"—

had been hired as Walgreens' new CEO. Brewer's appointment came with a mandate from the Company's Board of Directors to spearhead its strategic shift to healthcare. Indeed, in the press release announcing Brewer's appointment, then-CEO and new Executive Chairman Stefano Pessina detailed how Brewer had extensive experience "driving significant and sustainable growth and value creation[,]" which is "exactly what [Walgreens] needs as the Company enters its next chapter."

48. During her first earnings call at the helm of Walgreens on July 1, 2021, Brewer told investors she was conducting "a detailed review of our long-range business plans across the company" and had determined to "accelerat[e] our rollout plans with VillageMD following continued positive patient response." During the call, Defendant Kehoe added that Walgreens was already benefitting from the anticipated VillageMD synergies, affirming that "there is definitely a script uplift in the store from the relationship."

49. Again, the market cheered. Following the call, Evercore reported that Walgreens was "[a]ccelerating rollout plans with VillageMD," and was already experiencing "a script uplift in the Walgreens store from the relationship." Cowen analysts applauded Brewer and her role in the VillageMD expansion, reporting that "we've become more constructive" on the Company's strategic vision "given the appointment of a new CEO … and acceleration of the VillageMD partnership, indicating that the company is looking to reposition itself as a more healthcare oriented company."

50. As discussed below, despite calling Walgreens' partnership with VillageMD "a significant growth catalyst," Defendants understood right from the outset of the clinic rollout that Walgreens could not profitably scale, or even profitably operate, the VillageMD business. Instead, Walgreens' strategy of providing doctor-staffed, primary care clinics attached to or inside of

Walgreens stores failed from the very start. Most notably, doctors overwhelmingly refused to relocate their practices to Walgreens, ***resulting in a staggering number—more than 50% of co-located clinics—suffering serious physician staffing shortages***. And even in the unusual instance where physicians could be recruited to practice in a Walgreens drug store, patients overwhelmingly balked at receiving their primary care treatment at Walgreens, collectively resulting in approximately ***70% of co-located clinics underperforming before and throughout the Class Period***. Moreover, the clinics were extraordinarily expensive to build, staff, and operate. Indeed, as Defendant Kehoe later explained at an investor conference during the Class Period, "it's well above $1 million to open a primary care physician[-staffed co-located clinic]." Notwithstanding, Walgreens bowed to intense market pressure and followed competitors into the healthcare market in an unbridled attempt to drive profitable growth. Accordingly, Defendants plowed ahead with their strategy to provide doctor-staffed, primary healthcare clinics at Walgreens stores nationwide—and to implement the strategy as quickly as possible.

### B. At The Beginning Of The Class Period, Walgreens Boasts That VillageMD Would "Drive Sustainable, Long-Term Profitable Growth" And Create The "Next Growth Engine" For The Company

51. On October 14, 2021, the first day of the Class Period, Walgreens issued a flurry of press releases and held a combined earnings call and investor conference to unveil a dramatic expansion of the Walgreens-VillageMD partnership. Significantly, in the announcement, Defendants made clear to investors that VillageMD was critically important to the Company's financial future, stating in no uncertain terms that it would be "***the key*** to unlock material, enhanced, long-term growth" for the entire Company. Under the terms of the deal, Walgreens would pay $4.0 billion in cash and a $1.2 billion promissory note, in return for Walgreens controlling a 63% stake in VillageMD (the "VillageMD Acquisition"). The deal also gave Walgreens the right to appoint five of the nine members of VillageMD's Board of Directors, the

first of whom was Defendant Brewer. Additionally, Walgreens reorganized itself into three segments, with VillageMD as the centerpiece of a new "U.S. Healthcare" segment—which Defendants hailed as the Company's next growth driver and the lynchpin of its future success.

52. In the first press release issued on October 14, 2021, Defendants announced that Walgreens would be pouring an additional $5.2 billion into VillageMD to "accelerate the opening of at least 600 Village Medical at Walgreens primary care practices in more than 30 U.S. markets by 2025 and 1,000 by 2027." The press release declared that the massive new investment—representing nearly 90% of the Company's entire adjusted earnings for the past three years—made Walgreens "the first national pharmacy chain to offer full-service primary care practices with primary care physicians and pharmacists co-located at its stores all under one roof at a large scale." In the second press release, Walgreens announced that it had created a new business segment called "[U.S. Healthcare], enabled by investments in Village MD" and proclaimed that Walgreens' new healthcare-centric strategy would "drive sustainable, long-term profitable growth."

53. As a majority and controlling owner of VillageMD, Walgreens rolled-up and reported VillageMD's financial performance within the new U.S. Healthcare segment. In addition to VillageMD, the U.S. Healthcare segment consisted of three other portfolio companies: (1) an organically grown "Walgreens Health" business, which would contract with third-party payors and providers to enable pharmacists and nurse practitioners to deliver clinical healthcare services and care management programs to their members at "Health Corners"—*i.e.*, clinics staffed by "Health Providers" (not doctors or nurse practitioners) who addressed common health concerns such as tips on nutrition and staying active, which were located at fewer than 100 (about 1 in 100)

Walgreens stores; (2) Shields Health Solutions, a specialty pharmacy integrator and accelerator for hospitals; and (3) CareCentrix, a participant in the post-acute and home care management sectors.

54. In the second press release, Defendants specifically touted the U.S. Healthcare segment as the Company's "next growth engine." Indeed, while Walgreens' Retail Pharmacy segment accounted for most of the Company's consolidated annual revenue, its profit margins were very small and increasingly under pressure: as of the start of the Class Period, the segment's profit margin was a mere 2.3%, and the Company's overall profit margin was less than 1.8%. Accordingly, Defendants reiterated to investors that the new healthcare-centric strategy would be the key to boosting the Company's profits and unlocking long-term shareholder value.

55. The same day that Walgreens issued multiple press releases announcing the VillageMD Acquisition, the Company held a combined earnings and investor day conference call (the "FY 2021 Earnings and Investor Day Call"). During the call, Brewer stoked investor enthusiasm for the VillageMD Acquisition and further detailed Walgreens' plan to transform its business model by creating an entirely new U.S. Healthcare segment, with VillageMD as its centerpiece. Brewer underscored that the Company's strategic shift to primary healthcare through VillageMD's doctor-staffed clinics was "***the key to unlock material, enhanced, long-term growth for the business***," and assured investors that the decision to invest three years' worth of profits into acquiring a majority interest in VillageMD was the result of extensive research, analysis, and planning. Indeed, Brewer highlighted the "***extraordinary level of detail we've gone into with our review, with our planning and our analysis***," and declared that "***[w]e already know how to work with Village MD***" and "***[w]e know how to scale their model***."

56. Brewer was not alone among senior executives in singing praises for the VillageMD Acquisition and the Company's new growth strategy. Defendant Standley, Walgreens' Executive

VP and President, lauded the Company's "strong pivot into health care" and Defendant Kehoe, its CFO, hailed the VillageMD Acquisition as the Company's "***growth engine***" and a "***key step[] in bringing to life our healthcare ambitions.***" Kehoe declared that Walgreens was "***poised for explosive growth as it builds out 1,000 VillageMD at Walgreens***."

57. During the FY 2021 Earnings and Investor Day Call, Kehoe also laid out the Company's long-term growth plan for the new U.S. Healthcare segment (the "Long-Term Growth Plan"). Kehoe explained that the "margin structure" for U.S. Healthcare "will be attractive and higher than our current business," and emphasized that in just three years, the U.S. Healthcare segment, "enabled by investments in VillageMD," would generate at least 7% of the Company's 11% to 13% EPS growth.

58. Defendants also told investors that VillageMD clinics would accept a variety of insurance plans, which was "very important" because it would enable rapid scaling of the "VillageMD at Walgreens" business, and drive prescription uplift in Walgreens' pharmacy. Thus, Brewer explained that "[o]ne thing that is very important about VillageMD and a primary reason we started this partnership to begin with is that they are focused on all patient populations: ***Medicare, Medicare Advantage, Medicaid, commercial and the uninsured***." Defendant Kehoe echoed Brewer's remarks, emphasizing that VillageMD physicians accept "***all types of insurance***" enabling "VillageMD at Walgreens" clinics to "get to scale far, far quicker[.]"

59. The market reaction to Walgreens' acquisition of VillageMD and its strategy to rollout over 1,000 doctor-staffed, primary care clinics at Walgreens stores was immediate. Walgreens' stock price surged more than 7% following this news to close at $50.77 per share on October 14, 2021.

60. Analysts issued reports celebrating the Company's new strategic direction. For example, Baird issued a report titled "Reimagining the Company," which lauded Walgreens' "major push into healthcare services" and "significant step-up in VillageMD ownership" as a "turnaround of epic proportions." Baird added that it was Defendant "Roz Brewer's first major reveal on [] WBA's forward path." Highlighting the rapid pace and scale of the rollout – namely, 80 additional VillageMD clinics in the next quarter and 600 locations anticipated by 2025 – Morningstar emphasized that "we see this as a great strategic move for the company, as it provides a high-growth revenue stream (56% revenue CAGR since 2017) and dilutes the impact of reimbursement pressures on the company's U.S. pharmacy operations."

61. Analysts continued to issue favorable reports for several days. For example, in an October 15, 2021 report, Truist applauded Walgreens' investment in VillageMD as a concrete step the Company was taking to embrace the healthcare trend after years largely spent sitting on the sidelines. Truist commented that "we think the deeper push into healthcare meaningfully increases WBA's potential TAM [i.e., total addressable market], brings the company into higher-growth and higher-margin businesses, improves diversification, drives potential synergies with the base pharmacy business and improves positioning to benefit from overarching sector tailwinds (e.g. shift towards VBC [value-based care], site of service)." Putting a finer point on how the Company's strategic shift heavily relied upon the performance of VillageMD, on October 17, 2021, Credit Suisse underscored that "***WBA highlighted that the longer term growth profile for the company will be driven in large part by VillageMD . . . given the differential in margin profile of [VillageMD] relative to its legacy operations***."

62. As discussed below, at the time Walgreens announced its $5.2 billion VillageMD Acquisition to accelerate the pace and scale of the primary clinic rollout, the strategy faced the

same fundamental obstacles as it did since the Houston Pilot Project—namely, a chronic shortage of doctors and patients who bought into the strategy. These problems were acute in the very first new region Walgreens selected to open the "VillageMD at Walgreens" clinics, Arizona, and were no different in virtually every subsequent market that Walgreens sought to rollout the "co-located" VillageMD clinics. Moreover, contrary to Defendants' assertions that VillageMD physicians accepted "all types of insurance" including "Medicaid," in fact VillageMD refused to accept Medicaid, which undermined any uplift in prescriptions from a significant portion of pharmacy customers at the stores Walgreens selected for the clinics.

### C. During The Class Period, Defendants Repeatedly Assure Investors That The VillageMD Rollout Was Being Executed Successfully And That "Demand For Healthcare Services In Our Stores Has Never Been Higher"

63. As the Class Period progressed, Defendants continuously assured investors that Walgreens' strategic shift to healthcare was "***on track***," and frequently reiterated the targets of opening ***600 co-located VillageMD clinics by 2025 and 1,000 by 2027***. Along the way, Walgreens issued a steady stream of press releases that boasted about how quickly clinics were opening, and trumpeted VillageMD's entry into new markets across the U.S., including the opening of scores of new clinics in Texas, Arizona, Florida, New Hampshire, Massachusetts, Nevada, Colorado, and Illinois.[2] As Brewer underscored during the Evercore ISI HealthCONx Conference on November 29, 2021 (the "2021 Evercore Conference"), a crucial element in Walgreens' healthcare strategy was making sure that those 1,000 co-located clinics "***come up effectively***," and underscored that Walgreens' management had an "***intensified focus on execution***." Brewer also underlined that VillageMD was the hub of the U.S. Healthcare segment and would be the driver of its profitability,

[2] These press releases were issued on November 12, 2021, December 15, 2021, January 20, 2022, February 16, 2022, March 17, 2022, April 28, 2022, November 14, 2022, April 12, 2023, and August 10, 2023.

stating that of the three healthcare companies Walgreens had acquired, "***VillageMD is the most significant***."

64. The purportedly successful rollout and performance of VillageMD clinics resulted in Defendants repeatedly raising Walgreens' earnings projections during the Class Period. For instance, during Walgreens' Q1 2022 earnings call on January 6, 2022, Brewer boasted that the VillageMD clinic "***rollout has accelerated to a pace of a new opening every 4 to 5 days***," and explained that as a result, ***"we are raising our full year guidance***."

65. Days later, at the J.P. Morgan Healthcare Investor Conference on January 11, 2022 ("2022 J.P. Morgan Conference"), Brewer continued to paint VillageMD as the "key" growth engine for Walgreens, telling investors that VillageMD "will fuel our acceleration to sustainable low teens EPS growth after fiscal 2024." She further represented that VillageMD was "***on a high-growth trajectory***" and "***a clear path to national expansion and rapid growth, especially given their partnership with Walgreens***." Not only did Walgreens raise its financial projections for the U.S. Healthcare segment, Brewer also raised the Company's goal for co-located clinic openings "***for calendar year 2022 from 160 co-located clinics to at least 200***," and emphasized that "***the rollout has accelerated to an average pace of 1 opening every 3 days***." Moreover, while Defendant Kehoe acknowledged that its costs "well above $1 million to open" each co-located clinic, Brewer assured investors that "[w]e are investing to fuel our future growth."

66. As months went by, Defendants remained steadfast in painting a rosy picture of clinic openings and effective execution. For example, during the Company's fourth quarter and fiscal year 2022 earnings call with investors on October 13, 2022 (the "Q4 2022 Earnings Call"), Brewer declared that "***[w]e delivered ahead of our expectations in fiscal year '22 and are well underway in our transformation to a consumer-centric healthcare company***." Defendant

Brewer assured investors that Walgreens was rapidly "scaling our winning assets" in the U.S. Healthcare segment and that "[o]ur strategy is working to strengthen the business and build a solid foundation for sustainable shareholder value creation." During the same Q4 2022 Earnings Call, Defendant Kehoe reaffirmed that the "***clinic rollout at VillageMD continues on pace***" and that "***VillageMD grew in line with plan and revenue growth is on track as we launch new clinics, scale existing clinics and increase value-based arrangements***." Kehoe told investors that VillageMD was "***a significant tailwind as a greater percentage of clinics reach positive contribution margin***." Newly appointed President of the U.S. Healthcare segment, Defendant Driscoll boasted that "***demand for healthcare services in our stores has never been higher***."

67. During the call, some analysts raised concerns about the U.S. Healthcare segment's path to profitability, given the immense capital expenditures needed to build and staff clinics. For instance, during the Q&A portion of the Q4 2022 Earnings Call, a JP Morgan Chase analyst inquired, "[h]ow do we think about the longer-term profitability of [U.S. Healthcare]?" Defendant Kehoe replied, "this is a scale business" and further assured the market that, "[t]his is a model that breaks even in year 3. ***So opening clinics for us, yes, it will be painful in the first 2 years, but then the returns are outsized because we get a very rapid payback***."

68. Defendants further quieted concerns over the rollout's exorbitant costs by declaring that the purportedly successful rollout of co-located clinics, of which there were approximately 152 to date, allowed Defendants to significantly raise Walgreens' longer-term profit targets for its U.S. Healthcare segment. Providing detailed guidance for the U.S. Healthcare segment for the next two fiscal years, CFO Kehoe assured investors that the U.S. Healthcare segment had "***a clear path to profitability***" and was "***rapidly approaching positive adjusted EBITDA***," which the segment would achieve "by fiscal year 2024." Specifically, Kehoe projected "adjusted EBITDA

of $125 million to $225 million in '24 rising to $500 million to $700 million in 2025," and underscored that "[w]e are confident in this trajectory." As for the bottom-line, Kehoe reiterated that "[w]e expect U.S. Healthcare to contribute over half of the annual adjusted EPS growth over the long term while we continue to assume moderate growth from the core business." Kehoe underscored that "***VillageMD is the largest contributor with [earnings] growth achieved as existing clinics mature and realize more attractive economics and through ongoing expansion of VillageMD's clinic footprint***."

69. Defendants' highly positive picture of VillageMD's expansion and growth of the U.S. Healthcare segment resulted in the price of Walgreens stock increasing 5% that day to close on October 13, 2022 at $33.65 per share.

70. Analysts were thrilled with Walgreens' apparently successful execution of its healthcare-based growth strategy, noting the importance of the U.S. Healthcare segment to Walgreens and the importance of the accelerated clinic openings. For example, following the Q4 2022 Earnings Call, Credit Suisse described VillageMD as the "needle mover" for Walgreens' "updated outlook" noting that management was feeling "positive about VillageMD and has greater line of sight into its growth potential," including increased confidence in the ability of the partnership to "capitalize on synergies." Morningstar commented that, although revenue for the U.S. Retail Pharmacy segment had "decreased 7.2%" compared to the prior year, "the U.S. healthcare segment—the company's strategic focus moving forward— saw sales grow 34%" in the fourth quarter, highlighting that the increase was "positively affected" by "continued execution of VillageMD expansion." Morningstar also found noteworthy that Walgreens was "rapidly scaling its U.S. healthcare business" and had raised its long-term targets to achieve profitability in 2024. Likewise, Truist reported on October 13, 2022 that Walgreens' healthcare business "remains

a key area of focus and critical factor underpinning ramping long-term expectations" and noted that the Company was "on track to hit CY22 footprint expansion milestones" for VillageMD. On October 24, 2022, Deutsche Bank similarly noted that, since "WBA has been investing aggressively this year to build out its new growth engine," the true "lynchpin of the strategy is solid margin improvement in VillageMD clinics as they scale and mature."

71. Significantly, in the Company's SEC filings during the Class Period, Walgreens' most senior officers—including the Individual Defendants—specifically pointed investors to the number of VillageMD clinics open and functioning, which Defendants emphasized was highly material information reflective of the performance of the Company. Indeed, given the central role of VillageMD in the Company's growth plan, beginning with the Company's Annual Report on Form 10-K for fiscal year 2022, filed with the SEC on October 13, 2022 (the "2022 Annual Report"), Defendants represented to investors that the "number of co-located VillageMD clinics and number of total VillageMD clinics" were the "***key performance indicators***" for Walgreens. Specifically, the 2022 Annual Report stated that "the Company's management has evaluated its results of operations using these metrics and believes that these key performance indicators presented provide additional perspective and insights when analyzing the core operating performance of the Company from period to period and trends in its historical operating results." Defendants repeatedly pointed investors to these "key performance indicators" in dozens of securities filings, press releases, and investor presentations during the Class Period—reporting a steady and escalating drumbeat of new co-located VillageMD clinics and total VillageMD clinics in regions across the country.

72. The number of VillageMD clinics was particularly important because investors had little transparency into the actual financial performance of VillageMD's clinics (co-located or

otherwise). That was because Walgreens did not report VillageMD's operations and financial performance separately, but instead rolled them up and reported them as part of the U.S. Healthcare segment's overall results. Additionally, while Walgreens intermittently reported on the amounts of revenue contributed by VillageMD, given the steep costs associated with the clinic rollout, among other things, Walgreens never once reported on VillageMD's contributions, if any, to the U.S. Healthcare segment's earnings. Thus, other than the raw location counts Defendants provided and their assertions that the rollout was being executed effectively and driving earnings growth for the U.S. Healthcare segment and Company as a whole, investors had no way to verify that the clinics were actually performing successfully, accelerating margin growth, and driving any long-term value, as Defendants claimed.

73. Unbeknownst to investors, Defendants' "key performance indicators" presented an entirely materially false and misleading portrayal of the Company's business. The number of new and operating clinics told nothing about how the clinics were actually performing and if they were "unlock[ing] material, enhanced, long-term growth," as Defendants claimed. In reality, as discussed below, a staggering number of primary care clinics had incredible difficulty hiring doctors and recruiting patients, and as a result approximately 70% of clinics underperformed at all times. As overwhelmingly confirmed by multiple former Walgreens and VillageMD employees, from the very beginning of the Walgreens-VillageMD relationship—and in direct contrast to Defendants' representation during the Class Period that "we're really not seeing a labor issue on our [U.S. Healthcare] side"—clinics experienced serious physician staffing shortages nationwide and this pervasive problem never got resolved. Obviously, doctorless clinics cannot generate profits or increase numbers of prescription fills for Walgreens, resulting in VillageMD consistently failing to achieve Walgreens' targets. Additionally, while Defendants routinely represented that

Walgreens was "the first national pharmacy chain to offer full-service primary care practices with primary care physicians," those claims clearly were baseless.

### D. Walgreens Invests Another $3.5 Billion Into VillageMD And Defendants Continue To Assure Investors That The VillageMD Rollout Was Making "Great Progress" And Driving Growth In The New U.S. Healthcare Segment

74. Under increasing pressure to demonstrate profitability for the U.S. Healthcare segment, in November 2022, Walgreens announced it was tripling down on its investment in VillageMD by contributing an additional $3.5 billion, bringing the Company's total investment in VillageMD to almost ***$10 billion***. This staggering sum represented ***nearly all of the Company's $10.3 billion in total adjusted earnings for the past four years***. The latest investment, as described in Walgreens' November 7, 2022 press release, was to fund VillageMD's acquisition of another physician-led healthcare services company called Summit Health-CityMD ("Summit"), a provider of urgent and specialty care services. Pursuant to the terms of the deal (the "VillageMD/Summit Acquisition"), VillageMD would combine with Summit to create one large, multi-payer platform, with more than 680 provider locations in 26 markets across the United States. The VillageMD/Summit Acquisition was valued at $8.9 billion, with Walgreens retaining a majority 53% ownership stake in VillageMD.

75. Defendants hailed Walgreens' latest multi-billion-dollar investment in VillageMD as an "epic milestone" that "accelerate[d] growth opportunities through a strong market footprint and wide network of providers and patients across primary, specialty and urgent care," and "accelerate[d] WBA's path to profitability for its U.S. Healthcare segment." Because Summit Health and CityMD were profitable businesses that would be immediately accretive to the bottom line, after the VillageMD/Summit Acquisition, Walgreens announced that U.S. Healthcare would now reach positive adjusted EBITDA in fiscal 2023—a full year earlier than previously reported.

76. Defendants wasted no time promoting the "transformational" combination of VillageMD and Summit. Two days after a VillageMD/Summit Acquisition was announced, during an investor conference on November 9, 2022, Defendant Brewer immediately hyped the acquisition as: (i) "expand[ing] our total primary care physicians by over 50%," (ii) "expand[ing] our addressable market" by "more than doubl[ing] VillageMD's sales," and (iii) being "immediately" accretive to the Company's earnings per share. Brewer told investors that, "[o]n a combined basis, VillageMD and Summit are expected to comprise roughly 2/3 of our total U.S. Healthcare segment sales in 2025," with 600 co-located clinics. Brewer underscored that the transaction was "really accelerating our U.S. Healthcare in terms of scale and profit," driving "strong financial returns for WBA."

77. The VillageMD/Summit Acquisition marked a notable departure from the Company's pivot to primary healthcare, and an even further departure from VillageMD's value-based care model. In contrast to VillageMD's model of delivering value-based primary care through doctor-staffed clinics at Walgreens stores (and legacy standalone primary care clinics), Summit Health and CityMD focused on providing urgent and specialty care, under a fee-for-services ("FFS") model, at locations completely separate from Walgreens stores. As Defendant Brewer explained during the November 9, 2022 investor conference, urgent care comprised the vast majority of patients, providers, and revenue provided by the VillageMD/Summit Acquisition. Moreover, Walgreens announced it would not attempt to open new co-located Summit Health or CityMD clinics at its stores or integrate their FFS urgent or multi-specialty care business with VillageMD's value-based, primary care business. Instead, Summit Health and CityMD would continue to be run as separate businesses under the VillageMD umbrella. Significantly, the financial performance of Summit Health and CityMD were rolled up with VillageMD and those

of the U.S. Healthcare's other portfolio businesses, and reported to investors together. Accordingly, after the VillageMD/Summit Acquisitions, investors had even ***less*** transparency into whether the Company's strategic shift to providing primary healthcare at Walgreens stores was being successfully executed—or, for that matter, was contributing ***anything*** to the Company's bottom-line.

78. As the calendar turned to 2023, Defendants continued to assure investors of the "great progress" of the pivot into the healthcare market, highlighting the purported continued progress and successful execution of the VillageMD clinic rollout. For example, during the Company's January 5, 2023 Q1 2023 earnings call, Brewer boasted that "VillageMD is leading the way in value-based care for the country, with 393 clinics as of year-end, including 200 co-located with Walgreens, achieving the calendar 2022 target."

79. Defendants continued to back-up their clinic count updates with specific statements that the VillageMD clinics were performing successfully and consistent with Walgreens' targets. For example, during the Company's Q2 2023 earnings call, Driscoll stated unequivocally that "***the Village model works, and we've seen it work*** … ***in multiple geographies***." Driscoll underscored that "***we don't see any challenges to the actual model of what we're delivering for patients and with providers in those markets. So the trends are positive***." Brewer reiterated the point, telling investors the VillageMD rollout was continuing "***as we designed and planned***."

80. Analysts credited Defendants' continued reassurances and increased their price targets for Walgreens' shares. For example, in a March 28, 2023 report, J.P. Morgan explained it was increasing its price target for Walgreens from $40 to $43 per share given that "WBA reaffirmed its initial FY23 guidance[,]" noting that much of the Company's second quarter earnings call "Q&A focused on the cadence of earnings, the efforts to recapture lost scripts, and the outlook for

the recently completed VillageMD/Summit deal." A Morningstar report issued the same day noted that "U.S. Healthcare increased more than 200% in the quarter, including VillageMD's acquisition of Summit Health in early January. Walgreens continues to show promising growth in the segment; it now operates 210 co-located VillageMD clinics, up from 200 at the end of 2022." A Loop Capital report on March 29, 2023 lauded Walgreens' acquisitions of VillageMD and Summit, dubbing them to be "among the most promising of all the large deals done over the past year by managed care companies." The report underscored that "the healthcare business is surging" "fueled by the rapid development of new clinics" for VillageMD, and ***with "the healthcare business potentially breaking even over the next quarter or two, we believe that WBA's promise is not far away***."

81. In reality, the VillageMD/Summit Acquisition was nothing more than a veiled effort to mask the total failure of Walgreens' "transformational" strategy of providing full-service, primary healthcare by doctors "under the same roof" as its pharmacists "at a large scale." Indeed, Summit Health and CityMD were focused on completely different patient populations (urgent and specialty care), followed a different model than VillageMD (fee for service vs. value-based care), and, most importantly, were never "co-located" at Walgreens' stores or otherwise integrated into its business. Accordingly, their acquisition did nothing to support Defendants' continued assertions a year and a half into the Class Period (and over two and a half years after Walgreens' initial $1 billion investment) that "the Village model works" and was trending in a positive direction, with profitable growth just quarters away.

### E. In Truth, Defendants Knew VillageMD Was Substantially Underperforming Targets And The Co-Located Clinics Faced Severe Obstacles

82. Defendants' claims since the start of the Class Period that Walgreens was successfully executing the VillageMD clinic rollout and was "on track" to meet or exceed Walgreens' targets were materially false and misleading. While Defendants repeatedly

underscored to investors that they had successfully rolled out 200 clinics in the first two years after the Houston Pilot Program and touted that "our bold strategy is working," and would be the catalyst for "sustainable, long-term, profitable growth," in reality, Walgreens could not profitably scale, or even profitably operate, the VillageMD business at any time throughout the Class Period. Basic obstacles doomed the co-located clinics from inception, including a systemic shortage of doctors to staff the "Village Medical at Walgreens" clinics and extremely low demand from patients to receive primary care treatment at a Walgreens store. These problems were widely known and recognized internally, including by the Individual Defendants, yet hidden from investors.

83. The truth about Walgreens' disastrous foray into primary healthcare was described to Plaintiffs in cross-corroborating and overwhelming detail by over twenty former employees of Walgreens, VillageMD, Summit Health, and CityMD, each of whom had direct knowledge of the underlying facts.[3] These former employees spanned virtually every level of the companies, from regional managers through executives, and worked at locations throughout the United States, including in Walgreens' and VillageMD's corporate headquarters. Significantly, they include individuals directly tasked with overseeing the build-out of the clinics, finding doctors to staff them, finding patients to visit them, and analyzing and reporting the results to management. Collectively, these former employees described how before and throughout the Class Period, VillageMD consistently failed to perform as expected because: (i) VillageMD could not hire anywhere close to a sufficient number of physicians and other prescribers to work at co-located clinics; (ii) VillageMD failed to attract patients willing to be treated at co-located clinics; (iii) Walgreens engaged in a strategy of placing a large number of co-located clinics in poorly

[3] Former employees are referred to herein as "confidential witness" or "CW #" and are all referenced herein in the masculine form to maintain their confidentiality.

performing stores, which only exacerbated these systemic issues and further contributed to VillageMD's significant underperformance; and (iv) VillageMD refused to accept Medicaid, which undermined the anticipated prescription uplift synergies for Walgreens.

84. Together, these structural, operational, and strategic obstacles caused the "***vast majority***" of co-located clinics to substantially underperform Walgreens' targets. Indeed, as the confidential witnesses described in detail, by mid-2022—less than one year after Defendants invested $5.2 billion in VillageMD and announced Walgreens was "all in" on healthcare—***Defendants secretly determined to abandon the highly-touted Walgreens-VillageMD clinic rollout altogether***. Shortly thereafter, in April and June 2023, both Walgreens and VillageMD undertook massive layoffs, which included their entire "Implementation Teams"—*i.e.*, each company secretly fired every single employee responsible for executing Walgreens' expansion of VillageMD a full year before the end of the Class Period. Defendants knowingly concealed these highly material facts from the market. Additionally, Defendants' investment of another $3.5 billion in November 2022 to enable the VillageMD/Summit Acquisition was nothing more than a veiled effort to mask VillageMD's dramatic underperformance, and merely created a short-lived façade of success before the whole house of cards collapsed.

85. Significantly, Plaintiffs' investigation further unearthed corroborating confidential witness accounts demonstrating that the Company's most senior officers, including all of the Individual Defendants, were well aware throughout the Class Period that VillageMD faced these insurmountable obstacles and that the vast majority of VillageMD clinics ***never*** met Walgreens' expectations. Indeed, as further detailed below, numerous former employees consistently described how the issues preventing VillageMD's rollout from being profitable were widely known and routinely discussed at both Walgreens and VillageMD, including by the Individual Defendants

and other Walgreens' executives, each of whom participated in regular meetings, received regular reports, and had access to multiple key performance metrics demonstrating VillageMD's dramatic underperformance.

### 1. The "Vast Majority" Of Co-Located Clinics Underperformed Because Physicians Were Unwilling To Work At And Patients Were Unwilling To Be Treated At Walgreens Stores

86. Throughout the Class Period, Defendants disseminated a steady stream of press releases announcing Walgreens' opening of new VillageMD clinics in multiple markets across the country, including in Texas, Arizona, Florida, New Hampshire, Massachusetts, Nevada, Colorado, and Illinois. Defendants also routinely represented to investors that the number of VillageMD clinic openings was a "key performance indicator" for Walgreens, and in nearly all of the Company's Class Period press releases and earnings calls Defendants attested to the success of VillageMD's ongoing clinic rollout by assuring investors that Walgreens remained "on track" to open 600 co-located VillageMD clinics by 2025 and 1,000 by 2027, and was therefore "poised for explosive growth." However, unbeknownst to investors, far from being "on track" to become the largest contributor to Walgreens' "next growth engine," VillageMD at all times was severely underperforming. As succinctly summarized by CW 1, who served as a National Medical Director and Executive Vice President of VillageMD,[4] "***there were some serious performance issues at Village***," including "***finding doctors with patient panels in close proximity to a co-located clinic, and finding doctors willing to work in a Walgreens store at all***."

87. The first region that Walgreens targeted for the "VillageMD at Walgreens" clinic rollout following the purportedly successful Houston Pilot Program was the U.S. Southwest,

[4] CW 1 served as the National Medical Director at VillageMD from September 2020 until July 2022, and Executive Vice President of VillageMD from December 2021 until July 2022. CW 1 was responsible for managing people and leading governance. He reported directly to the C-Suite.

specifically, Arizona. During the Class Period, Walgreens issued no less than nine press releases highlighting VillageMD's opening of dozens of new clinics in multiple markets in Arizona. Thus, the success of Walgreens' multi-billion-dollar investments to expand the footprint of VillageMD was heavily dependent upon how the clinic rollout in the Arizona market fared. Each of these press releases attested to the success of the Arizona rollout, the fact that VillageMD's Arizona clinics were not only open but actually operating with doctors on-site to treat patients and, if necessary, prescribe medications, and that demand from patients seeking to use the clinics after they were opened was strong. In reality, however, the exact opposite was true.

88. As discussed below, multiple confidential witnesses personally responsible for implementing and overseeing the Arizona clinic rollout confirmed it was a complete failure from inception, and in fact, VillageMD never came close to hitting Walgreens' prescriber or patient volume targets at the overwhelming majority of co-located clinics in Arizona at any time before or during the Class Period. For instance, VillageMD's former Executive Director and Market President for Arizona, CW 2,[5] stated that he opened 30 clinics in Arizona in 2021, and "***all of them***" underperformed, adding "there were times when I pushed back and said – 'why would we continue to open these if we know they're not profitable?'" but he was told that VillageMD had made a commitment and was going to continue opening them regardless.

89. Critically, the issues facing the Arizona region—a shortage of doctors to adequately staff the clinics, and a lack of patient demand for the clinics—occurred in virtually every subsequent region that Walgreens sought to penetrate. Former employees uniformly stated that

[5] CW 2 served as an Executive Director for VillageMD in Arizona from February 2021 until December 2021, and the Market President in Arizona from January 2022 until September 2022. CW 2 was responsible for opening both stand-alone and co-located clinics in the Arizona area. He coordinated with the local and national Implementation Teams and reported to VillageMD's Regional President for the Arizona region, John West.

the dearth of providers and patients utilizing the co-located clinics resulted in the "vast majority" of co-located clinics nationwide substantially underperforming Walgreens' targets. For example, CW 1 reported that throughout his tenure at VillageMD, the "***vast majority of the Walgreens co-located clinics were underperforming***" Walgreens' expectations and "Florida in particular, was a struggle." In fact, CW 1 insisted that other than the pilot project in Houston, Texas, and a few other sites, where VillageMD already had acquired physician practices with full patient panels, he could not recall "***a single co-located clinic***" that performed up to Walgreens' projections. And, according to CW 1, this pervasive underperformance affected all markets and regions, and persisted from September 2020 until at least July 2022 when he left VillageMD. As discussed below, the pervasive lack of supply and demand for the clinics resulted in dramatic underperformance in states across the country, including Arizona, Florida, Texas, New Hampshire, Nevada, Colorado, Illinois, and Rhode Island.

90. Multiple other former employees confirmed that the vast majority of clinics were substantially less profitable than Walgreens anticipated and consistently underperformed. For instance, CW 3, a Business Development Director for VillageMD from April 2019 until June 2023,[6] reported that on a national level, only "30% of the co-located clinics did well," and the other 70% "***were dismal failures***." CW 3 recalled that there were only "a handful of clinics that did well," such as those "where doctors were able to bring the vast majority of their patients over" to the clinics or were "not moved into a co-located Walgreens site" at all, but rather "left at the legacy practice because they had the right patient population." CW 3 explained that the remaining

[6] CW 3 was responsible for identifying and recruiting physician practices for VillageMD's clinics in Arizona. CW 3 had previously worked with VillageMD prior to its partnership with Walgreens, focusing on offering management services to medical practices interested in transitioning to value-based care and he brought this knowledge of networks and physician practice groups to the identification of practices for acquisition and subsequent co-location at Walgreens.

stores, or "***roughly 70%***," underperformed expectations, many by a wide margin, and were "***dead weight***" that brought "***everybody down***."

91. Not only were the clinics so obviously failing financially, but numerous confidential witnesses recalled that the underperformance was very quickly apparent. The underperformance was manifest in the critical Arizona region. As CW 4, who served as VillageMD's Director of Clinical Operations in Arizona,[7] confirmed, provider shortages and lack of patient demand were "big problem[s]" that were "well known" from the time he started at VillageMD in July 2021, and "nothing changed" by the time he left in August 2022. Once again, the dramatic financial underperformance of co-located clinics was obvious not only in Arizona, but virtually all other regions Walgreens sought to penetrate. For instance, CW 5, a Walgreens Regional Implementation Team Lead in Florida from July 2021 until April 2023,[8] stated that from the outset of the VillageMD rollout, it was clear internally that the clinics were "***not performing up to Walgreens' expectations***" given that "all the store managers" routinely would tell him that "***they weren't getting the results they anticipated***." Accordingly, he recalled that "very soon" after the Walgreens-VillageMD partnership began, "***it looked less and less likely that it was going to succeed***" and he knew "there's definitely a problem here," adding that Walgreens' and VillageMD's employees "all knew that something wasn't right."

---

[7] CW 4 was VillageMD's Director of Clinical Operations in Arizona from July 2021 until August 2022. CW 4 was previously the Director of Clinical Operations for Hatfield starting in August 2020, and became employed by VillageMD in July 2021 when it acquired Hatfield. CW 4 was responsible for nine Walgreens-VillageMD buildouts. CW 4 reported to Executive Director/Market President of Arizona, CW 2.

[8] CW 5 started working for Walgreens in July 2018 as an Assistant Store Manager in Clearwater, Florida. In July 2021, he became a Regional Implementation Team Lead for the South Florida market where he was responsible for aisle updates, fixture removal and other store upgrades during the rollouts until he was laid off by the Company in a mass layoff in April 2023.

92. CW 6, VillageMD's Regional Practice Administrator in Rhode Island,[9] stated that it was clear VillageMD was a "sinking ship" within six months of joining VillageMD in March 2021. CW 7,[10] the VillageMD Senior Director of Strategic Growth, ***stated that he had visibility into all markets and it was obvious to him by late 2021 that the investment was struggling***. Similarly, CW 8,[11] a Walgreens Regional Implementation Team Lead in Florida from January 2019 until June 2023, who managed buildouts on the Walgreens' side of the stores, stated that he realized the Walgreens-VillageMD concept was flawed and destined to fail in 2021, about a year after he began work on the buildouts. Finally, CW 9,[12] the former Director of Revenue Cycle Management for Walgreens' U.S. Healthcare segment ***who reported directly to the segment's CFO*** from September 2021 until he was let go in July 2023, likewise advised that he realized Walgreens did not get the return with VillageMD they were looking for "a couple of months after I started. ***I'm serious. It was very obvious***."

**a. Physicians Were Unwilling To Work At Walgreens Stores**

93. The first obstacle preventing VillageMD's co-located clinics from profitably operating was a severe shortage of physicians willing to work in those clinics. As multiple

[9] CW 6 served as Director of Operations for Ocean State Urgent Care in Rhode Island starting in 2013. He became a Regional Practice Administrator for VillageMD in Rhode Island when VillageMD acquired Ocean State in March 2021. He stayed with VillageMD in the Regional Practice Administrator role until October 2021.

[10] CW 7 started at Village MD in March 2020 as the Director of Physician Network Development. He was promoted to Senior Director of Market Initiation and then elevated to Senior Director of Strategic Growth where he was responsible for recruiting physicians to Walgreens' co-located clinics.

[11] CW 8 was with Walgreens for 26 years until he was laid off from the Company in June 2023. His last title was as Regional Implementation Team Lead where he was responsible for managing buildouts and staging inventory on the Walgreens side of the stores that were receiving co-located VillageMD clinics. He worked on new, co-located clinic build outs in Florida, Georgia, Indiana, Illinois and Texas.

[12] In this role, CW 9 was responsible for receivables, billing and collections for medical services as well as Walgreens' organic portfolio. He reported to the then-CFO of the U.S. Healthcare division, John (Quon) Do.

confidential witnesses overwhelmingly confirmed, from the very beginning of the Walgreens-VillageMD relationship and throughout the Class Period—in direct contrast to Defendants' representation during the Class Period that "we're really not seeing a labor issue on our [U.S. Healthcare] side"—physician staffing shortages were experienced at Walgreens' clinics nationwide.

94. For instance, CW 3, a Business Development Director at VillageMD from April 2019 until June 2023 who identified and recruited physicians willing to relocate to Walgreens' clinics, recalled that there were "real challenges" from the very beginning with respect to staffing physicians who could bring a full panel of patients into Walgreens. CW 3 explained, "the challenge was trying to identify practices that were in close proximity to set up clinics so that you could retain the lion's share of those patients when the doctor and staff moved over" to Walgreens.

95. According to CW 3, many doctors were reluctant to give up their independent practices to go work at Walgreens, worrying that doing so would effectively make them a "***doc-in-a-box***." As a result, CW 3 emphasized, "***trying to get doctors to come on board was very challenging. You had to peel them off the ceiling***." CW 3 further explained that Walgreens faced significant competition to purchase physician practices with a full "panel" of patients, especially in markets that served more profitable older/Medicare patient populations, such as Arizona, Florida, and Texas. Beginning in 2021, and into 2022, VillageMD was forced to offer premium prices to induce independent doctors to sell their practices and move into a clinic, as competitors and private equity firms were "***throwing all kinds of money at these doctors***." Consequently, the costs associated with staffing Walgreens' clinics were astronomical.

96. The inability to recruit physicians, CW 3 recalled, was so bad that it resulted in a number of VillageMD clinics in Arizona "***never being able to recruit a doctor***," and instead, being

forced to staff the clinic with "***mid-level nurse practitioners***." CW 3 also stated that these issues "***never improved***" during his tenure, which ended in June 2023.

97. CW 4, who served as VillageMD's Director of Clinical Operations from July 2021 until August 2022, similarly stated that the goal was to "***buy as many [medical] practices for top dollar and throw them into a Walgreens***," but the buildouts were "***ramped up***" ***too fast*** and VillageMD could not adequately staff the clinics. He described a frantic six-month period during his tenure in which one to two clinics opened every two weeks. VillageMD was throwing large amounts of Walgreens' money into recruiting and purchasing medical practices, and rapidly building out the clinic sites, but "there was no consideration or thought of how to sustain this growth or a marketing plan associated with this project." CW 4 added that "***finding a physician is difficult***" in the first place, and it only "***became harder***" during his tenure.

98. CW 2, an Executive Director and the Market President for VillageMD, corroborated the accounts of CW 3 and CW 4, stating ***he personally opened 30 clinics in Arizona in 2021***, "***all of them***" underperformed, and "***the problem was finding providers***." CW 2 added that because "it took us so long to get providers," clinics slated to open often experienced delays in opening or were ***never*** opened.

99. CW 10, a Practice Manager for VillageMD in Phoenix, Arizona from March 2020 until September 2022 responsible for staffing Walgreens-VillageMD clinics,[13] corroborated that the VillageMD initiative significantly underperformed expectations in Arizona markets. Specifically, CW 10 stated that in or around March 2021, it was announced during a "town hall"

[13] CW 10 worked as a Practice Manager for Hatfield of Arizona prior to VillageMD acquiring Hatfield. CW 10 managed two standalone centers, Arizona Inpatient Medicine in Tucson, Arizona and Red Mountain Medical Center in Mesa, Arizona. CW 10 was responsible for the day-to-day operations of those clinics, including financials and staffing. CW 10 reported to CW 4, former Director of Clinical Operations for VillageMD, who reported to Executive Director/Market President of Arizona, CW 2.

video meeting that VillageMD would be acquiring Hatfield Medical Group ("Hatfield"), an Arizona-based physician practice, and building out VillageMD clinics in Walgreens stores in the Arizona market. According to CW 10, following the town hall, "***everyone knew it was going to fail***" because the market could not support the business plan. CW 10 elaborated, "***the model was not sustainable. They couldn't hire physicians as fast as they were building in Walgreens***." As a result, CW 10 explained that VillageMD built out approximately 40 Walgreens co-locations that they "***were never able to staff***" during his tenure.

100. CW 7, who was responsible for recruiting physicians to Walgreens' clinics, similarly explained that VillageMD's staffing difficulties were so severe that sites in Arizona were staffed with "***physicians who were not even practicing in Arizona or nearby***."

101. The lack of physicians caused VillageMD to change business practices. CW 4 explained that, at first, co-located VillageMD clinics were supposed to be open seven days a week, but some did not have any providers willing to work nights or weekends. As a result, CW 4 recalled that VillageMD reduced its clinical hours of operation to close at 5 p.m. on weekdays and to be closed altogether on weekends, resulting in significantly fewer hours for doctors that were willing to work at Walgreens to be able to generate revenue by seeing patients. CW 8, who was responsible for managing buildouts on the Walgreens side of the stores, corroborated these facts, recalling that the clinics were supposed to be run as full-service clinics with extended operating hours, but VillageMD was so understaffed that closing time was changed to 5 p.m. and weekend operations ceased.

102. Importantly, these critical operational and performance issues were not limited to Arizona, but affected VillageMD markets nationwide. Indeed, CW 3 attested that he learned during bi-weekly conference calls he attended with VillageMD's national growth teams, as well as

from direct calls and communications with colleagues in other regions, that the same staffing challenges were "not at all unique to Arizona," and in fact, "***there were significant staffing issues across the country*** and the issues never improved." He estimated that "***well upwards of 50% of Village clinics [nationwide] had staffing shortages***." To this point, CW 5, a Walgreens Regional Implementation Team Lead in Florida from July 2021 until April 2023, specifically recalled several locations in Florida where "***construction was done***" but the "***stores sat empty for months… because doctors were not available***." CW 5 also corroborated that the staffing issues expanded beyond Arizona and Florida, and were nationwide, based on text exchanges with his colleagues in other markets about whether certain co-located clinics were "***ever going to open***."

103. CW 8, another Walgreens Regional Implementation Team Lead who was personally responsible for building out 20-30 co-located clinics across five markets; Florida, Georgia, Indiana, Texas, and Illinois, likewise recounted that Walgreens opened clinics "***too fast and*** that ***doctors and nurses could not be recruited to properly staff them***," therefore "***there was nobody to run them***." Echoing CW 3's account, CW 8 reiterated that multiple clinics "***sat empty for months***," adding that a member of his own family tried to use a location near his house and "***got turned away was told there were no openings***."

104. Indeed, co-located clinics in Rhode Island and Texas suffered the same fate. CW 6, a VillageMD Regional Practice Administrator in Rhode Island from March 2021 until October 2021, similarly recalled that VillageMD was struggling to staff clinics well before the start of the Class Period, explaining that VillageMD simply "***did not have enough staff to support all the centers that they were acquiring***." CW 6 added that "***VillageMD just kept buying and buying and they were not sustaining what they had prior to investing in new offices***."

105. CW 11, a VillageMD Regional Administrator who was responsible for clinic buildouts, and practice group acquisitions in the Houston, Texas region from November 2020 until February 2022,[14] specifically ***recalled five to ten facilities "going on-line"*** in mid-2021 that had "***no doctors to staff them***" and stated, "we knew we weren't going to fill the vacancies." According to CW 11, the "opening" of those clinics served no other purpose but to allow ***VillageMD and Walgreens to "cook the books and look super profitable***." Additionally, CW 11 regularly expressed his concerns that buildouts could not be staffed appropriately by medical doctors during weekly meetings. His group inevitably would say "***why are we scaling so fast? Do we have enough patients and doctors***?" but his superior, Pamela Conrad,[15] would tell his team: "Don't worry about it. ***We were being told by the tippy top to just build it***."

106. CW 12,[16] a VillageMD National Medical Director in Texas from February 2023 until August 2024, primarily focused on the performance and profitability of existing clinics by analyzing data to support projections, plans, and financial forecasts. He explained that the difficulties staffing co-located clinics with physicians that had adequate patient panels were not resolved as the Class Period progressed and similarly attributed the problem to Walgreens opening "***too many clinics, too fast***."

---

[14] CW 11 served as a VillageMD Regional Administrator in the Houston, Texas region from November 2020 until February 2022. He was responsible for VillageMD clinic buildouts, practice group acquisitions and training. He reported to VillageMD's Vice President of Practice Operations for Houston, Texas.

[15] Pamela Conrad ("Conrad") was Vice President of Practice Operations, Houston, Texas. Conrad directly reported to the CEO and Chairman of VillageMD, Tim Barry.

[16] CW 12 served as a National Medical Director for VillageMD in Texas from February 2023 until August 2024. He focused on the performance and profitability of existing clinics by analyzing data to support projections, plans and financial forecasts. CW 12 reported to Chief Physician Executive, Dr. David Hatfield, among others.

### b. Patients Were Unwilling To Be Treated At Walgreens Stores

107. Another substantial obstacle plaguing VillageMD's profitability was chronically insufficient patient demand for receiving primary care services inside Walgreens. Indeed, even in the unusual circumstance when VillageMD was able to find enough doctors and nurse practitioners to appropriately staff co-located clinics, very few patients were interested in receiving their primary care treatment there. Numerous former employees of VillageMD and Walgreens explained that—in direct contrast to Defendants' representation during the Class Period that "demand for healthcare services in our stores has never been higher"—in truth, the vast majority of clinics nationwide consistently experienced extremely low patient demand before and throughout the Class Period. For instance, CW 3, a long-term Business Development Director for VillageMD, estimated that only "***30%***" of co-located clinics "***on a national level***" had patient panels that were full enough to meet Walgreens' financial projections, ***meaning that approximately 70% of clinics were at all times underperforming Walgreens' targets.*** CW 3 added that from April 2019 up until the time he left in June 2023, "***these problems never got solved***." And the VillageMD Director of Clinical Operations, CW 4, corroborated that beyond prescriber staffing, the "***bigger issue was a shortage of patients***," certain providers would "***see only three patients a day***," and the lack of patients was such a "***big problem***" that Walgreens expected ***its own employees*** to stem the shortage and become patients of VillageMD.

108. Confidential witnesses detailed a host of reasons why VillageMD faced significant obstacles in recruiting and retaining patients at the co-located clinics.

109. *First*, it was difficult to find doctors with full patient panels in close proximity to the clinic locations that Walgreens selected who were willing to relocate, which resulted in VillageMD recruiting and acquiring physician practices without ***any*** portable patient panels. CW

3 attributed this to the fact that most of the clinics were located in underserved areas where "***they couldn't find a doctor that had a panel***." However, CW 3 explained that "***an effort had to be made to capture any physicians they could***" and, as a result, "a number of the physicians that were ultimately hired came out of enclosed environments where they were with a system or a hospital," and "***they didn't have any panels to speak of at all***, because the system owns the patients."

110. *Second*, confidential witnesses reported that the pace of the rollout was so rapid and relentless that it prevented Walgreens and VillageMD from being able to focus on growing patient panels at existing clinics. CW 1, VillageMD's National Medical Director, reported that "***at one point they were opening one or two clinics a week, clearly more clinics than they had patients for***," so "now you're paying a whole staff to manage a clinic with maybe six or eight exam rooms ***without the patient panel to actually create any revenue whatsoever***."

111. *Third*, even when VillageMD was able to acquire a physician practice with an existing patient panel, there was significant patient "leakage"—*i.e.*, when a patient leaves a provider's network to seek care elsewhere. As CW 3 explained, a big reason for this leakage was that many patients were reluctant to travel to a new site, especially if it was five or more miles away from where their primary care clinic was previously located. Thus, according to CW 3, patient "***retention was [not] as robust as anyone had forecasted*** or would have liked." CW 4 similarly noted that it was hard to retain patients when physicians moved to clinics because "***people don't want to move***." "***You find providers, either close to work, or close to home***," then your provider "***picks up the practice and puts it in a Walgreens sometimes 10 miles away and expects that membership to go with them***," but on many occasions that did not work out.

112. CW 13,[17] a former Walgreens Vice President of Pharmacy and Retail Operations who left in November 2023 after 20 years with the Company, confirmed that when VillageMD started "going farther and farther out from the Walgreens store to get prescribers to join VillageMD," their "***patients weren't coming to the Walgreens***." Walgreens thought that patients within a certain trade area would be willing to go to a new office. "***That model didn't work***."

113. *Fourth*, multiple CWs described how patients often didn't understand that primary care is what the clinics were providing. For instance, CW 14,[18] a VP of Market Integration for VillageMD, described breaking the "perception of [VillageMD] being a MinuteClinic"[19] as a significant "challenge" and "a difficult thing to overcome." CW 4 similarly explained that there was no marketing strategy to explain how the clinics were not a nurse practitioner minute clinic, and the project was viewed by the public as an urgent care. Walgreens felt, "***if you build it they will come***," but they never did.

114. CW 2, a VillageMD Executive Director and Market President, similarly confirmed that "[VillageMD] struggled to get patients to go from regular clinics to the co-located clinics" because "***they associated it with the old Walgreens model or CVS model of minute-clinics*** where

[17] CW 13 was with Walgreens for 20 years, from March 2003 to November 2023, and last served as Vice President Pharmacy and Retail Operations for the southwest. Prior to that time, he was a District Manager (2003-2009), Regional VP (2009-2015), Divisional VP (2015-2017), and Regional VP (2017-2019). It was his responsibility to oversee operations at the co-located clinics and build relationships between VillageMD and the Walgreens' store teams at each location. CW 13 advised that in 2019, as a Regional VP for the southwest region, he took over this role for the Arizona, Utah, Nevada, and Colorado markets.

[18] CW 14 served as the VP Market Integration at VillageMD from February 2020 until January 2021. He was originally tasked with build outs and staffing in the Phoenix market. The role expanded into responsibility for sourcing locations nationwide for new clinics.

[19] A "MinuteClinic" is a retail medical clinic operated inside CVS Pharmacy locations that provides basic medical services, such as routine vaccinations, physical exams, and treatment for common illnesses such as cold and flu, allergies, and minor injuries. These clinics are typically not staffed by physicians, but by nurse practitioners and physician assistants, and these clinics are unable to treat the same range of conditions as traditional healthcare clinics.

it was out in the open. That's what most people thought it was. They didn't realize that it was a full clinic with a waiting room." A former Walgreens Regional Manager for Implementation in South Florida who opened in excess of 20 co-located clinics, CW 15,[20] likewise stated that the clinics in Florida were not as busy as anticipated and attributed the lack of patient demand to the fact that "***people weren't really grasping the idea that this was a primary care doctor's office attached to a Walgreens***" or even "thinking about the concept of having a primary care physician within a Walgreens." And CW 16,[21] who was responsible for VillageMD's operations across five markets in Indiana, Michigan, Illinois, and Kentucky as a Regional President Central Region from January 2016 until July 2023, elaborated that "having the business model of waiting for someone to go into a Walgreens for an ear infection and hoping they then become a permanent patient is poor branding and business model. ***After they would see the doctor, the patient would never show again***."

### c. Walgreens' Strategy of Opening Clinics At Poorly Performing Stores Exacerbated VillageMD's Underperformance

115. Before and during the Class Period, Walgreens engaged in a strategy of placing the co-located clinics in poorly performing stores in hopes of boosting those stores' profitability, which came at a great cost to VillageMD's success. The idea behind doing so was that patients visiting VillageMD's clinics would now fill their prescriptions at Walgreens and also increase the store's

---

[20] CW 15 held various positions at Walgreens for 21 years, initially starting as a Certified Pharmacy Technician in 1999. From March 2019 until he was laid off in July 2023, CW 15 was Regional Manager, Implementation, Region 6, South Florida. In this role, CW 15 opened more than 20 co-located clinics. CW 15 started work on his first co-located store in July 2021 in Pinellas Park, Florida.

[21] CW 16 was responsible for VillageMD's operations across five markets in four states (Indiana, Michigan, Illinois and Kentucky) as the Regional President Central Region for VillageMD from January 2016 until July 2023. In this role, he was responsible for 115 employed providers, 45 affiliated independent providers, and 2,000 independent physician association providers. By the end of his tenure at VillageMD, he was reporting to the former Chief Financial Officer/Chief Operating Officer of VillageMD, Chris Ricuarte.

retail sales via increased foot traffic. As directed by Defendants, however, this strategy meant VillageMD clinics were often built in undesirable and unsafe areas, making it even more difficult for VillageMD to attract sufficient numbers of providers and patients. Thus, in direct contrast to Defendants' representations during the Class Period that the VillageMD partnership was "***a significant growth catalyst***" and "***we don't see any challenges to the actual model of what we're delivering for patients and with providers in those markets***," numerous former employees confirm that, in truth, Defendants' strategy for selecting site locations resulted in exactly the opposite.

116. As an initial matter, multiple CWs, including CW 2, a VillageMD Executive Director and Market President, and CW 1, the National Medical Director for VillageMD, among others, confirmed that Walgreens dictated the locations where each of the VillageMD co-located clinics would be built out. According to CW 2, Walgreens overwhelmingly located clinics in "***stores where they did not have high profitability***" and refused to surrender retail square footage to VillageMD at highly profitable stores, regardless of whether the location was a better fit for VillageMD's model: "we'd go through this whole process with the Growth Team – okay, you have to open three more, where in the valley do you need them," and his team would select a store in a desirable location such as Scottsdale, only to be told by Walgreens "***no, you can't have that one – that one's absolutely off the table***." Consequently, CW 2 explained that clinics were often located in undesirable and "***high Medicaid areas***," which reduced the profitability of VillageMD's business model and resulted in a "revolving door of providers."

117. CW 1 corroborated that Walgreens "absolutely" selected the sites for clinics, and that it was clear that Walgreens was not focused on locations that were best positioned to succeed, and instead simply selected stores that were poorly performing. He advised that "***they've taken***

***these Walgreens that weren't super productive in terms of stores and turned part of that store into a clinic. Already at baseline, the stores weren't highly productive as they became Village Medical***." He stated that many of these underperforming stores were located in less than desirable areas, including northern Indiana, areas south of Houston, and around Orlando, and opening clinics in these areas proved to be a challenge.

118. CW 17,[22] Walgreens' Group Vice President, Operations Planning and Strategic Initiatives from May 2019 until May 2022, ***described the conflict between where VillageMD wanted clinics versus where Walgreens wanted them as "the biggest issue" with the VillageMD rollout***. He explained that Walgreens needed VillageMD to move into Walgreens stores where the retail store was "not producing" and "the front-end is not profitable," but "[t]hat's not where [VillageMD] wants to go. [VillageMD] wanted the corner." He emphasized that these "***competing interests***" prevented Walgreens from scaling the clinic rollout to the level and profitability it anticipated.

119. Similarly, according to CW 7, VillageMD's former Senior Director of Strategic Growth, Walgreens disregarded where doctors "wanted to practice," and instead placed VillageMD clinics in stores that were underperforming with the hope that putting a physician practice there would increase pharmacy revenue. CW 7 explained that Walgreens' poorly performing stores tended to be located in run-down neighborhoods where there were homeless people or drug activity. He stated that the areas selected were "not at all appealing," and patients were reluctant to use clinics in these areas. The resulting lack of patient demand was such a big issue, according

[22] In this role, CW 17 was responsible for overseeing the operations for all sites, running the labor model, and overseeing all pilot operations. He reported to a Senior Vice President. Prior to becoming Group Vice President, Operations Planning and Strategic Initiatives, CW 17 served as Group Vice President, Acquisitions and Integration from January 2017 until May 2019, Vice President Integration Management Office from January 2016 until December 2017, and in various other roles at Walgreens for over twenty years.

to CW 7, that VillageMD was asking Walgreens for help in generating and referring more patients to these clinics. CW 3 likewise stated that staffing issues were exacerbated by Walgreens placing clinics in "***high crime areas***" and "***extremely undesirable locations***," recalling the problems were so acute at some locations, that he wondered – "***What the hell are we doing here. There was no way that we were going to get a doctor in there***."

120. In addition to exacerbating the physician and patient shortages that were already causing VillageMD's clinics to underperform, Defendants' strategy of placing clinics in undesirable store locations had another negative side effect; namely, the primary patient pools in those areas were patients insured, most commonly, by Medicaid. However, despite Defendants' routine assurances during the Class Period that VillageMD was "payer agnostic" and "served patients across all socioeconomic statuses," including "Medicaid," that was not the case. VillageMD did not accept patients insured by Medicaid. Thus, Defendants' selection of where to build out most co-located clinics effectively prohibited Walgreens from benefiting from prescription uplift synergies generated by the partnership.

121. As CW 1 explained, Defendants' decision to open about 50% of co-located clinics in underserved areas where there were large populations of Medicaid patients "***definitely created headwinds***" for Walgreens primarily because "***VillageMD did not accept Medicaid. Period.***" Thus, CW 1 explained that, if a patient was on Medicaid, that patient could not be treated at a VillageMD clinic unless the customer paid out-of-pocket—a highly unlikely situation for any patient, but particularly for patients who qualified for Medicaid. As a result, as CW 1 explained, VillageMD could not have provided any "uplift" in the number of prescriptions filled by Walgreens for patients on Medicaid. "There would have been none." CW 1 reiterated: "***It would never work the way they had set it up" because "Village wasn't in the business of taking Medicaid patients***."

122. Walgreens' Regional Manager for Implementation, CW 15, similarly confirmed that Walgreens established many co-located sites in areas with high Medicaid populations even though VillageMD did not accept Medicaid. CW 15 advised that his Pinellas Park store was in a fairly low-income area, and that he had a store in St. Petersburg that was just 200 yards from the main bus depot, adding that the idea of placing primary care facilities in areas that had been medically underserved "***was another red flag***" and simply made no sense: "***You don't take Medicaid, but that's what the primary patient group is here***."

### 2. Walgreens' VillageMD Initiative Was Such An Obvious, Unmitigated Disaster That Defendants Secretly Abandoned The Clinic Rollout In Mid-2022, Mere Months Into The Class Period, And Then Fired Everyone Responsible For Opening New Clinics

123. Multiple high ranking former employees of both Walgreens and VillageMD confirm that the VillageMD rollout was proceeding so poorly that, ***by mid-2022***, ***Walgreens' management had secretly made the critical, strategic decision to put a hold on, and begin winding down, the opening of all new co-located VillageMD clinics nationwide***.

124. Indeed, CW 5, the Lead for the Walgreens Regional Implementation Team in the Florida market, described how ***by mid-2022, the entire rollout of VillageMD co-located clinics had been put on a nationwide hold***, explaining that "we had multiple stores that were slated to go through the conversion and, ***all of a sudden…, in mid-2022, they were all put on hold***." CW 5 recalled that at the beginning of the rollout, there was a preliminary schedule of about 40 stores that were projected for opening in his Tampa Bay/Orlando district and "all of these were in the process of happening, and then got put on hold." He explained that "they slowed it to a crawl and then they just said – we're not doing any more." He noticed this slowdown by the summer of 2022.

125. CW 5 further confirmed that the rollout hold occurred at this time not only in his Florida market, but nationwide, stating "there were many conference calls that happened that told us that all the projects had been put on hold." CW 5 further explained these conference calls were weekly or biweekly, were hosted by a representative from Walgreens' corporate office related to the VillageMD projects, and that "***discussions about slowdowns with the VillageMD rollout and shifting priorities started sometime around May 2022***."

126. After the VillageMD clinic rollout was put on hold, CW 5 recalled that the focus of the Implementation Teams shifted from opening new VillageMD clinics to upgrading facets of existing retail stores because Walgreens was trying to find other projects for his and all the other Implementation Teams to work on. He recalled learning about other projects being assigned to other Implementation Teams across the country during regular national Implementation Team conference calls, including updating store aisle and fixtures, replacing flooring and ceilings, and other upgrades to Walgreens stores—projects that had absolutely nothing to do with expanding and scaling VillageMD.

127. The former National Medical Director for VillageMD, CW 12, corroborated this timeline, stating that the focus when he joined VillageMD in February 2023 was on how to improve the performance and profitability of the existing clinics, largely by cutting costs, rather than growing the number of clinics or acquiring new physician practices. CW 12 elaborated that "both co-located clinics and standalone clinics" were being closed around the time he joined VillageMD in early 2023.

128. Significantly, CW 12 also confirmed that in mid-2022, Walgreens placed one of its executives, Mark Vainisi ("Vainisi"), into VillageMD as SVP of Growth for the partnership. CW 12 explained that Vainisi was not placed at VillageMD to grow the business by continuing the

rollout of new Village clinics, but rather as part of a strict directive to contain costs. CW 12 confirmed that the "winding down" on the opening of new VillageMD clinics occurred sometime in 2022 in Texas and many other regions in connection with these cost containment efforts, as there was a recognition that they needed a "***significant reduction of overall expenses***."

129. CW 12 reiterated that under Vainisi's leadership, not only was there a change in strategy whereby VillageMD "***stopped growing and expanding their site numbers***," but VillageMD also stopped trying to acquire new physician practice groups at this time. Instead, they worked on identifying strategies for getting more patients into existing sites and reducing the costs associated with exiting each site to reduce the cost per existing site. CW 12 also confirmed that they were not trying to quadruple the existing 200 co-located clinics to 800 when he joined the Company in 2023. Instead, he stated that by mid-2023, "there was recognition that clinic numbers had peaked and there was a desire to not increase clinic numbers" and, if possible, just to increase site profitability.

130. CW 7, the Senior Director of Strategic Growth for VillageMD who reported directly to Vainisi, explained that "by early 2022," the focus had shifted from recruiting doctors for new locations to "developing and retaining patients," emphasizing that "they needed to change their direction on how they were recruiting and how they were acquiring patients."

131. VillageMD's Business Development Director in Arizona, CW 3, confirmed that Vainisi's arrival at VillageMD in mid-2022 coincided with the decision to "***slow down or stop***" the opening of new co-locations and focus on trying to get the existing sites to become profitable. CW 3 explained that after Vainisi arrived, the conversation changed to the extent that, "maybe the best use of the dollars was not continuing with the opening of co-located clinics, but maybe using the money to build up free-standing clinics with a pharmacy tacked on." CW 3 recalled that, in

addition to halting the rollout of new clinics, Vainisi directed him and other VillageMD employees to "***tap the brakes***" on acquisition activities, implement "***cost controls***" at existing clinics, and "***tighten the belt***."

132. VillageMD's Market President in Arizona, CW 2 similarly stated that shortly before he left VillageMD in September 2022, VillageMD was slowing down openings and was not going to open any more new clinics, including six of his clinics that had been scheduled to open by the end of 2022 because "we weren't able to fill them and they weren't growing." CW 2 advised that "we had a whole schedule for all of these clinics and when they were supposed to open," but we would receive instructions "from the National Growth Team at corporate" that "this one's on hold or this one's not going forward." CW 2 reiterated that around this same time, Vainisi was brought on to be a "course corrector."

133. The National Medical Director for VillageMD, CW 1, also confirmed that by mid-2022, the building of co-locations stopped in certain markets. He emphasized that by mid-2022, VillageMD had completely "hit the brakes in Nevada" and other markets which, made it "difficult to meet projections" for targeted numbers of clinic openings. CW 1 recalled that after mid-2022, rather than looking to open new VillageMD clinics, Vainisi was looking for a partner for a merger and acquisition, which led to the VillageMD/Summit Acquisition later that year.

134. There was "***definitely***" a slowdown of buildouts by mid-2022, CW 15, a Walgreens Regional Manager for Implementation, confirmed that around June 2022, he was informed Walgreens was going to pause the buildouts, but that only sites then under construction would be finished. CW 15 personally attended "national calls with all Regional Implementation Managers" and "***people from Walgreens corporate***" who, he emphasized, "***were cascading information to us***." He recalled that, as the initiative was wound down, it was discussed during these meetings

that Walgreens' project management teams were being reorganized and assignments were being reallocated. CW 15 advised that as a result of the slowdown, a lot of completed buildouts "just sat empty." In his South Florida region alone, there were 6 or 8 sites that never opened.

135. CW 18,[23] a Walgreens District Manager in Atlanta, Georgia, who was with Walgreens for thirty years until his departure in November 2023, likewise confirmed that a "***nationwide hold***" was placed on the build out of all new co-located VillageMD clinics in 2022, and that construction of new clinics in Georgia was already being put on hold months before that time. CW 18 recounted that there were two clinics in his district slated for construction in 2022, but construction never happened—it "kept getting pushed off and pushed off" and that's "when we realized that things weren't going to be happening."

136. Multiple confidential witnesses confirm that, as Walgreens ran up against fundamental obstacles to executing the Company's substantial growth plans for VillageMD, Walgreens enabled VillageMD to acquire Summit in November 2022, in a last-ditch attempt to conceal VillageMD's underperformance.

137. For instance, CW 19, a Director and Senior Director, Clinical Quality Pharmacy at VillageMD between August 2021 and July 2023,[24] described how the ***co-located clinics were "draining all the profit that VillageMD was making***," and that the VillageMD/Summit Acquisition was "***an act of desperation or a last ditch effort to save the company***." He explained how he was bothered by the acquisitions of Summit Health and CityMD because they were "contradictory to VillageMD's initial mission," as they provided urgent care using a fee-for-service

[23] CW 18 was with Walgreens for thirty years until he was laid off in November 2023. He last served as a District Manager, overseeing a group of Walgreens stores in Atlanta, Georgia.

[24] CW 19 served as a Director, Clinical Quality Pharmacy from August 2021 until November 2022 and Senior Director, Clinical Quality Pharmacy from November 2022 until July 2023, and held various other roles at VillageMD since September 2019.

business model and VillageMD was focused on providing value-based primary healthcare. CW 19 explained that VillageMD/Walgreens wanted to buy Summit Health and CityMD "***because of their profits***." Walgreens wanted to "***mask their losses with the profits of Summit/CityMD to offset each other.***"

138. Because Summit Health and City MD were profitable operations, CW 3, a VillageMD Business Development Director, explained that VillageMD was "attracted to them because Village was in the red while these entities operated at a profit." With an estimated 70% of clinics nationwide not meeting expectations and many within that 70% which were underperforming by wide margins, he emphasized that "***the idea was that the marriage of the two would help the balance sheet***."

139. The perspective of the VillageMD/Summit Acquisition from the employees at Summit Health and CityMD was also that Summit acted as a lifeline to VillageMD's failing model. In particular, CW 20, the Director of Financial Planning and Analysis for Summit Health in New Jersey since January 2022, confirmed that Walgreens' motivation for acquiring Summit was to mask VillageMD's underperformance. As CW 20 observed, "***Walgreens was looking for VillageMD as an area of growth for their business, but Village was not delivering that growth organically, so they looked to acquire a quickly growing organization, to achieve growth targets***." Supporting this motivation, CW 20 advised that "Summit and CityMD have continued to run pretty much the same as they did pre-acquisition." As an example of changes that were not undertaken as part of the VillageMD/Summit Acquisition, CW 20 advised that Summit did not co-locate. Indeed, when asked about intercompany transfers of physicians and staff, CW 20 recounted that he was not aware of any Summit physicians being moved into a co-located clinic.

140. CW 16, VillageMD's Regional President for Indiana, Michigan, Illinois, and Kentucky, confirmed that VillageMD was attempting to buoy their numbers by acquiring fee-for-service practices like Summit to show a growth of patients at VillageMD. CW 16 explained, "the financials for Summit/CityMD were financially strong," and "VillageMD took these numbers with the intent of showing strong growth in both primary care facilities and increased patient numbers."

### 3. The VillageMD Debacle Was Progressing So Poorly That In Mid-2023, Walgreens Laid Off Hundreds Of Employees Who Were Directly Involved In Opening And Overseeing VillageMD Clinics

141. In addition, multiple former employees confirmed that by mid-2023, the VillageMD initiative was proceeding so poorly that Defendants let go of hundreds of employees that were tasked with opening new VillageMD clinics. Specifically, in April and June/July 2023, Walgreens and VillageMD laid off hundreds of employees nationwide, including their entire "Implementation Teams." The Team Lead for Walgreens Regional Implementation in the Florida market, CW 5, had personal knowledge of this, given that he was let go as part of Walgreens' mass layoffs in April 2023. CW 5 recalled that approximately 600 employees were laid off in April 2023, ***including Walgreens' entire Implementation Team of approximately 100 employees***, ***which included all Walgreens employees nationwide responsible for building out co-located clinics at Walgreens***. A District Manager for Walgreens in the Atlanta market, CW 18, confirmed the massive layoff described by CW 5 of over 500 Walgreens employees "***absolutely***" took place in April 2023, and included the entire Walgreens Implementation Team, explaining he recalled the timing of the layoffs "very clearly" because he was laid off just a few months later.

142. The Director of Revenue Cycle Management for Walgreens' U.S. Healthcare segment, CW 9, likewise confirmed that hundreds more Walgreens employees were laid off in July 2023, stating that he was let go in this second round of layoffs. Originally, there were five people on his team, but after the July 2023 layoffs only one of them remained.

143. Around the same time, VillageMD laid off hundreds of VillageMD employees, including its employees who were responsible for the rollout of VillageMD clinics funded by Walgreens. As VillageMD's Business Development Director, CW 3, explained, there were two rounds of layoffs at VillageMD in the first six months of 2023, an initial round around March 2023 and a second round around May or June of the same year and these employees were "mainly in Growth and the Transition teams." VillageMD's National Medical Director responsible for the Texas market, CW 12, corroborated this account, explaining that he personally had to make several reductions in forces, not only in Texas, but across the country.

### 4. Defendants Were Regularly Informed Of VillageMD's Underperformance And Had Ready Access To Its Key Financial And Operational Metrics

#### a. The Issues Plaguing The VillageMD Rollout Were Openly And Routinely Discussed At All Levels Of Both Walgreens And VillageMD

144. Former employees of both Walgreens and VillageMD recounted that Walgreens' senior executives, including the Individual Defendants, and VillageMD's senior executives regularly discussed the progress of the VillageMD rollout and the pervasive underperformance of VillageMD clinics. The former employees described how these meetings occurred throughout all levels of the organizations, from discussions among and between senior leadership of the two companies all the way down to the store levels.

145. *First*, several former employees confirmed that the issues plaguing the rollout were well known and regularly discussed at all levels of Walgreens. Former employees reported that the issues plaguing the rollout were discussed by Walgreens' management during annual, Company-wide leadership meetings, which Walgreens held near the close of each fiscal year. The Director of Revenue Cycle Management for Walgreens' U.S. Healthcare segment, CW 9, stated that he attended these Company-wide meetings via Teams, where Defendant Kehoe openly

discussed VillageMD's struggles and underperformance, in the presence of Defendant Brewer and other C-suite executives. CW 9 specifically recalled attending an all-hands meeting that occurred shortly before September 2022, the close of Walgreens' fiscal year, ***where Defendants Brewer and Kehoe "definitely" discussed VillageMD "struggling, underperforming, and not meeting targets***." He stated that "there was a discussion about Village failing to meet revenue projections." Kehoe would say, "we recognize that there will be a struggle to meet revenue projections, and we're making up for it here, or we're trying to do this or whatever." CW 9 recalled another big meeting he attended via Teams focused on financials, where ***Kehoe "definitely talked about the underperformance of Village. That was widely known***."

146. These issues were also discussed during regular meetings of the Walgreens Implementation Team, which included Implementation Specialists in the corporate office in Deerfield, recalled CW 5, who was a Regional Implementation Team Lead in Florida. The meetings, which were held via Teams, were attended by Implementation Team members from across the country. CW 5 recalled that all types of subjects would be discussed during these Teams calls, including space plans, construction, and scope updates for the clinics. The purpose was getting a go or a no-go on projects, discussing things to be on the lookout for at future stores, and troubleshooting problems at current stores. CW 5 stated that the calls were usually on Tuesdays, but then went to bi-weekly to monthly and then "just stopped" as the VillageMD rollout wound down. CW 15, who served as the Walgreens Regional Implementation Manager for South Florida, likewise advised that, "these were national calls with all Regional Implementation Managers and some people from Walgreens corporate who were cascading information to us."

147. *Second*, former employees confirmed that the issues plaguing the rollout were well known and regularly discussed at the highest levels of VillageMD. For instance, CW 12 who

reported to Chief Physician Executive, Dr. David Hatfield, explained that there were weekly calls with the VillageMD C-suite where the operations and performance of VillageMD clinics were discussed. CW 12 recalled that Dr. Hatfield ran those weekly calls. CW 12 stated that Dr. Hatfield reported on the different regions and discussed issues each region was experiencing, including regions not hitting their targets.

148. VillageMD's C-Suite and other members of senior management held bi-weekly conference calls to discuss national issues, recalled CW 3. Topics of discussion included problems hiring physicians to staff VillageMD clinics, and problems finding sufficient patients to visit the clinics – in particular, patients with Medicare or private insurance. He recalled that these bi-weekly meetings were led by VillageMD's SVP of Growth, Vainisi (formerly of Walgreens), who was based out of VillageMD's corporate office, and were attended "basically by everybody working on Growth." CW 3 reiterated that inadequate physician staffing and inadequate patient panels were "definitely" topics discussed on these national calls.

149. CW 2, a former VillageMD Executive Director, personally attended routine meetings with VillageMD's upper management, which were held telephonically. He added that, "***every market president had to get on the monthly call, and on those calls, you had the National Growth person, and sometimes the COO, the CFO and CEO attending***." CW 2 recounted that during these meetings, all aspects of VillageMD's performance were explored. He said, "It's everything. You have to run through your staffing model, your providers, your financials, your risk based, everything." They had projections and, "if you were off, you had to explain why you're off, where you're off, and your plan to correct it."

150. Former employees also confirm that the progress of the VillageMD rollout and staffing at the co-located clinics was the topic of weekly regional meetings among VillageMD

regional administrators and vice presidents. As CW 3 explained, each market held a weekly regional meeting to discuss the planned co-located sites, staffing, and the problems they were experiencing acquiring doctors and patients to staff sites.

151. That weekly meetings were held for each market to discuss the progress of the rollout was confirmed by VillageMD's Regional Administrator in Texas, CW 11. He explained that his team held weekly meetings via Teams either on Wednesdays or Thursdays updating the progress of his team's buildouts and facility acquisitions. CW 11 stated his peers of eight to nine Regional Administrators were in attendance along with Conrad, the Vice President of Practice Operations for Houston, Texas. Conrad directly reported to the CEO and Chairman of VillageMD, Tim Barry. Also in the meeting was VillageMD's Implementation Team in Katy, Texas and the Business Development Team headed by Blonde Suico based out of Cypress, Texas.[25] During these meetings the group would review the status of every center for which each team member was responsible.

152. *Third*, former employees confirmed that the issues plaguing the rollout were regularly discussed during meetings between Walgreens and VillageMD, including among the executives of those companies. For instance, the National Medical Director for VillageMD in Texas, CW 12, confirmed that Walgreens' C-Suite and senior management knew about the significant problems with the VillageMD rollout, because these issues were discussed at regular monthly and quarterly meetings with executive and senior management of VillageMD. CW 12 explained that Dr. Hatfield and VillageMD C-Suite executives had regular meetings with C-Suite executives at Walgreens where these issues were discussed "***in great detail***." CW 12 confirmed

[25] Blonde Suico has been employed by Village Medical since August 2017 and she currently serves as Vice President of Business Development.

that the Walgreens C-Suite executives who attended these regular meetings between C-Suite executives of VillageMD and Walgreens included Defendants Brewer, Kehoe, and Driscoll. CW 12 also recalled two meetings where he personally met with Defendant Driscoll and discussed VillageMD's "***struggles***."

153. Walgreens Vice President of Pharmacy and Retail Operations, CW 13, confirmed that "***there were definitely meetings***" between high level executives of Walgreens and VillageMD. He specified that "***[t]hey were definitely meeting level-to-level, CEO to CEO, VP to VP, the people responsible for different parts of the initiative and organization, always sharing every detail***." With respect to the VillageMD rollout, CW 13 stated that Walgreens had a team led by its corporate office called "Dev-Ops" or "Development Operations" that met regularly with a team from VillageMD. CW 13 stated that he knew about these meetings because he was personally involved in the operations and rollout.

154. Multiple former employees from Walgreens and VillageMD recounted how the problems at VillageMD clinics detailed above were also the subject of regular meetings between Walgreens store managers and VillageMD pharmacists at each clinic. CW 5 explained that Walgreens store managers were required by Walgreens policy to have regular meetings with the managers of the VillageMD clinics to discuss hours, staffing, and other logistics, such as whether the clinic had sufficient resources. He added, "it was a requirement. Once an office opened, it was part of the agreement and was standard operating procedure to see that they were on the same page." CW 5 stated that these meetings occurred regularly, either weekly or biweekly, and at least monthly. He confirmed that Walgreens store managers were aware of problems that VillageMD was experiencing at their clinics with respect to hours, staffing, and customer complaints from these mandated meetings.

155. CW 13 confirmed there were regular meetings between the Walgreens store manager, the Walgreens pharmacist and the VillageMD doctors and team at each co-located clinic. CW 13 recounted that the Walgreens store manager made sure the required meetings were attended with meetings first occurring on a weekly basis, then on a bi-weekly basis, and eventually on a monthly basis as the rollout slowed. CW 2 confirmed that when a co-location was first opened there was an initial meeting attended by the store manager, pharmacist, practice manager, and the lead physicians to "go over everything." According to CW 2, "there were then weekly meetings between the store manager and the practice managers, as well as meetings between the pharmacy manager and physicians" to discuss operational issues and complaints. According to CW 13, "[t]he purpose of these get togethers were to have pow-wow meetings and talk about patients and how they could increase the number of patients and get better adherence on scripts from those patients" because without a robust and observant patient panel from VillageMD, the prescription bottom line at its co-located pharmacy would similarly underperform with the clinic.

### b. Walgreens' Management Had Unfettered Access To Information And Received Regular Reports Concerning VillageMD's Performance

156. As numerous confidential witnesses confirmed, both at the outset of the Walgreens-VillageMD relationship and throughout the Class Period, Walgreens' management had access to a host of metrics the Company tracked that allowed them to evaluate performance at the co-located sites, including the number of prescriptions filled at every store, and the number of prescribers at each co-located site. Beyond those metrics, Walgreens also had access to a host of VillageMD data, including clinic and financial data, and confidential witnesses confirmed that Walgreens' executives received regular reports regarding the progress of the rollout.

157. Multiple confidential witnesses confirm that Walgreens closely tracked and received reports regarding the number of prescriptions filled at each co-located site, which, as

described above, was an important and prominently touted "synergy." For example, CW 13, the Vice President of Pharmacy and Retail Operations for Walgreens, advised that Walgreens executives would look at a store with a new co-located clinic and see what the percentage increase in prescription fills was in 30 days. "Then they would find a very similar store that didn't have a VillageMD and see what they were up in scripts." Walgreens had software that was "***very precise***" – for example, in tracking the numbers of inbound prescriptions and outbound prescriptions, "with and without VillageMD" – which enabled Walgreens to match stores with similar demographics and look at in-bound script counts and forecast script counts. Walgreens would lump up to 50 stores into groups, those with VillageMD and those without. "The difference would be growth due to VillageMD. That's the kind of information that we received. ***It was peer group modeling of increases in prescription fills.***" Based on the metrics he saw, CW 13 stated he knew that the sites he was responsible for "***were not making money***."

158. Walgreens also tracked the number of prescribers at each co-located site, and CW 13 advised that this was a key metric for Walgreens but "VillageMD was never able to hit the target of actual prescribers," which he recalled was three prescribers per site. According to CW 13, although the contracts called for there to be two full-time doctors and one nurse practitioner at each clinic, VillageMD "***was never able to get to that level***." Instead, CW 13 recounted how the physician metrics for each of the approximately 60 co-located stores in his region roughly averaged merely "1.2 to 1.3 doctors and just under one NP."

159. CW 13 confirmed that Walgreens' executives received these metrics. With respect to what was shared with Walgreens corporate, CW 13 advised that "Walgreens was closely watching how every single site was performing." CW 13 stated, "I know that they (VillageMD) would give us very high-level numbers on a quarterly basis." He confirmed "We would know if

the site was successful versus another site." CW 13 advised that he is fairly certain that Walgreens executive management was following how the two entities together were working from a data standpoint. "***That was all in the Corporate office***."

160. Former employees also confirmed that Walgreens closely tracked and received reports concerning VillageMD's financial and revenue metrics. CW 9, who reported directly to John Do, the CFO of U.S. Healthcare, advised that VillageMD utilized the Athena Health platform to track operational metrics, including clinical data, such as the number of patients seen at a given store or region each day, and payor information, and that those metrics were made available to executive management, including Defendants Brewer and Kehoe, through the Athena Health platform. CW 9 added that Walgreens' management also had access to all of VillageMD's financial metrics and revenue cycle numbers "***at least monthly***." CW 9 emphasized that Walgreens "***absolutely***" closely tracked their investment in VillageMD: "***If there is anything that Walgreens does a good job at, it's tracking metrics and financials***."

161. CW 18 confirmed that Walgreens' executive management "***absolutely***" had access to VillageMD's operating metrics. He emphasized that everyone at Walgreens from the "***[Director] level and up… absolutely***" had access to VillageMD clinical data, including patients seen in each store per day and the number of pharmacy fills by VillageMD patients, on at least a monthly basis. That Walgreens had visibility into VillageMD's performance was confirmed by CW 21,[26] the Vice President of Process Improvement for VillageMD. As CW 21 explained, due to Walgreens' investment in VillageMD, everyone at Walgreens from at least the vice president

[26] CW 21 was a former VP Process Improvement, first for CityMD in 2015, then for VillageMD in New Jersey, who specialized in information technology, infrastructure and cybersecurity until he was laid off in January 2024.

level and above had access to VillageMD metrics, which would have allowed them to see whether targets were being met in terms of patient volumes.

### F. The Truth Gradually Emerges

162. The truth regarding Walgreens' disastrous pivot into the healthcare market and the resulting devastating impact on the Company was revealed to investors over the course of five corrective disclosures.

#### 1. The Q3 2023 Earnings Release

163. Before markets opened on June 27, 2023, Walgreens issued a press release disclosing financial results for Q3 2023 and providing dramatically lowered full-year EPS guidance (the "Q3 2023 Earning Release"). Despite having repeatedly assured investors that the Company was "quickly scaling" the U.S. Healthcare segment "with a defined path to achieve profitability" in fiscal 2023, the Q3 2023 Earnings Release disclosed an adjusted EBITDA ***loss*** of $113 million, and an adjusted operating ***loss*** of $172 million for U.S. Healthcare in the quarter, each well below both Walgreens' prior guidance and analysts' consensus estimates. The Q3 2023 Earnings Release further revealed a dramatic 20% reduction to EPS guidance for fiscal 2023, from a range of $4.45 to $4.65 per share, to a range of $4.00 to $4.05 per share. Walgreens also disclosed its "[p]reliminary fiscal 2024 expectation for low-to mid-single digit adjusted operating income growth." In sum, not only did Walgreens sharply underperform its prior earnings guidance for Q3 2023 and lower its EPS guidance for the second half of 2023, it also sharply reduced its "preliminary" earnings growth guidance for fiscal 2024 to the low single digits.

164. During the accompanying earnings call later that day, Brewer attributed the Company's underperformance and reduced fiscal 2023 guidance to "***a slower profit ramp for U.S. health care***," particularly at VillageMD. Kehoe similarly attributed the U.S. Healthcare segment's adjusted EBITDA loss of $113 million in the quarter to "***weaker than-expected results at***

***VillageMD and Summit***," including the "new clinic expansion" and "lower [patient] visit volume." Defendant Driscoll, too, explicitly acknowledged that "***U.S. Healthcare missed targets due to VillageMD and CityMD underperformance***."

165. Additionally, Defendant Kehoe disclosed that Walgreens was projecting "an adjusted EBITDA ***loss*** of $340 million to $380 million" for fiscal 2023. This would be the first annual loss in Walgreens' 122-year history. Moreover, Kehoe was forced to acknowledge during the call that it would take even longer for VillageMD and the U.S. Healthcare segment as a whole to achieve profitability—meaning even more losses ahead—stating that "***we're probably 6 to 12 months behind***" the original profitability targets Walgreens had announced for the U.S. Healthcare segment at the start of the Class Period on October 14, 2021.

166. On this news, the price of Walgreens common stock fell more than 10%, from a closing price of $31.59 per share on June 26, 2023, to a closing price of $28.64 per share on June 27, 2023.

167. Analysts readily attributed the stock price decline to VillageMD's disappointing performance and Walgreens' reduced outlook for the U.S. Healthcare segment, highlighting Walgreens' struggles executing on its strategic shift to healthcare. For example, Evercore reported on June 27, 2023, that Walgreens' earnings shortfall and reduced guidance "showed the difficulty of its business model transition today as FY3Q results and the lower guidance disappointed investors." A UBS report issued the same day likewise lambasted the Company, noting U.S. Healthcare adjusted operating income "came in well below expectations (negative $172M, vs negative $64M), which raises some concerns over the profitability ramp for the business." In another June 27, 2023, report, J.P. Morgan downgraded Walgreens from overweight to neutral,

and directly linked the Company's reduced earnings guidance to the slower pace of VillageMD openings, opining it was a "negative" sign that VillageMD "is not performing as planned."

168. Going a step further, Deutsche Bank issued a scathing report on June 28, 2023, downgrading the Company's shares from "Buy" to "Hold," which excoriated Defendants for the U.S. Healthcare segment's abysmal performance and bleak outlook, stating that U.S. Healthcare "revenue and earnings missed our targets by a wide margin with the ***company walking back expectations*** for near and medium term profit expectations." Deutsche Bank highlighted the Company's reduced guidance for U.S. Healthcare as a "***striking concern***," noted that the segment "was expected to flip to profitability in F3Q," and decried that "[w]hat is most disturbing is the company now appears a year or so behind schedule on its Health profitability ramp."

169. Given the Company's dismal quarterly performance and sharply reduced earnings guidance, Defendants sought to assuage investors' concerns. Indeed, the Q3 2023 Earning Release reassured investors that Walgreens was "[o]ptimizing the U.S. Healthcare path to profitability" and "taking immediate actions to drive sustainable growth in adjusted operating income" in 2024. These "swift actions" included "accelerated VillageMD patient panel build, . . . and an increased and accelerated synergy target for VillageMD/Summit Health." Additionally, the Q3 2023 Earnings Release assured the market that the Company was "[a]ccelerating synergies between U.S. Healthcare and Walgreens operations," and that U.S. Healthcare "rapidly scale[d]" during the quarter with pro forma sales growth of 22%, "reflecting existing clinic growth and clinic footprint expansion" at VillageMD and Summit—including the addition of "93 clinics" at VillageMD compared to the prior year period.

170. Defendants repeated these positive sentiments during the accompanying earnings call. CEO Brewer, for example, reiterated that the Company was taking "several specific actions

to accelerate U.S. health care's path to profitability, focused on VillageMD and Summit Health." Defendant Kehoe acknowledged that there were previously undisclosed issues facing VillageMD, stating that "rapid corrective actions are underway," and that management expected "improvement in the fourth quarter as we build patient panels and traffic and align the cost profile with sales." Moreover, in addressing "key factors that will influence 2024 performance," Kehoe specifically emphasized that "***[o]ur U.S. health care business will be a significant profit driver***," including "***a maturing VillageMD clinic profile and strong actions to accelerate***" its path to profitability. Defendant Driscoll, President of the U.S. Healthcare segment, also reassured investors that VillageMD was on a "***path to profitability***."

171. Defendants' reassuring statements had their intended effect. For example, although RBC Capital Markets reduced its price target on Walgreens shares from $36 to $29 per share on June 28, 2023, given the "overall slower than expected profitability ramp in the U.S. Healthcare segment," RBC also praised Walgreens for its focus on "accelerating integration at VillageMD and Summit, while accelerating synergies with legacy businesses." RBC added that Defendants expected to "improve profitability in the U.S. healthcare segment" in fiscal 2024, which "underscores a significant confidence in [Walgreens'] ability to create value in the U.S. Healthcare segment, [and] create synergies." J.P. Morgan issued a second report that day noting several actions Walgreens was taking "to improve the U.S. Healthcare path to profitability including: leveraging WBA marketing expertise to accelerate patient panel build within VillageMD, appointing new VillageMD CFO, right-sizing CityMD clinic operations, and aggressively integrating prior acquisitions within Summit." A report by Raymond James the same day further noted that "the 192 co-located [VillageMD clinics] opened over the last years should mature and aid in improving" adjusted operating income for the segment moving forward.

### 2. The Sudden Resignations Of Walgreens' CEO And CFO, Defendants Brewer And Kehoe

172. After markets closed on July 27, 2023, Walgreens issued a press release announcing the sudden departure of CFO Kehoe from the Company, effective mid-August. Notably, the release made clear that the departure was so sudden that there was no planned successor, and that Manmohan Mahajan, Walgreens' SVP, Global Controller, would assume the role of Interim CFO as the Company conducted a search to find a new CFO.

173. In response, Walgreens' stock price fell 3% and analysts expressed surprise at Kehoe's sudden departure, quickly linking the departure to Kehoe's role in the struggling U.S. Healthcare segment. UBS reported that day that Kehoe's departure came as a "surprise to many investors," as Walgreens "is currently in the midst of an operational transformation around healthcare delivery (i.e., VillageMD/Summit), with Kehoe playing a major role in the strategic rollout." Evercore similarly reported that Kehoe's departure "comes as a bit of a surprise," adding that the "press release notably did not reiterate guidance."

174. Approximately one month later, the next shoe dropped. On September 1, 2023, Walgreens issued a press release announcing that its CEO, Defendant Brewer, had also suddenly resigned effective August 31, 2023. As with Kehoe, the Company had no planned replacement. The press release disclosed that in addition to stepping down as CEO, Brewer had left the Company's Board of Directors, marking a complete exit from the Company by the very individual selected by Walgreens' Board of Directors to lead its strategic shift to healthcare.

175. On this news, the price of Walgreens common stock declined over 7%, falling from a closing price of $25.31 per share on August 31, 2023, to a closing price of $23.43 per share on September 1, 2023.

176. Analysts were alarmed by the fact that Walgreens' top two officers had left the Company just 40 days apart, and immediately connected the terminations to management's ongoing struggles to execute the Company's strategic shift to healthcare. Deutsche Bank issued a stern rebuke, emphasizing in a September 1, 2023, report that the "departure of the two key executives comes at possibly the worst time" given that "WBA has now seen both its CEO and CFO depart the company in the last 40 days, leaving the company effectively leaderless" when it was attempting to navigate its strategic transformation. Highlighting the "vacuum at the top of [Walgreens'] leadership structure" as it "continues to lose momentum in the turnaround of both its Pharmacy segment and its Health business," Deutsche Bank underscored that it "***cannot recall a time in our coverage experience where we have seen both the CEO and the CFO depart a large-cap company in such a short span where there were no other issues at the company***."

177. Other analysts concurred, noting that Brewer's departure indicated that VillageMD's challenges were likely greater than previously disclosed and likely spurred Brewer's departure. For example, J.P. Morgan reported on September 1, 2023, that "[w]ith WBA still in the midst of its healthcare-centric transformation, we view continued leadership uncertainty as adding to investor concerns." Likewise, Evercore reported on September 1, 2023 that "today's announcement will likely take many by surprise . . . particularly as the business is at a core inflection point[.]"

178. The mainstream financial media also reported on the sudden executive departures, and, like securities analysts, easily connected the new "vacuum" in leadership and Walgreens' continued failure to execute on its strategic shift to healthcare. For example, on September 5, 2023, *Fortune* published an article calling the moves "***stunning***" and reporting that Brewer's "departure also raises questions about Walgreens's ability to pull off the ambitious pivot towards

health care that Brewer had announced six months after becoming Walgreens CEO." The *Fortune* article questioned Walgreens' massive and rapid expansion into healthcare by "buying up companies outside of the core pharmacy industry" that "unnecessar[ily] exposed Walgreens to risk" (quoting Walgreens' former CEO, and then-current Executive Chairperson, Stefano Pessina). Similarly, *Bloomberg* published an article on September 1, 2023, reporting that Walgreens stock had lost half its value since Brewer took over in March 2021, as "Walgreens struggle[d] to build [its] health care services business."

### 3. Defendants Continue To Falsely Reassure Investors Regarding VillageMD And The State Of The Company's Business

179. Despite the sudden departure of its two top officers, Walgreens continued to issue reassuring statements concerning the Company's commitment to healthcare and its key role in Walgreens' growth strategy. For instance, during an investor conference on September 21, 2023, a Cowen analyst asked "in the past, you guys gave some targets in terms of co-located VillageMD, Walgreens kind of locations, if I recall, something like 600 by 2025 and 1,000 by 2027. ***Are those kind of still sort of the milestones we should be thinking about [for that] framework***?" In response, Defendant Driscoll responded in the affirmative, assuring the market: "***Yes, I think we should be – I'm obsessively focused on delivering better results faster***." Driscoll added, "we feel the responsibility to our shareholders to deliver more profitability from some of the markets we've invested in" and that "our focus is going to be accelerating profitable growth."

180. On October 10, 2023, Walgreens issued a press release announcing the appointment of Defendant Tim Wentworth as its new CEO. The release highlighted Wentworth's "nearly three decades of healthcare leadership experience" and reaffirmed the Company's commitment to becoming "a consumer-centric healthcare company," which remained its "next phase of growth."

181. On October 12, 2023, Walgreens issued a press release announcing its financial results for Q4 and fiscal year 2023 and held an earnings call with investors. During the earnings call, although Defendant Driscoll disclosed that Walgreens planned "to exit approximately five markets and approximately 60 [co-located] clinics in fiscal 2024" because those clinics were located in "nonstrategic markets," Defendants also made a series of positive statements about VillageMD. For instance, Defendant Mahjan announced favorable fiscal 2024 adjusted EPS guidance of $3.20 to $3.50 and underscored that "we expect accelerating profitability in our U.S. healthcare business in 2024" with "ongoing growth in all businesses." Driscoll further emphasized that "***VillageMD, Summit Health and CityMD will be the most meaningful drivers of growth in fiscal 2024***," adding that "[w]e believe that we can best enhance VillageMD growth and value by focusing on increased density in our highest opportunity markets." In announcing this refined "focus" targeting VillageMD's "highest opportunity markets," Driscoll reassured investors in no uncertain terms that the "***VillageMD model works***."

182. Later during the earnings call, in response to an analyst question about the driving factor for closing 60 VillageMD clinics and Walgreens' inability to drive volumes in those markets, Defendant Driscoll responded that "[e]very one of our clinics actually shows month-over-month growth, but we don't see the growth coming fast enough in certain markets," so "our strategy going forward will be really focusing on markets where we see that momentum . . . focusing on markets where we can go deep and continue to grow on a compounded serious way profitably."

183. Defendants' reassuring statements comforted the market and prevented further decline in Walgreens' stock price. For example, in an October 13, 2023 report, Truist Securities raised its price target for Walgreens' stock from $25 to $27, noting that "VillageMD/Summit/CityMD are expected to be the key drivers of growth into '24 and we are

encouraged by actions to improve profitability at VillageMD." Analysts at Jefferies indicated in a report issued that same day that the price of Walgreens' common stock increased in response to these disclosures because "the introduction of a seasoned [healthcare] executive as CEO in Tim Wentworth & the cost conscious change of tone—including the identification of $1B in cost cutting opportunities—were well received by investors."

#### 4. The Q1 2024 Earnings Release

184. On January 4, 2024, before the markets opened, Walgreens issued a press release announcing its financial results for Q1 2024 (the "Q1 2024 Earnings Release"). In the Q1 2024 Earnings Release, Walgreens disclosed abysmal financial results, including adjusted EPS that decreased by over 43% to $0.66, and free cash flow of negative $788 million—a $671 million decrease compared with the prior year period. Consequently, Walgreens announced that it was slashing its quarterly dividend nearly in half, by 48%. With regard to the U.S. Healthcare segment, the release reported an operating loss of "$436 million, flat versus the year-ago quarter"—*i.e.*, despite Defendants having spent years reassuring investors that U.S. Healthcare would be the Company's next "growth driver," it was still reporting zero growth.

185. During the accompanying earnings conference call held later that day, Defendant Wentworth "fully acknowledge[d] . . . the growing pains in our [U.S.] Healthcare segment." Wentworth stated that "I came to WBA eyes wide open with a clear mandate to act with everything on the table in terms of putting our business on the right track," including VillageMD which was now an asset "that we're actively managing." Wentworth further stated that "I would not expect to see us investing in additional primary care assets in our portfolio of investments."

186. Once again, in an effort to comfort investors and buoy Walgreens' stock price, Defendants made reassuring statements during the Q1 2024 earnings call. For example, Defendant Mahajan reassured investors that "[w]e are making progress to accelerate profitability at

VillageMD." During the Q&A portion of the call, when asked "do you think the care delivery business" and specifically "Village[MD]" is "core" to Walgreens' overall business, Wentworth emphatically reassured investors that Walgreens was ***not*** planning to divest its stake in VillageMD, stating: "We're working closely with them" and "***there's no question that they have put themselves on a good path, both in terms of their costs and their footprint, getting to a place where they're going to be meaningfully growing and profitable***."

187. In response to the January 4, 2024 disclosures, the price of Walgreens common stock fell more than 5%, from a closing price of $25.57 per share on January 3, 2024, to a closing price of $24.26 per share on January 4, 2024.

188. Analysts continued to credit Defendants' reassurances regarding VillageMD's commercial viability. For example, on January 4, 2024, J.P. Morgan reported that "***we found commentary from WBA encouraging***," highlighting that "***U.S. Healthcare profitability should increase over the course of the year***," given "the continued progress around focusing on improving VillageMD's profitability." J.P. Morgan took comfort that "***management commentary indicates the segment is progressing as expected***." In another report issued the same day, J.P. Morgan emphasized that Walgreens' "reaffirmed guidance is a positive for the stock." Similarly, Evercore issued two reports on January 4, 2024, which highlighted management's guidance reiteration as an "upside surprise." Likewise, Barclays emphasized that "***management views its primary care assets VillageMD and Summit Health as important pillars in WBA's forward path***."

189. On March 28, 2024, Walgreens issued a press release announcing its financial results for Q2 2024 (the "Q2 2024 Earnings Release"), and held an earnings call later that day. In the release, Walgreens disclosed a $12.4 billion impairment charge related to VillageMD goodwill, which resulted in a $5.8 billion impairment attributable to Walgreens. Significantly, Walgreens

suffered a net loss of $5.9 billion for the quarter, an astounding $5.8 billion of which was caused by the underperformance of VillageMD.

190. During the accompanying earnings call, Defendant Wentworth disclosed an additional 100 VillageMD clinic closures, bringing the total closure count to 160. Specifically, Wentworth stated during the call that: "As Village prioritizes density in their highest opportunity markets, they decided in January to exit a total of approximately 160 clinics inclusive of the 60 that had been previously communicated. As of today, they have already exited 140 locations." Significantly, Defendants spun the impairment charge and additional store closures as a positive development for VillageMD, claiming that "[w]e have reached an important milestone delivering our first ever quarter of positive adjusted EBITDA" for the U.S. healthcare segment and that "VillageMD's actions to accelerate profitability . . . are driving improvement in adjusted EBITDA." Mahajan similarly reinforced VillageMD's purported growing profitability, stating: "***During the first half of fiscal '24, we have seen positive financial impacts from the recent actions taken by VillageMD's management team to accelerate profitability***."

**5. The Q3 2024 Earnings Release**

191. The truth was finally fully revealed just three months later, on June 27, 2024. On that day, *The Wall Street Journal* published an article prior to the market open featuring an interview with Defendant Wentworth in which he admitted that VillageMD was a complete disaster, and Walgreens' healthcare business was unsalvageable and unfixable. In fact—in direct contravention to Defendants' staunch assertions that it was not abandoning the VillageMD model—Wentworth now admitted that VillageMD was so far gone that Walgreens was throwing in the towel on its $10 billion in investments and planned to divest itself of the VillageMD business. In Wentworth's own words, Walgreens was exiting the healthcare business, as providing primary healthcare was "***a strategy that we are no longer pursuing***." In addition, Defendants also revealed

that the VillageMD debacle was so ruinous that Walgreens' overall business was in freefall and would require it to close upwards of 2,000 underperforming Walgreens stores. *The Wall Street Journal* article, which was aptly headlined "Pharmacy chain plans to shutter a significant share of its roughly 8,600 stores, ***cuts its stake in primary-care provider VillageMD***," highlighted that Walgreens was a "***struggling chain***" that was "***planning to close a substantial number of poorly performing stores and pulling back on the company's plunge into the primary-care business***."

192. In addition, also on June 27, 2024, Walgreens issued a press release (the "Q3 2024 Earnings Release") announcing poor financial results for the third quarter of fiscal 2024 that were well below the Company's projections and analysts' expectations. Underscoring that the VillageMD debacle had left the Company's business in ruins, the Q3 2024 Earnings Release reported adjusted EPS for the quarter of just $0.63, down nearly 37% from the prior quarter, and, as a result, lowered full year 2024 EPS guidance by 12%, from $3.20 to $3.35, to $2.80 to $2.95. The release also confirmed that Walgreens planned to "close certain underperforming U.S. stores."

193. On this news, Walgreens' stock price was decimated, falling from a closing price of $15.66 per share on June 26, 2024, to a closing price of just $12.19 per share on June 27, 2024. This 22% decline in Walgreens' stock price represented ***the largest single-day percentage drop in the Company's 123-year history***, making Walgreens the day's single worst performer in the S&P 500 and ***wiping out $3 billion dollars in shareholder value***.

194. Multiple analysts directly linked the June 27, 2024 disclosures and the resulting stock price decline to Defendants' failed investments in VillageMD and their prior statements touting the purportedly "transformational" VillageMD model. For example, HealthcareDive—a leading healthcare industry publication—published an article on June 27, 2024 entitled, "Walgreens to reduce stake in VillageMD, close stores," which specifically highlighted that

Walgreens was "pulling back its focus on healthcare services after the strategic shift failed to bolster the struggling retailer's financial health." Similarly, EvercoreISI reported on June 27, 2024 that Walgreens was completely abandoning its strategy of operating co-located primary care practices with VillageMD at Walgreens stores, stating that going forward, Walgreens had no plans to continue to fund "brick and mortar primary care practices." Deutsche Bank also reported on June 27, 2024 that Walgreens had failed to show any "evidence of a turnaround at Village," and opined that without VillageMD, "there doesn't seem to be any type of strategy around growth."

195. The same day, J.P. Morgan highlighted that, "[c]oncurrent with the earnings release, the Wall Street Journal reported in an interview" with Wentworth that Walgreens "is planning to divest a portion of its stake in VillageMD" and "is reviewing a quarter of its stores that aren't profitable," a "'meaningful percent'" of which could shutter. And Barclays reported that "WBA shares were down 25% post call (SPX flat) on a F3Q print marked by continued profitability headwinds" and "a strategic review update that features scaled store closures and a majority stake divesture of VillageMD," lowering its price target from $15 to $11. On June 28, 2024, HSBC lamented that "[m]anagement announced an aggressive store reduction plan" and opined that Walgreens' "stock price will continue to suffer accordingly," particularly since "we do not see any short-term catalysts for the Company" given the VillageMD failure.

## V. POST CLASS PERIOD EVENTS

196. Following the end of the Class Period, the VillageMD debacle continued to have catastrophic impacts on Walgreens. On August 7, 2024, Walgreens issued a press release providing an update on its "strategic and operational review towards simplifying and focusing its U.S. Healthcare portfolio." The release stated that after sinking approximately $10 billion into VillageMD, Walgreens was now considering "a sale of all or part of the VillageMD businesses, [or] possible restructuring" given "VillageMD's substantial ongoing and expected future cash

requirements." Even worse, the release disclosed that in August 2024, Walgreens and VillageMD "acknowledged the existence of defaults" under the $2.25 billion senior secured loan the Company previously provided to VillageMD in connection with the VillageMD/Summit Acquisition, which Walgreens agreed to forbear while it considered its options for cash-strapped VillageMD. Later that same day, *Reuters* reported that the Company was "exploring options for VillageMD, including a sale, citing the primary-care provider's substantial cash needs."

197. On October 15, 2024, Walgreens issued its Annual Report on Form 10-K, which disclosed that, despite investing approximately $10 billion in VillageMD and Defendants' years promoting its "tremendous growth potential," the fair value of VillageMD as of August 24, 2024 amounted to only $1.5 billion. Moreover, in a Form 8-K the Company issued the same day, Walgreens disclosed that, in connection with its strategic review, "the Company expects to close an aggregate of 1,200 to 1,300 stores over the next three years, including approximately 500 stores projected to close in fiscal 2025." During an earnings conference the same day, Wentworth bluntly acknowledged that the Company's catastrophic flop with VillageMD made it "critical" for the Company to focus on improving operating cashflow and strengthening its tattered balance sheet. Wentworth emphasized that Walgreens was now "focused on monetizing noncore assets to generate cash," and that "[c]hief among this is VillageMD."

198. On November 27, 2024, VillageMD announced the resignation of Tim Barry, its long-time CEO and Chairperson. The financial media quickly reported on Barry's resignation and the dire straits VillageMD found itself in due to its calamitous partnership with Walgreens. For example, in an article published on November 27, 2024, *Forbes* reported that VillageMD had "struggled to fill its clinics attached to Walgreens with patients and has scaled back dramatically on the expansion of doctor practices it manages and Village Medical clinics the company opened

attached to Walgreens." Likewise, Crain's Chicago Business reported on November 27, 2024 that Barry left the company following a "rocky few years mired by its failure to help execute on a health care push launched by majority-owner Walgreens Boots Alliance."

199. Finally, on December 10, 2024, *The Wall Street Journal* reported that Walgreens, the once iconic pharmacy store chain that for 122 years had a consistent positive growth trajectory and never once had a losing year, was so decimated by the VillageMD debacle that it was now in discussions to sell itself to the private-equity firm, Sycamore Partners. The byline of the article read that the "[d]eal would cap a tumultuous run for the retailer whose market value shrank from a peak of over $100 billion to below $8 billion." In the article, *The Wall Street Journal* described how Walgreens' shares have been on a "downward slide" as the Company has faced "[m]ounting pressures on both its pharmacy and retail businesses," culminating in Walgreens' announcement in the summer of 2024 "to scale back on its move into the primary-care business by cutting its stake in primary-care provider VillageMD."

200. In sum, as a result of the Company's disastrous foray into the VillageMD initiative, Walgreens will likely no longer continue to operate as a public company.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

201. Throughout the Class Period, Defendants made materially false and misleading statements concerning: (i) the successful rollout and performance of VillageMD clinics, including the increasing number of clinics being opened nationwide, and the "tremendous" long term growth potential of the U.S. Healthcare segment provided by VillageMD and its acquired companies; (ii) earnings guidance for U.S. Healthcare and the Company, which were purportedly driven by VillageMD's growth; (iii) VillageMD's purportedly "payer agnostic" business model; and (iv) VillageMD's and U.S. Healthcare's continued commercial viability and path to profitability,

including after the Company's reductions in earnings guidance, executive departures, announcement of selected VillageMD clinic closures, and nearly $6 billion write-down.

**A. October 2021 False Statements**

202. At the start of the Class Period on October 14, 2021, Walgreens issued a press release, which was also filed with the SEC on Form 8-K, touting the Company's plan to accelerate the opening of over 600 "Village Medical at Walgreens" primary care clinics nationwide by 2025, and 1,000 clinics by 2027, via a massive $5.2 billion investment that exceeded the Company's earnings for the prior three years combined. Titled "Walgreens Boots Alliance Makes $5.2 Billion Investment in VillageMD to Deliver Value-Based Primary Care to Communities Across America," the press release stated that the "$5.2 billion investment will accelerate the opening of at least 600 Village Medical at Walgreens primary care practices in more than 30 U.S. markets by 2025 and 1,000 by 2027." The release specified that Walgreens and VillageMD "have 52 co-located primary care practice locations currently open, and will have more than 80 open by the end of this calendar year." The release explained that the clinics would provide "comprehensive, coordinated care through a primary care model," and emphasized that "[t]hrough its partnership with VillageMD, Walgreens is the first national pharmacy chain to offer full-service primary care practices with primary care physicians and pharmacists co-located at its stores all under one roof at a large scale."

203. The statements in ¶202 were materially false and misleading. Defendants' statements touting the number of VillageMD clinics that the Company was purportedly opening and successfully operating—and which Defendants claimed offered "full-service" physician practices—were materially false and misleading because, in reality, many of those clinics were entirely unable to hire any doctors and the medical staff needed to operate them. Indeed, numerous former employees of Walgreens and VillageMD, including individuals specifically tasked with building out the clinics and recruiting physicians to staff them, stated that doctors overwhelmingly

refused to work at the clinics and, as a result, there was an extreme "shortage" of patients treated at the clinics. For example, a former VillageMD Executive Director and Market President responsible for opening clinics in Arizona, the Company's first key market during the Class Period, emphasized that he personally opened 30 clinics in Arizona in 2021 and "all of them" underperformed because VillageMD could not find doctors to staff them.

204. Numerous former employees corroborated that the severe shortage of doctors willing to work at Walgreens stores was a systemic problem that impacted all regions Walgreens entered, and that this fundamental problem was only exacerbated by Walgreens' attempt to rapidly scale the model. Indeed, former employees uniformly described that Walgreens opened "too many clinics, too fast," such that "doctors and nurses could not be recruited to properly staff them," "there was nobody to run them," and "they sat empty for months." A former VillageMD Business Development Director estimated that a full 70% of clinics nationwide had so few doctors and patients that they did not come close to meeting Walgreens' targets and were simply "dead weight." Because of this severe and systemic shortage of doctors and patients, the "vast majority" of clinics dramatically underperformed Walgreens' targets from the moment they were opened.

205. Accordingly, once Defendants chose to tout the number of clinic openings to the market, they were required to disclose all material information about those clinics, including the highly material facts that many lacked doctors and medical staff, had little—if any—patients, and were in fact performing poorly and dramatically below the Company's expectations. As a former Regional Administrator at VillageMD stated, Walgreens' announcement of the "opening" of co-located clinics served no other purpose but to allow Defendants to "cook the books and look super profitable."

206. In a second press release issued on October 14, 2021, Walgreens also specified that, by fiscal year 2025, the Company's acquisition of a majority ownership interest in VillageMD "leads to adjusted EPS growth of 11 to 13 percent, as the faster growing and higher margin [U.S. Healthcare segment] achieves scale." Additionally, during the FY 2021 Earnings and Investor Day Call on October 14, 2021, Kehoe emphasized that "the new segment we're setting up will generate significant and material revenue and profits well into the future," with "growth rates" reaching "high teens" and "18%" as early as 2025. During the same conference, Kehoe further explained that "[o]ur long-term growth will be highly influenced by the pace of healthcare investments" and that once the VillageMD investment reaches scale "we see a clear path to a growth model that aims for EPS growth of 11% to 13%," with "7 percentage points of growth" attributed solely to the U.S. Healthcare segment.

207. The statements in ¶206 were materially false and misleading. In reality, Walgreens could not profitably scale or even profitably operate the "Village Medical at Walgreens" initiative at any time during the Class Period due to a host of basic, undisclosed, and unresolved obstacles, including a chronic shortage of doctors and nurse practitioners to staff the clinics, and chronically low demand from patients to receive full-service, primary care treatment at Walgreens' drug stores. As a result, the "vast majority" of VillageMD co-located clinics substantially underperformed Walgreens' targets from inception. Former employees of both Walgreens and VillageMD confirmed that these severe headwinds were never resolved, and that the "vast majority" of clinics nationwide never came close to hitting Walgreens' prescriber, patient, or financial targets at any time during the Class Period. Accordingly, Defendants' growth projections, including "significant and material revenues and profits well into the future," growth rates reaching the "high teens" as

early as 2025, and full Company "EPS growth" of "11% to 13%" by fiscal 2025, lacked any reasonable basis in fact at the time that they were issued to investors.

208. During the FY 2021 Earnings and Investor Day Call on October 14, 2021, Defendant Brewer discussed at length the Company's new strategic direction that "pivots our business deeper into healthcare." Brewer represented that the strategy was well-positioned for success because Walgreens "already know[s] how to work with VillageMD" and "[w]e know how to scale their model." During the call, Brewer also highlighted the significance of VillageMD's purportedly payer-agnostic business model, stating: "One thing that is very important about VillageMD and a primary reason we started this partnership to begin with is that they are focused on all patient populations: Medicare, Medicare Advantage, Medicaid, commercial and the uninsured." Defendant Kehoe echoed Brewer's remarks, emphasizing that VillageMD accepts "all types of insurance."[27]

209. The statements in ¶208 were materially false and misleading. Since the conclusion of the Houston Pilot Program, Defendants' "work with VillageMD" for over a year established that Walgreens did not "know how to scale" VillageMD's model. Instead, it established precisely the opposite. The "vast majority" of "Village Medical at Walgreens" clinics dramatically underperformed Walgreens' own targets and the fundamental problems finding doctors to staff the clinics and patients to use them were only exacerbated by the locations Walgreens selected for scaling VillageMD's model. Numerous employees of Walgreens and VillageMD, including

[27] During the Class Period, Defendants repeatedly affirmed that VillageMD accepts "all types of insurance," including, specifically, "Medicaid." Such statements were made in almost a dozen press releases, earnings calls, and investor conferences. Specifically, Defendants made these statements during Walgreens' October 14, 2021 FY21 Earnings and Investor Day Call, the November 29, 2021 Evercore ISI HealthCONx Investor Conference, the January 11, 2022 J.P. Morgan Healthcare Conference, and Walgreens' March 28, 2023 Q2 2023 earnings call. These statements were also made in Walgreens' January 20, 2022, February 16, 2022, March 17, 2022, April 28, 2022, November 14, 2022, April 12, 2023, and August 10, 2023, press releases announcing new VillageMD clinic openings and expansion into new markets.

individuals specifically tasked with building out the clinics and finding doctors to staff them, described that the "VillageMD at Walgreens" model failed because, among other things, Walgreens opened "too many clinics, too fast," such that "doctors and nurses could not be recruited to properly staff them," "there was nobody to run them," and thus "they sat empty for months." Moreover, even in the limited instances where VillageMD could find adequate medical professionals, a full 70% of clinics nationwide were "dismal failures" that did not come close to meeting Walgreens' targets and were simply "dead weight" that brought "everybody down."

210. Furthermore, contrary to Defendants' representations that VillageMD was "focused on all patient populations" and accepts "all types of insurance," including "Medicaid," multiple former employees confirmed that "Village wasn't in the business of taking Medicaid patients" and "did not accept Medicaid." VillageMD's refusal to accept Medicaid reduced any uplift in prescription fills at Walgreens pharmacies from VillageMD patients, which was the principal "synergy" for Walgreens from the VillageMD initiative—particularly given the medically underserved sites Walgreens selected for most clinics.

**B. November 2021 False Statements**

211. In a Company press release on November 12, 2021, Walgreens announced "plans to open 20 new Village Medical at Walgreens primary care practices in the Tampa area over the next year" and reiterated that "[m]ore than 80 Village Medical at Walgreens practices will be opened by the end of 2021." Walgreens continued to assure investors that clinic buildouts were successfully proceeding as planned, stating that Walgreens and VillageMD "are on track to open 1,000 primary care practices by 2027."

212. On November 29, 2021, Walgreens management presented at the Evercore ISI HealthCONx Investor Conference (the "2021 Evercore Conference"). There, CEO Brewer repeated that Walgreens "already know[s] how to work with VillageMD to scale their model."

Brewer also described the benefits to Walgreens of expanding the VillageMD partnership, stating that: "[it] will allow us to scale the number of co-located clinics towards 1,000 units by 2027" giving the Company "unprecedented reach and scale[.]" At the 2021 Evercore Conference, Brewer stated that "we are now operating physician clinics at 70 Walgreens locations" and further assured investors that the transition to healthcare was proceeding as planned, stating: "We continue to advance our new health care initiatives, and we're on track to achieve our goals for this new segment." Brewer assured that the transition would be quick and successful based on the performance of the VillageMD clinics it had already opened, declaring, "[w]e have momentum in our business and proof that we can execute at pace[.]"

213. The statements in ¶¶211-212 were materially false and misleading. Defendants had no basis to tout the number of VillageMD clinics that the Company was purportedly opening and successfully operating—and which Defendants claimed offered "comprehensive primary care from physicians"—when, in reality, at least 50% of these co-located clinics nationwide lacked the doctors and medical staff needed to successfully operate. Indeed, numerous former employees of Walgreens and VillageMD, including individuals specifically tasked with building out the clinics and recruiting physicians to staff them, stated that doctors overwhelmingly refused to work at the clinics and, as a result, there was an extreme "shortage" of patients treated at the clinics. For example, a former VillageMD Executive Director and Market President responsible for opening clinics in Arizona, the Company's first key market during the Class Period, emphasized that he personally opened 30 clinics in Arizona in 2021 and "all of them" underperformed because VillageMD could not find doctors to staff them. Numerous former employees corroborated that the severe shortage of doctors was a systemic problem that impacted all regions Walgreens entered, and that this fundamental problem was only exacerbated because Walgreens opened "too many

clinics, too fast," such that "doctors and nurses could not be recruited to properly staff them," "there was nobody to run them," and "they sat empty for months." A former VillageMD Business Development Director estimated that a full 70% of clinics nationwide had so few doctors and patients that they did not come close to meeting Walgreens' targets and were simply "dead weight."

214. Because of this severe and systemic shortage of doctors and patients, the "vast majority" of clinics dramatically underperformed Walgreens' targets from the moment they were opened. Accordingly, it was highly misleading for Defendants to tout that "we are now operating physician clinics at 70 Walgreens locations" as evidence that the VillageMD clinic rollout was being executed successfully, and for Brewer to state that "[w]e have momentum in our business and proof that we can execute at pace," when the substantial majority of clinics that had already opened were "dismal failures" due to chronic understaffing and lack of patient demand—problems that were only exacerbated by Walgreens' attempt to rapidly scale the model. Once Defendants chose to tout the number of clinic openings to the market, they were required to disclose all material information about those clinics, including the highly material facts that many lacked doctors and medical staff, had little—if any—patients, and were in fact performing poorly and dramatically below the Company's expectations. As a former Regional Administrator at VillageMD stated, Walgreens' announcement of the "opening" of clinics served no other purpose but to allow Defendants to "cook the books and look super profitable."

**C. January 2022 False Statements**

215. On January 6, 2022, Walgreens issued a press release announcing its financial results for the first quarter of fiscal 2022. The press release also touted that Defendants had surpassed their clinic rollout target of 80 for 2021 and set a new target of 160 for 2022, stating that the "[r]ollout of VillageMD continues with 81 co-located centers now open, and 160+ targeted for CY22 year-end."

216. During the accompanying Q1 2022 earnings call the same day, Brewer again touted Walgreens' rollout of VillageMD clinics, representing "the rollout has accelerated to a pace of a new opening every 4 to 5 days[.]" Defendant Brewer also stated that "we are delivering well against our Investor Day commitment as laid out in October and making meaningful progress towards our strategic priority." Defendant Kehoe affirmed that the "[U.S. Healthcare] segment is tracking well against its key milestones[.]" Kehoe specified that "VillageMD currently has 257 locations across 18 markets, 81 of which are co-located with Walgreens stores, up from 55 at the end of fiscal '21. The goal is to have at least 160 co-located clinics in place by the end of '22."

217. The statements in ¶¶215-216 were materially false and misleading. Defendants had no basis to tout the number of VillageMD clinics that the Company was purportedly opening and successfully operating—and which Defendants claimed offered full-service physician practices—when, in reality, in reality, at least 50% of these co-located clinics nationwide lacked the doctors and medical staff needed to successfully operate. Indeed, numerous former employees of Walgreens and VillageMD, including individuals specifically tasked with building out the clinics and recruiting physicians to staff them, stated that doctors overwhelmingly refused to work at the clinics and, as a result, there was an extreme "shortage" of patients treated at the clinics. These former employees described how the severe shortage of doctors was a systemic problem that impacted all regions Walgreens entered, and that this fundamental problem was only exacerbated when Walgreens attempted to scale the model—opening "too many clinics, too fast," such that "doctors and nurses could not be recruited to properly staff them," "there was nobody to run them," and "they sat empty for months." A former VillageMD Business Development Director estimated that a full 70% of clinics nationwide had so few doctors and patients that they did not come close to meeting Walgreens' targets and were simply "dead weight." Because of this severe and systemic

shortage of doctors and patients, the "vast majority" of clinics dramatically underperformed Walgreens' targets from the moment they were opened.

218. Accordingly, it was highly misleading for Defendants to tout the hundreds and thousands of primary care clinics that Walgreens would open, "81 co-located centers now open," and the "accelerated" pace of the rollout, when the substantial majority of clinics that it had already opened were "dismal failures" due to basic obstacles VillageMD could not resolve. Once Defendants chose to tout the number of clinic openings to the market, they were required to disclose all material information about those clinics, including the highly material facts that many lacked doctors and medical staff, had little—if any—patients, and were in fact performing poorly and dramatically below the Company's expectations. As a former Regional Administrator at VillageMD stated, Walgreens' announcement of the "opening" of clinics served no other purpose but to allow VillageMD and Walgreens to "cook the books and look super profitable." Defendants reinforced the false impression that the VillageMD rollout was being executed successfully by stating that Walgreens was "delivering well against [its] Investor Day commitment" and "tracking well against [] key milestones," particularly as the considerable majority of clinics were substantially underperforming Walgreens' targets.

219. On January 11, 2022, during the J.P. Morgan Healthcare Conference (the "2022 J.P. Morgan Conference"), Defendant Brewer touted the "tremendous growth potential of VillageMD." Brewer represented that "VillageMD is a unique business that has the scale and momentum to drive tremendous long-term growth," noting that VillageMD is "on a high-growth trajectory" with "257 locations across 18 markets, [and] a clear path to national expansion and rapid growth, especially given their partnership with Walgreens." With respect to the rollout of co-located clinics, Brewer reaffirmed that the Company was "meeting our stated goal of 80 for the end of

calendar 2021" and, because the rollout was going so well, raised the Company's goal for 2022 from 160 to 200. Brewer emphasized that the rollout was so seamless that it "has accelerated to an average pace of 1 opening every 3 days for calendar year 2022" and therefore "we have raised our goal to 200 co-located centers by the end of 2022, and we are well on the way to at least 1,000 by calendar 2027. Execution along these long-term targets will . . . accelerate WBA's EPS growth to low teens beyond fiscal 2024." Accordingly, Brewer once again assured investors that "[w]e are delivering well against the goals that we laid out at our Investor Day in October," and specified that the new U.S. Healthcare segment was "on track toward long-term targets."

220. The statements in ¶219 were materially false and misleading. Numerous former employees of Walgreens and VillageMD, including individuals specifically tasked with building out the clinics and recruiting physicians to staff them, stated that doctors overwhelmingly refused to work at the clinics and, as a result, there was an extreme "shortage" of patients treated at the clinics. These former employees described how the severe shortage of doctors was a systemic problem that impacted all regions Walgreens entered, and that this fundamental problem was only exacerbated when Walgreens attempted to rapidly scale the model—opening "too many clinics, too fast," such that "doctors and nurses could not be recruited to properly staff them," "there was nobody to run them," and "they sat empty for months." A former VillageMD Business Development Director estimated that a full 70% of clinics nationwide had so few doctors and patients that they did not come close to meeting Walgreens' targets and were simply "dead weight."

221. Because of this severe and systemic shortage of doctors and patients, the "vast majority" of clinics dramatically underperformed Walgreens' targets from the moment they were opened. Accordingly, it was highly misleading for Defendants to tout the hundreds and thousands of primary care clinics that Walgreens would open, and the "accelerated" pace of the rollout—now

reaching "1 opening every 3 days"—knowing that the substantial majority of clinics that it had already opened were "dismal failures" due to basic obstacles VillageMD could not resolve. As a former Regional Administrator at VillageMD stated, Walgreens' announcement of the "opening" of clinics served no other purpose but to allow VillageMD and Walgreens to "cook the books and look super profitable."

222. Further, the statements in ¶219 concerning VillageMD's earnings growth were materially false and misleading, and omitted material facts when made, because Walgreens could not profitably scale or even profitably operate the "Village Medical at Walgreens" at any time throughout the Class Period due to a host of basic, undisclosed, and unresolved obstacles, including a chronic shortage of doctors and nurse practitioners to staff the clinics, and chronically low demand from patients to receive full-service, primary care treatment at Walgreens' drug stores. As a result, the "vast majority" of VillageMD clinics substantially underperformed Walgreens' targets from inception. Former employees of both Walgreens and VillageMD confirmed that these severe headwinds were never resolved, and that the "vast majority" of clinics nationwide never came close to hitting Walgreens' prescriber, patient, or financial targets at any time during the Class Period. Accordingly, Defendants' earnings growth statements, including that VillageMD was "on a high-growth trajectory," had "a clear path to national expansion and rapid growth," and would accelerate "WBA's EPS growth to low teens beyond fiscal 2024," lacked any reasonable basis in fact when made.

### D. March 2022 False Statements

223. In a March 17, 2022 Company press release, Walgreens boasted that its primary care strategy was successfully being implemented in a host of new regions across the country. The release stated that the Company "plans to open three new Village Medical at Walgreens primary care practices in the Southern New Hampshire area by the end of summer 2022," and emphasized

that "[w]ith the Southern New Hampshire openings, VillageMD and Walgreens will have opened approximately 100 practices across 13 markets, including Arizona, Florida, Texas, Kentucky and Indiana." The release also reaffirmed that Walgreens and VillageMD were "on track to open more than 200 practices by the end of 2022." Walgreens also continued to emphasize that the co-located clinics offered "comprehensive," "[f]ull-[s]ervice, [p]rimary [c]are" from physicians.

224. The statements in ¶223 were materially false and misleading. Defendants had no basis to tout the number of VillageMD clinics that the Company was purportedly opening and successfully operating—and which Defendants claimed offered "full-service" physician practices—when, in reality, many of those clinics were entirely unable to hire any doctors and at least 50% co-located clinics nationwide lacked the doctors and medical staff needed to successfully operate. Indeed, numerous former employees of Walgreens and VillageMD, including individuals specifically tasked with building out the clinics and recruiting physicians to staff them, stated that doctors overwhelmingly refused to work at the clinics and, as a result, there was an extreme "shortage" of patients treated at the clinics. These former employees described how the severe shortage of doctors was a systemic problem that impacted all regions Walgreens entered. A former VillageMD Business Development Director estimated that a full 70% of clinics nationwide had so few doctors and patients that they did not come close to meeting Walgreens' targets and were simply "dead weight." Because of this severe and systemic shortage of doctors and patients, the "vast majority" of clinics dramatically underperformed Walgreens' targets at all times.

225. Accordingly, it was highly misleading for Defendants to tout the hundreds and thousands of primary care clinics that Walgreens would open knowing that the substantial majority of clinics that it had already opened were "dismal failures" due to basic obstacles VillageMD could not resolve. Once Defendants chose to tout the number of clinic openings to the market, they were

required to disclose all material information about those clinics, including the highly material facts that many lacked doctors and medical staff, had little—if any—patients, and were in fact performing poorly and dramatically below Walgreens' expectations. As a former Regional Administrator at VillageMD stated, Walgreens' announcement of the "opening" of clinics served no other purpose but to allow Defendants to "cook the books and look super profitable."

226. On March 31, 2022, Walgreens issued an earnings release for the second quarter of fiscal 2022 reiterating that the "[r]ollout of VillageMD continues with 102 co-located clinics now open, on track toward 200+ by CY22 year-end; expansion into new markets including Boston, Massachusetts; Jacksonville, Florida; and Tucson, Arizona in February; Denver, Colorado in January; and San Antonio, Texas in December."

227. During the accompanying Q2 2022 earnings conference call held later that same day, Brewer called the VillageMD partnership "a significant growth catalyst" as "VillageMD's care delivery model is highly scalable with attractive unit economics over time" and proclaimed that Walgreens was "executing on our vision today[,]" particularly since the rollout of VillageMD clinics "has accelerated to an average pace of 1 opening every 3 days for calendar year 2022." Echoing Brewer, during the Q2 2022 earnings call, Defendant Kehoe stated definitively, "Village is very much on the track[,]" explaining that "[t]he rollout of VillageMD continues with 94 co-located clinics opened at the end of the second quarter, up from 81 at the end of the first quarter. As of today, we have 102 co-located clinics opened, progressing towards our goal of 200 by the end of calendar year 2022."

228. The statements in ¶¶226-227 were materially false and misleading. Defendants' statements touting the number of VillageMD clinics that the Company was purportedly opening and successfully operating—and which Defendants claimed offered "full-service" physician

practices—were false and misleading because they failed to disclose the highly material fact that many of those clinics were entirely unable to hire any doctors and the medical staff needed to operate them. Indeed, numerous former employees of Walgreens and VillageMD, including individuals specifically tasked with building out the clinics and recruiting physicians to staff them, stated that doctors overwhelmingly refused to work at the clinics and, as a result, there was an extreme "shortage" of patients treated at the clinics. These former employees described how the severe shortage of doctors was a systemic problem that impacted all regions Walgreens entered, and that this fundamental problem was only exacerbated by Walgreens attempt to rapidly scale VillageMD's model—opening "too many clinics, too fast," such that "doctors and nurses could not be recruited to properly staff them," "there was nobody to run them," and "they sat empty for months." A former VillageMD Business Development Director estimated that a full 70% of clinics nationwide had so few doctors and patients that they did not come close to meeting Walgreens' targets and were simply "dead weight." Because of this severe and systemic shortage of doctors and patients, the "vast majority" of clinics dramatically underperformed Walgreens' targets from the moment they were opened.

229. Accordingly, it was highly misleading for Defendants to tout VillageMD's "102 co-located clinics opened" and "expansion into [five] new markets," and that "Village is very much on the track," as evidence that Walgreens was "executing" on the VillageMD clinic rollout, knowing that the substantial majority of clinics that it had already opened were "dismal failures" due to basic obstacles VillageMD could not resolve. Once Defendants chose to tout the number of clinic openings to the market, they were required to disclose all material information about those clinics, including the highly material facts that many lacked doctors and medical staff, had little—if any—patients, and were in fact performing poorly and dramatically below the Company's

expectations. As a former Regional Administrator at VillageMD stated, Walgreens' announcement of the "opening" of clinics served no other purpose but to allow Defendants to "cook the books and look super profitable." For the same reasons, Brewer's statements that that the VillageMD partnership was "a significant growth catalyst," that its model was "highly scalable with attractive unit economics over time," and that "Village is very much on track," lacked any reasonable basis in fact when made.

**E. June 2022 False Statements**

230. On June 30, 2022, Walgreens issued a press release announcing its financial results for the third quarter of fiscal 2022. The press release provided another update on the progress of the VillageMD rollout, stating that Walgreens had "[c]ontinued the rollout of VillageMD with 120 co-located clinics now open, on track toward 200 by end of CY22" and that, as of the end of the third quarter, "VillageMD had 315 total clinics open, an increase of 97 clinics compared to the year-ago quarter." According to the press release, during the quarter "VillageMD grew 69 percent, reflecting existing clinic growth and footprint expansion."

231. During the accompanying Q3 2022 earnings conference call the same day, Defendants provided a highly favorable update on the VillageMD rollout. Specifically, Brewer declared that "[w]e are tracking well against all of our key milestones for [the U.S. Healthcare segment] this year[,]" and, referencing VillageMD, stated: "We've seen good success in terms of the initial investments that we've made there." Brewer specified that "[o]ur largest partnership, VillageMD, continues its rollout of co-located clinics with 120 now open, on pace towards 200 by the end of 2022. VillageMD is in 22 markets today[.]" Kehoe added that, "[a]t the end of the third quarter, VillageMD had 315 clinics, an increase of 97 clinics year-over-year" and reiterated that "[t]he rollout of VillageMD continues, with 120 co-located clinics opened at the end of the third

quarter, up from 94 at the end of the second quarter. We are progressing towards our goal of 200 by the end of this calendar year."

232. The statements in ¶¶230-231 were materially false and misleading. Defendants' statements touting the number of VillageMD clinics that the Company was purportedly opening and successfully operating—and which Defendants claimed offered full-service physician practices—were false and misleading because they failed to disclose the highly material fact that many of those clinics were entirely unable to hire any doctors and the medical staff needed to operate them. Indeed, numerous former employees of Walgreens and VillageMD, including individuals specifically tasked with building out the clinics and recruiting physicians to staff them, stated that doctors overwhelmingly refused to work at the clinics and, as a result, there was an extreme "shortage" of patients treated at the clinics. These former employees described how the severe shortage of doctors was a systemic problem that impacted all regions Walgreens entered, and that this fundamental problem was only exacerbated because Walgreens rapidly attempted to scale VillageMD's model—opening "too many clinics, too fast," such that "doctors and nurses could not be recruited to properly staff them," "there was nobody to run them," and "they sat empty for months." A former VillageMD Business Development Director estimated that a full 70% of clinics nationwide had so few doctors and patients that they did not come close to meeting Walgreens' targets and were simply "dead weight."

233. Because of this severe and systemic shortage of doctors and patients, the "vast majority" of clinics dramatically underperformed Walgreens' targets from the moment they were opened. Accordingly, it was highly misleading for Defendants to tout the hundreds and thousands of primary care clinics that Walgreens would open, the addition of "97 clinics year-over-year," and that "VillageMD grew 69 percent" during the quarter, knowing that the substantial majority of

clinics that it had already opened were "dismal failures" due to basic obstacles VillageMD could not resolve. Once Defendants chose to tout the number of clinic openings to the market, they were required to disclose all material information about those clinics, including the highly material facts that many lacked doctors and medical staff, had little—if any—patients, and were in fact performing poorly and dramatically below the Company's expectations. As a former Regional Administrator at VillageMD stated, Walgreens' announcement of the "opening" of clinics served no other purpose but to allow Defendants to "cook the books and look super profitable."

234. Moreover, and significantly, by the time these statements in ¶¶230-231 were made, the VillageMD initiative was such an unmitigated disaster that in-mid 2022 Defendants internally decided to completely shut down the VillageMD rollout. Multiple high ranking former employees of both Walgreens and VillageMD confirm that, by mid-2022, Walgreens' management secretly made the decision to completely reverse course on the Company's "transformational" primary care strategy by putting a hold on, and beginning to wind down, the opening of all new co-located VillageMD clinics other than clinics already under construction and physician practices already in the process of being acquired. Indeed, Walgreens installed its own executive at VillageMD, Mark Vainisi, to be the "course corrector."

235. Defendants' statements in ¶231 that Walgreens was "tracking well against all of our key milestones" and seeing "good success" from its investments in VillageMD lacked any reasonable basis in fact when made. As an initial matter, the total number of clinics and co-located clinics were not "key milestones." In fact, they were precisely the opposite: many clinics were entirely unable to hire any doctors and the medical staff needed to operate them. Further, the clinics were not in any respect a "good success." Many of the clinics sat completely empty due to the chronic doctor and patient shortages, and over 70% of the clinics underperformed Walgreens'

expectations. Indeed, at the same time Brewer and Kehoe were telling investors that the VillageMD initiative was "tracking well against all of our key milestones" and was making "good success," Brewer and Kehoe internally decided with Walgreens other executives to wind down the rollout due to its severe underperformance, and both of them openly discussed at a Company-wide leadership meeting that VillageMD was "struggling, underperforming, and not meeting targets."

### F. October 2022 False Statements

236. On October 13, 2022, Walgreens issued a press release announcing financial results for the fourth quarter and fiscal year 2022 and also filed its 2022 Annual Report. In the 2022 Annual Report and press release, Defendants represented to investors that the "number of co-located VillageMD clinics and number of total VillageMD clinics" were "key performance indicators" for Walgreens. Specifically, the 2022 Annual Report stated that, "the Company's management has evaluated its results of operations using these metrics and believes that these key performance indicators presented provide additional perspective and insights when analyzing the core operating performance of the Company from period to period and trends in its historical operating results."[28] The press release further stated that by the quarter end VillageMD had "342 total clinics and 152 co-located clinics now open, [and was] on track toward 200 co-located clinics by end of CY22."

[28] These "key performance indicator" statements were repeated verbatim in Walgreens' quarterly report on Form 10-Q filed with the SEC on January 5, 2023 and press release issued that same day. Additionally, Walgreens' quarterly reports on Forms 10-Q filed with the SEC on March 28, 2023 and June 27, 2023, and press releases issued on March 28, 2023 and June 27, 2023, contained similar representations, stating that the "number of co-located VillageMD clinics and number of total VillageMD/Summit/CityMD locations," were "key performance indicators" for Walgreens and that "the Company's management has evaluated its results of operations using these metrics and believes that these key performance indicators presented provide additional perspective and insights when analyzing the core operating performance of the Company from period to period and trends in its historical operating results."

237. On the accompanying earnings call held that same day, Defendant Brewer favorably reported on the Company's transition to healthcare, stating: "We delivered ahead of our expectations in fiscal year '22 and are well underway in our transformation to a consumer-centric healthcare company." Brewer added that Walgreens was rapidly "scaling our winning assets to accelerate growth and profitability of our U.S. Healthcare business" and that "[o]ur strategy is working to strengthen the business and build a solid foundation for sustainable shareholder value creation." Defendant Kehoe underscored that "[w]e continue to drive strong execution . . . and rapidly expand our U.S. healthcare business." Regarding VillageMD specifically, Defendant Kehoe touted that the "clinic rollout at VillageMD continues on pace" and represented that "VillageMD grew in line with plan and revenue growth is on track as we launch new clinics, scale existing clinics and increased value-based arrangements." During the Q&A portion of the call, a JP Morgan Chase analyst inquired, "[h]ow do we think about the longer-term profitability of [U.S. Healthcare]?" Addressing VillageMD specifically, Defendant Kehoe responded by once again tying VillageMD's profitability to the speed and scale of the clinic rollout, stating: "we actually accelerated the investments in 2022. So instead of 160 clinics in calendar '22, we've gone to 200. So we're actually doing the smart thing. We're doubling down. This is a scale business."

238. The statements in ¶¶236-237 were materially false and misleading. Contrary to what Defendants claimed, the "number of co-located VillageMD clinics" was not a key performance metric for measuring the success of the rollout as, in reality, the exact opposite was true. Indeed, at least 50% of these co-located clinics nationwide lacked the doctors and medical staff needed to successfully operate, and as a result, those clinics dramatically underperformed Walgreens' own targets. Numerous former employees of Walgreens and VillageMD stated that doctors overwhelmingly refused to work at the clinics and, as a result, large numbers of clinics

were left empty for months with no patients to treat. Thus, the sheer of number of "Village Medical at Walgreens" clinics was not in any meaningful sense a "key performance indicator" for the Company, and it was materially misleading for Defendants to tout the number of VillageMD clinics Walgreens had opened, or planned to rollout, as evidence that the VillageMD rollout was being executed successfully when in fact, the "vast majority" of clinics—approximately 70%—were "dismal failures" according to Walgreens' own targets. As a former Regional Administrator at VillageMD stated, Walgreens' announcement of the "opening" of clinics served no other purpose but to allow Defendants to "cook the books and look super profitable."

239. Indeed, at the same time that these statements were made, the VillageMD initiative was such an unmitigated disaster that in-mid 2022 Defendants internally decided to completely shut down the VillageMD rollout. Multiple high ranking former employees of both Walgreens and VillageMD confirm that, by mid-2022, Walgreens' management secretly made the decision to completely reverse course on the Company's "transformational" primary care strategy by putting a hold on, and beginning to wind down, the opening of all new co-located VillageMD clinics. As a former Walgreens Vice President of Pharmacy and Retail Operations explained, Walgreens looked at the VillageMD business analytically, did not see "a path to profitability, and decided to shut it down and cut their losses."

240. Also, during the Company's Q4 2022 earnings call, Defendants touted the physician growth and patient demand at VillageMD. For instance, an analyst from Jefferies asked, "can you discuss the labor headwinds you're seeing across [U.S. Healthcare]?" In response, Brewer firmly denied that VillageMD had any problems adequately staffing its clinics with physicians: "So labor trends in [the U.S. Healthcare] side, we -- there's really no impact there. That's our primary care physician position through VillageMD. We're continuing to grow the

number of primary care physicians. So we're really not seeing a labor issue on our [U.S. Healthcare] side." Defendant Driscoll also stridently assured investors regarding patient demand, declaring that "demand for healthcare services in our stores has never been higher." At the conclusion of the call, Brewer summed up the overall outlook for the U.S. Healthcare segment and focused squarely on VillageMD, stating, "the work we're doing with [VillageMD] right now is very strong[,]" "[i]t's probably the center of our health care work for us[,]" and "it's going well."

241. The statements in ¶240 were materially false and misleading. It was false for Defendant Brewer to claim that [w]e're continuing to grow the number of primary care physicians," and we're "not seeing a labor issue on our [U.S. Healthcare] side" because, as multiple former employees confirmed, the VillageMD initiative failed precisely because "[t]hey couldn't hire physicians as fast as they were building [clinics] in Walgreens." Former employees explained that Walgreens' attempt to rapidly scale the VillageMD business caused "significant staffing issues across the country and the issues never improved" with "well upwards of 50% of Village clinics" nationwide suffering staffing shortages. Further, contrary to Defendant Driscoll's emphatic claim that "demand for healthcare services in our stores has never been higher," throughout the Class Period VillageMD experienced a severe and systemic lack of patient demand. As a Business Development Director for VillageMD estimated, only 30% of VillageMD clinics nationwide had adequate patient panels and performed up to expectations. Indeed, patient demand at the clinics was so low that Walgreens secretly shutdown the rollout of new clinics, and instituted draconian cost-cutting measures, in mid-2022. Thus, Brewer's affirmation that Walgreens' work with VillageMD was "very strong" and going "very well" were also patently false and omitted material facts. Significantly, about the very same time Brewer made these statements, she and Kehoe

openly discussed at a Company-wide leadership meeting that VillageMD was "struggling, underperforming, and not meeting targets."

242. At the top of Walgreens' October 13, 2022 press release, the Company highlighted "Fourth Quarter Results Ahead of Expectations; Raising Long-Term Targets for [the] U.S. Healthcare Segment." The release quoted Brewer as stating that "[o]ur execution to date provides us visibility and confidence to increase the long-term outlook for our next growth engine and reconfirm our path to low-teens adjusted EPS growth." Additionally, the press release announced that the U.S. Healthcare segment was now "expected to achieve positive adjusted EBITDA by fiscal year 2024." And, during the accompanying earnings call, Kehoe echoed these sentiments, stating that "[w]e are very encouraged by our progress as we build out our next growth engine" and "we have clear line of sight to positive adjusted EBITDA in fiscal '24." Kehoe also stated that "[w]e expect U.S. hHealthcare to contribute over half of the annual adjusted EPS growth over the long term[,]" with adjusted EPS "building to low teens growth in 2025." As to profitability, Kehoe projected "adjusted EBITDA of $125 million to $225 million in '24 rising to $500 million to $700 million in 2025," and underscored that "[o]ur maturing VillageMD clinic profile is a significant tailwind as a greater percentage of clinics reach positive contribution margin" and "[w]e are confident in this trajectory[.]"

243. The statements in ¶242 were materially false and misleading. Defendants lacked any reasonable basis in fact "to increase the long-term outlook" for U.S. Healthcare, "reconfirm [the Company's] path to low-teens adjusted EPS growth," and represent that Walgreens' "execution to date" on its VillageMD initiative provided a "clear line of sight to positive adjusted EBITDA in fiscal '24." In reality, Walgreens could not profitably scale or even profitably operate the "Village Medical at Walgreens" clinics at any time throughout the Class Period due to a host

of basic, undisclosed, and unresolved obstacles, including a chronic shortage of doctors and nurse practitioners to staff the clinics, and chronically low demand from patients to receive full-service, primary care treatment at Walgreens' drug stores. As a result, the "vast majority" of VillageMD clinics substantially underperformed Walgreens' targets from inception. Former employees of both Walgreens and VillageMD confirmed that these basic and severe headwinds were never resolved, and that the "vast majority" of clinics nationwide never came close to hitting Walgreens' prescriber, patient, or financial targets at any time during the Class Period.

244. Indeed, the VillageMD initiative was such an unmitigated disaster that, months before the statements in ¶242 were made, Walgreens had internally decided to shut down the VillageMD rollout. Multiple high ranking former employees of both Walgreens and VillageMD confirm that, by mid-2022 Walgreens' management had secretly made the decision to completely reverse course on the Company's "transformational" primary care strategy by putting a hold on, and beginning to wind down, the opening of all new co-located VillageMD clinics other than clinics already under construction and physician practices already in the process of being acquired. Indeed, Walgreens installed its own executive at VillageMD, Mark Vainisi, to oversee the "course correct[ion]." As a former Walgreens Vice President of Pharmacy and Retail Operations explained, Walgreens looked at the VillageMD business analytically, did not see "a path to profitability, and decided to shut it down and cut their losses."

**G. January 2023 False Statements**

245. On January 5, 2023, Walgreens issued a press release announcing its financial results for the first quarter of fiscal year 2023. During the accompanying earnings conference call on the same day, Defendant Brewer provided yet another update on the status of the VillageMD clinic rollout, which notably now included Summit-acquired clinics: "<u>VillageMD is leading the way in value-based care for the country, with 393 clinics as of year-end, including 200 co-located</u>

with Walgreens, achieving the calendar 2022 target. Following the close of the Summit transaction earlier this week, VillageMD now operates over 680 locations across 26 markets." Additionally, Brewer proclaimed "[w]e are making great progress to accelerate our transformation to health care, most notably in the quarter with the VillageMD acquisition of Summit Health" and "[w]e are quickly scaling U.S. healthcare with a defined path to achieve profitability exiting this fiscal year." Brewer underscored that the remarkable growth of the U.S. Healthcare segment was fueling the Company's turnaround, declaring that "[t]his was a landmark quarter for accelerating the build-out of our next growth engine, the US Healthcare segment."

246. On January 10, 2023, during the J.P. Morgan Healthcare Conference, Brewer assured investors that "[w]e're executing our strategic vision that we set out just over a year ago" and reinforced that VillageMD remained the centerpiece of Walgreens' transformational shift into healthcare, stating: "VillageMD is leading the way in value-based care for the country with 393 clinics as of year-end, including 200 of those are co-located with Walgreens, achieving the calendar 2022 target" and, "on a combined basis [with Summit], VillageMD now has over 4,100 providers across 680 locations in 26 markets." Brewer stated definitively that the VillageMD "strategy is working."

247. The statements in ¶¶242-246 were materially false and misleading. The VillageMD strategy was decidedly not "working." Indeed, the VillageMD initiative was such an unmitigated disaster that, over six months before the statements in ¶¶245-246 were made, Walgreens internally decided to shut down the VillageMD rollout. Multiple high ranking former employees of both Walgreens and VillageMD confirm that, by mid-2022 Walgreens' management had secretly made the decision to completely reverse course on the Company's "transformational" primary care strategy by putting a hold on, and beginning to wind down, the opening of all new co-located

VillageMD clinics other than clinics already under construction and physician practices already in the process of being acquired. Indeed, Walgreens installed its own executive at VillageMD, Mark Vainisi, to oversee the "course correct[ion]." As a former Walgreens Vice President of Pharmacy and Retail Operations explained, Walgreens looked at the VillageMD business analytically, did not see "a path to profitability, and decided to shut it down and cut their losses."

248. Further, Defendants' statements concerning the number of VillageMD clinics Walgreens had opened, or planned to rollout, omitted that the "vast majority" of "Village Medical at Walgreens" clinics dramatically underperformed Walgreens' own targets. Numerous former employees of Walgreens and VillageMD, including individuals specifically tasked with building out the clinics and finding doctors to staff them, stated that doctors overwhelmingly refused to work at the clinics and, as a result, large numbers of clinics were left empty for months with no patients to treat. These former employees described that the "VillageMD at Walgreens" model was not "quickly scalable"—but rather failed precisely because Walgreens opened "too many clinics, too fast," such that "doctors and nurses could not be recruited to properly staff them," therefore "there was nobody to run them" and "they sat empty for months."

249. Additionally, although clinics were "going on-line," many of those same clinics had severe "shortage[s] of patients." Thus, the sheer of number of "Village Medical at Walgreens" clinics was not in any meaningful sense a "key performance indicator" for the Company, and it was materially misleading for Defendants to tout the number of VillageMD clinics Walgreens had opened, or planned to rollout, as evidence that the VillageMD clinic rollout was being executed successfully when in fact, the "vast majority" of clinics—approximately 70%—had so few doctors and patients that they were "dismal failures" according to Walgreens' own targets. Once Defendants chose to tout the number of clinic openings to the market, they were required to

disclose all material information about those clinics, including the highly material facts that many lacked doctors and medical staff, had little—if any—patients, and were in fact performing poorly and dramatically below the Company's expectations. As a former Regional Administrator at VillageMD stated, Walgreens' announcement of the "opening" of clinics served no other purpose but to allow VillageMD and Walgreens to "cook the books and look super profitable."

250. Finally, Defendant Brewer's statement that, with the VillageMD/Summit Acquisition we have "a defined path to achieve profitability exiting this fiscal year," omitted the highly material fact that Defendants orchestrated the VillageMD/Summit Acquisition for the purpose of masking VillageMD's abysmal performance and concealing Walgreens' abandonment of the VillageMD clinic rollout. Multiple former employees confirm that the VillageMD/Summit Acquisition was "an act of desperation or a last ditch effort to save the company" and that Walgreens simply bought Summit to "offset" the losses of VillageMD.

**H. March 2023 False Statements**

251. On March 28, 2023, Walgreens issued a press release announcing its financial results for the second quarter of fiscal 2023. During the accompanying Q2 2023 earnings conference call with analysts and investors held later that day, Defendant Kehoe boasted that the Company was "seeing benefits on the Walgreens side from our partnership with VillageMD," and provided an update on VillageMD clinic openings, stating: "VillageMD ended the quarter with 729 locations, including Summit Health and CityMD. The 403 clinics for the legacy VillageMD business compared to 270 at the end of the prior year period and included 210 clinics co-located with Walgreens, up from 94 co-located clinics a year ago."

252. Later in the March 28, 2023 earnings call, U.S. Healthcare President Driscoll represented unequivocally that "the village model works, and we've seen it work with -- with some of the legacy businesses in multiple geographies.…we're confident, and we don't see any

challenges to the actual model of what we're delivering for patients and with providers in those markets. So the trends are positive." Also during the call, Brewer underscored, "the inflection is here. Our bold strategic actions are working[.]"

253. The statements in ¶¶251-252 were materially false and misleading. Walgreens' "bold strategic actions" to become a primary healthcare provider through its partnership with VillageMD were not "working" and the trends were decidedly not "positive." Indeed, the VillageMD initiative was such an unmitigated disaster that, approximately nine months before the statements in ¶¶251-252 were made, Walgreens internally decided to shut down the VillageMD rollout. Multiple high-ranking former employees of both Walgreens and VillageMD confirm that, by mid-2022 Walgreens' management had secretly made the decision to completely reverse course on the Company's "transformational" primary care strategy by putting a hold on, and beginning to wind down, the opening of all new co-located VillageMD clinics other than clinics already under construction and physician practices already in the process of being acquired. As a former Walgreens Vice President of Pharmacy and Retail Operations explained, Walgreens looked at the VillageMD business analytically, did not see "a path to profitability, and decided to shut it down and cut their losses." Moreover, while Defendants were continuing to tout the purported success of the VillageMD rollout and the "benefits" Walgreens was seeing from its partnership with VillageMD, just days later, Walgreens and VillageMD each began instituting mass layoffs—including firing the entire "Implementation Team" at each company that had been responsible for building out VillageMD clinics nationwide—well over 100 individuals in total.

254. Further, Defendants' statements concerning the number of VillageMD clinics Walgreens had opened, or planned to rollout, omitted that the "vast majority" of "Village Medical at Walgreens" clinics dramatically underperformed Walgreens' own targets. Numerous former

employees of Walgreens and VillageMD, including individuals specifically tasked with building out the clinics and finding doctors to staff them, stated that doctors overwhelmingly refused to work at the clinics and, as a result, large numbers of clinics were left empty for months with no patients to treat. These former employees described that the "VillageMD at Walgreens" model was not "quickly scalable"—but rather failed precisely because Walgreens opened "too many clinics, too fast," such that "doctors and nurses could not be recruited to properly staff them," therefore "there was nobody to run them" and "they sat empty for months."

255. Additionally, although clinics were "going on-line," many of those same clinics had severe "shortage[s] of patients." Thus, the sheer of number of "Village Medical at Walgreens" clinics was not in any meaningful sense a "key performance indicator" for the Company, and it was materially misleading for Defendants to tout the number of VillageMD clinics Walgreens had opened, or planned to rollout, as evidence that the VillageMD clinic rollout was being executed successfully when in fact, the "vast majority" of clinics—approximately 70%—had so few doctors and patients that they were "dismal failures" according to Walgreens' own targets. Once Defendants chose to tout the number of clinic openings to the market, they were required to disclose all material information about those clinics, including the highly material facts that many lacked doctors and medical staff, had little—if any—patients, and were in fact performing poorly and dramatically below the Company's expectations. As a former Regional Administrator at VillageMD stated, Walgreens' announcement of the "opening" of clinics served no other purpose but to allow VillageMD and Walgreens to "cook the books and look super profitable."

### I. June 2023 False Statements

256. On June 27, 2023, Walgreens issued a press release and held an earnings call regarding its financial results for the third quarter of fiscal 2023. Walgreens disclosed disappointing adjusted EPS of $1.00 for the quarter, which was below the Company's guidance of

$1.06 and analysts' consensus estimate of $1.07, driven by softness in the U.S. Healthcare and U.S. Retail Pharmacy segments. As discussed in Section IV.F above, the price of Walgreens stock declined by more than 10% in response to the news released on June 27, 2023, but Defendants made a series of statements during the earnings call that buoyed the stock price and prevented the price from declining further.

257. Specifically, the June 27, 2023 earnings release assured investors that Walgreens was "taking immediate actions to drive sustainable growth" in fiscal 2024, including "swift actions to improve the U.S. Healthcare path to profitability," and "accelerated VillageMD patient panel build[.]" Additionally, the Q3 Earnings Release assured that the Company was "[a]ccelerating synergies between U.S. Healthcare and Walgreens operations[,]" and noted the addition of "93 clinics" at VillageMD compared to the prior year period. During the accompanying earnings call, Brewer reassured investors that despite the "slower profit ramp for U.S. healthcare[,]" the Company was still successfully executing on its shift to healthcare, emphasizing that "we have the right strategy in place" and "[w]e are addressing current challenges head on and moving at a pace to deliver long-term shareholder value."

258. The statements in ¶257 were materially false and misleading. While Defendants assured investors that they were "taking immediate actions to drive sustainable growth," including "swift actions to improve the U.S. Healthcare path to profitability" and "accelerated VillageMD patient panel build," Defendants omitted the highly material fact that they had internally decided—a year ago—to shut down the rollout of any new co-located clinics. Defendants' statements gave the false appearance that Defendants' strategy of rolling out full-service, physician-staffed, primary care clinics at a large scale was still commercially viable. Indeed, Defendants told investors that they had added "93 clinics" at VillageMD compared to the prior year period and

were "accelerating synergies" that would improve U.S. Healthcare's "path to profitability," when, in reality, Defendants had already wound down the rollout of any new co-located clinics, were shutting down existing clinics, and exiting entire regions. Further, while Defendants continued to reassure investors that they "had the right strategy in place with VillageMD" and were "moving at a pace to deliver long-term shareholder value," in April 2023, two months before the statements in ¶257 were made, Walgreens and VillageMD began instituting mass layoffs, including firing the entire "Implementation Team" at each company that had been responsible for building out VillageMD clinics nationwide—over 100 individuals in total.

259. Further, not only was there no "path to profitability" through the doctor-staffed, primary care clinics at Walgreens stores, but the strategy was so unprofitable that Walgreens forced VillageMD to acquire Summit to mask the losses of the VillageMD clinics and the complete failure of the primary care strategy. Nor were there "accelerating synergies" between Walgreens and VillageMD, Summit Health, or CityMD. Multiple former employees of VillageMD, CityMD, and Summit describe how the companies were nothing alike, were not integrated into VillageMD or Walgreens in any meaningful way, and that Walgreens simply bought them to "offset" the losses in VillageMD's legacy business in "an act of desperation or a last ditch effort to save the company"

**J. September 2023 False Statements**

260. On September 21, 2023, Driscoll attended TD Cowen's 8th Annual Future Health Investor Conference on behalf of the Company (the "2023 TD Cowen Conference"). In the Q&A portion of the conference, a TD Cowen analyst asked, "I think in the past, <u>you guys gave some targets in terms of co-located VillageMD, Walgreens kind of locations, if I recall, something like 600 by 2025 and 1,000 by 2027. Are those kind of still sort of the milestones we should be thinking about</u>[]?" Even as late as September 21, 2023, Driscoll answered affirmatively, reassuring

investors that "[y]es, I think we should be -- I'm obsessively focused on delivering better results faster."

261. The statements in ¶260 were materially false and misleading. Defendants told investors that the "number of co-located VillageMD clinics" was a key performance metric for measuring the success of the rollout and the "core operating performance of the Company from period to period." However, Defendants' statements concerning the number of VillageMD clinics Walgreens had opened, or planned to rollout, omitted that the "vast majority" of "Village Medical at Walgreens" clinics dramatically underperformed Walgreens' own targets. Numerous former employees of Walgreens and VillageMD, including individuals specifically tasked with building out the clinics and finding doctors to staff them, stated that doctors overwhelmingly refused to work at the clinics and, as a result, large numbers of clinics were left empty for months with no patients to treat. These former employees described that the "VillageMD at Walgreens" model failed because Walgreens could not scale the model—opening "too many clinics, too fast," such that "doctors and nurses could not be recruited to properly staff them," therefore "there was nobody to run them" and "they sat empty for months."

262. Additionally, although clinics were "going on-line," many of those same clinics had severe "shortage[s] of patients." Thus, the sheer of number of "Village Medical at Walgreens" clinics was not in any meaningful sense a "key performance indicator" for the Company, and it was materially misleading for Defendants to tout the number of VillageMD clinics Walgreens had opened, or planned to rollout, as evidence that the VillageMD clinic rollout was being executed successfully when in fact, the "vast majority" of clinics—approximately 70%—had so few doctors and patients that they were "dismal failures" according to Walgreens' own targets. Once Defendants chose to tout the number of clinic openings to the market, they were required to

disclose all material information about those clinics, including the highly material facts that many lacked doctors and medical staff, had little—if any—patients, and were in fact performing poorly and dramatically below the Company's expectations. As a former Regional Administrator at VillageMD stated, Walgreens' announcement of the "opening" of clinics served no other purpose but to allow VillageMD and Walgreens to "cook the books and look super profitable."

263. Further, Driscoll's affirmation of the Company's targeted co-location counts of 600 by 2025, and 1,000 by 2027 as "milestones" investors should still be thinking about omitted the highly material facts that Walgreens had internally decided—over a year ago—to shut down the rollout of any new co-located clinics. And, in April 2023, nearly four months before Driscoll affirmed the co-location count targets, Walgreens and VillageMD began instituting mass layoffs, including firing the entire "Implementation Team" at each company that had been responsible for building out VillageMD clinics nationwide—over 100 individuals in total. Driscoll's statement gave the false appearance that Defendants' strategy of rolling out full-service, physician-staffed, primary care clinics at a large scale was still commercially viable, when, in reality, the Company had completely abandoned it.

**K. October 2023 False Statements**

264. On October 12, 2023, Walgreens held an earnings call for the fourth quarter and fiscal year 2023. During the call, Defendant Driscoll disclosed that Walgreens planned "to exit approximately five markets and approximately 60 [co-located] clinics in fiscal 2024" because those clinics were located in "nonstrategic markets." Assuaging investor concern, Driscoll unequivocally declared that, notwithstanding store closures in select markets, the "VillageMD model works" and emphasized that VillageMD would be one of the "most meaningful drivers of growth in fiscal 2024." During the Q&A portion of the call, an analyst asked Driscoll for more details about why Walgreens was closing 60 clinics in 5 "non-strategic markets." In response,

Driscoll stated that "[e]very one of our clinics actually shows month-over-month growth" and that "our strategy going forward will be really focusing on markets where we see that momentum . . . . So it's really more of a discipline around focusing on markets where we can go deep and continue to grow on a compounded serious way profitably." Also during the call, Defendant Mahajan further reassured investors that "we expect accelerating profitability in our U.S. healthcare business in 2024" with "ongoing growth in all businesses."

265. The statements in ¶264 were materially false and misleading. While Driscoll clung to his claim that the "VillageMD model works," boasting that "every one of our clinics actually shows month-over-month growth," and that the Company just needed to "focus[] on markets where we see that momentum," numerous high-ranking former employees of both Walgreens and VillageMD confirmed that the "vast majority" of the Walgreens clinics nationwide were underperforming at all times. Numerous former employees described how, contrary to Defendants' statements that the "VillageMD model works," the "VillageMD at Walgreens" "model was not sustainable" because "VillageMD was never able to hit the target of actual prescribers." As a result, only 30% of the co-located clinics "on a national level" did well, and the other 70% "were dismal failures." Defendant Driscoll reinforced the false impression that the model was working, at least in certain markets, by stating that Walgreens simply needed to be more "discipline[d] around focusing on markets where we can go deep and continue to grow on a compounded serious way profitably." Far from being one of "the most meaningful drivers of growth in fiscal 2024," the strategy was so unprofitable that Walgreens secretly shutdown the rollout of VillageMD clinics in mid-2022, and instituted mass layoffs in mid-2023 that included all individuals responsible for building out new co-located clinics, while forcing VillageMD to acquire Summit to mask the losses of VillageMD in "an act of desperation or a last ditch effort to save the company."

### L. January 2024 False Statements

266. On January 4, 2024, Walgreens issued a press release and held an earnings call regarding its financial results for the first quarter of fiscal 2024. Walgreens disclosed adjusted EPS of $0.66, which met the Company's guidance and beat analysts' consensus estimate of $0.62, driven by strength in the U.S. Retail Pharmacy and International segments. However, the Company slashed its dividend by 48%, to $0.25 per quarter, in an effort to strengthen its balance sheet. As discussed in Section IV.F. above, the price of Walgreens stock declined by over 5% per share in response to the news released on January 4, 2024, but Defendants made a series of materially false and misleading statements during the earnings call that buoyed the Company's stock price and prevented it from declining further.

267. Specifically, during the earnings call, in announcing financial results for the U.S. Healthcare segment, Defendant Mahajan assured investors that "<u>[w]e are making progress to accelerate profitability at VillageMD</u>." And, during the Q&A portion of the call, when asked "<u>do you think the care delivery business</u>" and specifically "Vi<u>llage[MD]</u>" is "<u>core</u>" to Walgreens' overall business, Defendant Wentworth assured investors that "<u>there's no question that they have put themselves on a good path, both in terms of their costs and their footprint, getting to a place where they're going to be meaningfully growing and profitable</u>."

268. The statements in ¶¶266-267 were materially false and misleading. In reality, and as set forth above, by this point VillageMD was not "on a good path" in any way and Defendants knew full well that the initiative was not "going to be meaningfully growing and profitable." In fact, the exact opposite was true: VillageMD was incurring billions of dollars in losses. Indeed, by January 2024, Defendants had already secretly decided to wind down the VillageMD initiative in mid-2022; the Company had instituted mass layoffs, including its entire "Implementation Team" responsible for overseeing new clinic rollout, in mid-2023; Walgreens was in the process of closing

an additional 100 VillageMD clinics, which would be announced just two months later; Walgreens was about to take a $5.8 billion impairment and announce a $5.9 billion quarterly loss for the second quarter of 2024—virtually all of which was attributable to the underperformance of VillageMD; and the Company was on the verge of completely abandoning VillageMD precisely because there was no growth or profitability in the initiative. Under these circumstances, Defendants had absolutely no reasonable basis to represent to investors that VillageMD was positively impacting the Company in any form or fashion.

269. On January 8, 2024, Wentworth and Mahajan attended the J.P. Morgan 42nd Annual Healthcare Conference on behalf of the Company (the "2024 J.P. Morgan Conference"). During this conference, a J.P. Morgan analyst noted that "[o]ne of the key drivers to the guidance for 2024 is the swing factor in health care services, primarily driven based on the amount of loss that we'll see with VillageMD." In response, Mahajan assured investors that Walgreens fiscal 2024 guidance remained achievable, stating: "we want to really concentrate on accelerating the profitability within Village. . . . So yes, I think we're moving in the right direction as it relates to where the fiscal year is[.]"

270. The statements in ¶269 were materially false and misleading. While Defendants represented that Walgreens was "making progress to accelerate profitability at VillageMD" and that they were "moving in the right direction" with respect to the initiative, as set forth above, the exact opposite was true. Indeed, numerous high-ranking former employees of both Walgreens and VillageMD confirmed that the "vast majority" of the Walgreens clinics nationwide were beset by chronic physician understaffing and a dearth of patients—to the extent that approximately 70% of all clinics were "dismal failures" that dramatically missed Walgreens' targets. Indeed, the strategy was so unprofitable and such an unmitigated disaster across the board that Walgreens secretly

shutdown the rollout of VillageMD clinics in mid-2022, instituted mass layoffs in mid-2023 that included all individuals responsible for building out new co-located clinics, and was about to announce billions of dollars in losses that would cripple the Company's business.

**M. March 2024 False Statements**

271. On March 28, 2024, Walgreens issued a press release and held a conference call regarding its financial results for the second quarter of fiscal 2024. In the press release, Wentworth reported that "[w]e are continuing to strategically review our portfolio over the next three months in an effort to ensure it drives growth and delivers value." Assuaging investor concern about Walgreens' lackluster growth, Defendants made additional positive statements concerning the success of their efforts to turn VillageMD profitable. The release represented that the U.S. Healthcare segment had achieved positive adjusted EBITDA for the quarter and attributed achievement of this milestone as "<u>driven by growth from VillageMD</u>[.]"

272. During the conference call, Defendant Wentworth similarly reassured investors about VillageMD's continued viability and profitability, stating "<u>turning to U.S. Healthcare[,] [w]e have reached an important milestone delivering our first ever quarter of positive adjusted EBITDA . . . [and] VillageMD's actions to accelerate profitability, including recent rightsizing of their cost structure, optimizing their clinic footprint and growing patient panels, are driving improvement in adjusted EBITDA</u>." Likewise, Defendant Mahajan assured investors that "<u>Village, we expect to continue to drive growth as they focus on the core markets as well as continue on their cost actions that they are going through this year</u>." Mahajan reinforced VillageMD's purported growing profitability, stating: "<u>During the first half of fiscal '24, we have seen positive financial impacts from the recent actions taken by VillageMD's management team to accelerate profitability</u>."

273. The statements in ¶¶271-272 were materially false and misleading. As the Company admitted just three months later, in reality, VillageMD was a disaster of epic proportions.

The Company suffered billions of dollars in losses on its investment in VillageMD— losses so massive that the Company had to completely abandon its healthcare strategy, seek to sell its stake in VillageMD in a desperate effort to raise cash, and disclose that it was forced to close upwards of 2,000 stores over the next three years, or almost 25% of Walgreens' stores. The staggering losses incurred by Walgreens as a result of the VillageMD debacle were so severe that they left the company in ruins. Rather than "accelerating profitability" and "driving improvements in adjusted EBITDA" as Wentworth and Mahajan represented, just three months later, the Company reported a 37% decline in adjusted EPS for the second quarter of 2024 and a 12% cut to full year 2024 EPS guidance. Walgreens was so decimated by VillageMD that the Company is now in discussions to sell itself to a private equity firm—meaning the end of its history as a public company.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

274. As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning the success of Walgreens' VillageMD Acquisition and associated co-located clinic rollout, and its contribution to the projected earnings of the U.S. Healthcare segment and the Company as whole, were materially false and misleading when made. In addition to the allegations set forth above, particularized facts evidencing Defendants' scienter include the following.

275. ***The Individual Defendants Repeatedly Assured Investors That Walgreens' Pivot To Becoming A Primary Healthcare Provider Was A "Transformational" Shift That Would Drive "Sustainable, Long-Term, Profitable Growth."*** At the start of the Class Period, Walgreens announced a "transformational" strategic shift from its legacy retail pharmacy business to becoming a provider of primary healthcare through full-service, doctor-staffed clinics it would build out in one thousand of its U.S. stores. This significant change in strategy purportedly made Walgreens "the first national pharmacy chain to offer full-service primary care practices with

primary care physicians and pharmacists co-located at its stores all under one roof at a large scale." The Individual Defendants told investors the new initiative would be the Company's next "growth driver," and fuel "sustainable, long-term profitable growth" for the Company. Defendants made VillageMD the epicenter of the Company's "next growth engine" by reorganizing the Company to create an entirely new business segment, U.S. Healthcare, which Defendants proclaimed was "enabled by investments in VillageMD[.]" The significance of this strategic shift and the centrality of VillageMD's performance to the Company's long-term growth strongly supports that Defendants' statements were knowingly or recklessly false and misleading when made.

276. Moreover, the Individual Defendants professed to be highly knowledgeable about the new "healthcare-centric" strategy and the purportedly successful execution of the VillageMD clinic rollout, and discussed each on myriad occasions with investors during the Class Period. The Individual Defendants spoke repeatedly and in highly specific terms about VillageMD and Walgreens' new healthcare-centric strategy in nearly every investor conference and earnings call during the Class Period, and gave detailed updates and responses to analysts' frequent inquiries on these topics. That Defendants' misstatements concerned the specific subjects about which Defendants frequently communicated with investors during the Class Period, including in response to highly specific questions by analysts, supports a strong inference of scienter.

277. ***Walgreens Invested Approximately $10 Billion in VillageMD, Controlled its Strategy, and Closely Oversaw its Performance and Operations***. In addition to its initial pre-Class Period investment of $1 billion in VillageMD, Walgreens made two further VillageMD investments during the Class Period that collectively amounted to $9 billion. First, Walgreens invested another $5.2 billion on October 14, 2021—the first day of the Class Period—to acquire a 63% majority ownership interest in VillageMD. Through this $5.2 billion acquisition, Defendants

gained control of VillageMD's Board of Directors via Walgreens' appointment of five of VillageMD's nine directors, which Defendant Brewer (Walgreens' then-CEO) and Defendant Driscoll (Walgreens' then President of the U.S. Healthcare segment) each joined at various times during the Class Period.[29] Importantly, Walgreens' majority interest and Board seats afforded Defendants the power to exercise control over VillageMD's strategic direction and business operations, including the critical task of selecting which Walgreens' stores would be included in the VillageMD value-based, primary care model, and received regular reports on VillageMD's operations and financial performance—powers Defendants possessed for the duration of the Class Period.

278. Next, just over a year later, Walgreens made its second massive Class Period investment in VillageMD. Specifically, in November 2022 Walgreens announced it had invested an additional $3.5 billion to help fund VillageMD's acquisition of Summit Health-CityMD, other physician-led healthcare services companies, with Walgreens retaining a majority 53% ownership stake in VillageMD, and the right to designate a majority of members of the VillageMD Board of Directors. Indeed, Brewer herself even acknowledged as much during a November 9, 2022, investor conference, where she stated, "we have 53% ownership. We have the majority Board seats on the Village entity. I'm actually a member of the Board. …we'll have the opportunity to

[29] Numerous Walgreens executives served on VillageMD's Board of Directors during the Class Period, including Defendant Brewer, who served as a member of VillageMD's Board of Directors from at least April 2022 until August 2023; Defendant Driscoll, who has served as a member of VillageMD's Board of Directors since 2023; Ginger Graham, former interim CEO of Walgreens, who has served as a member of VillageMD's Board of Directors since 2023; Defendant Mahajan, who has served as a member of VillageMD's Board of Directors since 2024; and Holly May, former EVP and Global Chief Human Resources Officer of Walgreens, who served as a member of VillageMD's Board of Directors from at least March 2023 until February 2024. There were also a number of non-executive interlocking directorates, including Steve Shulman, David Brailer, and Jan Babiak who all served as members of both Walgreens' and VillageMD's Board of Directors during all or part of the Class Period.

not only just vote in a normal governance setting but also to influence [VillageMD's operations and strategic decision making] because we're sitting there with them on a quarterly basis as [a] Board." In total, Walgreens invested approximately $10 billion in VillageMD—representing nearly all of the Company's $10.3 billion in total adjusted earnings for the past four years.

279. The sheer magnitude of the VillageMD investment, coupled with Walgreens' control and intimate oversight of VillageMD's operations and Defendant Brewer's admissions, reinforces a strong scienter inference.

280. ***Walgreens' VillageMD Initiative Was Such an Obvious Failure That Less Than One Year After Walgreens' $5 Billion-Plus Investment in VillageMD, Defendants Abandoned the "Village Medical at Walgreens" Clinic Rollout Altogether.*** As multiple former employees explained, by mid-2022—less than one year after Defendants made their massive $5.2 billion investment in VillageMD and announced that the VillageMD partnership would be "the key to unlock material, enhanced, long-term growth" for the entire Company—Defendants internally determined that the VillageMD initiative was a complete failure, and placed one of its executives, Mark Vainisi, into VillageMD to wind down the opening of new co-located clinics, shutter underperforming clinics, and exit certain markets completely. As CW 12 explained, by mid-2022, Walgreens recognized that the VillageMD initiative was not profitable and they needed a "significant reduction of overall expenses," and installed Vainisi as VillageMD's SVP of Growth to oversee Walgreens' "winding down" strategy. CW 5 confirmed that "slowdowns with the VillageMD rollout and shifting priorities started sometime around May 2022." Former employees further confirmed that by mid-2023, Walgreens and VillageMD instituted mass layoffs, firing every employee responsible for building new clinics. In these circumstances, it would be implausible to

suggest Defendants were unaware that Walgreens had completely reversed course and thrown in the towel on its "next growth engine" after less than one year.

281. ***VillageMD's Failure Caused the First Annual Loss in Walgreens' 122-year-long History.*** For 122 years, through recessions, depressions, two world wars, and the COVID-19 pandemic, Walgreens maintained profitability with a steady growth trend and never once reported an annual loss. That all changed, however, when Walgreens acquired VillageMD. Indeed, merely two short years after engaging in the VillageMD Acquisition, Walgreens reported its first annual loss in history—specifically, a net loss of $3.1 billion for fiscal year 2023, at least 50% of which was directly attributable to the abysmal financial performance by VillageMD. The significance of the fact that Walgreens suffered its first ever annual loss during the Class Period, and the fact that the majority of that substantial, multi-billion-dollar loss was caused by underperformance from VillageMD, strongly supports the inference that Defendants' statements were knowingly or recklessly false and misleading when made.

282. ***Defendant Brewer and Other Individual Defendants Were Hired Specifically to Implement and Oversee Walgreens' Strategic Transition.*** Before and during the Class Period, Walgreens specifically brought in experienced C-Suite executives, including Defendants Brewer, Standley, and Driscoll, to implement and effectively execute Walgreens' "transformational" pivot into providing full-service, primary healthcare. Defendant Brewer was hand-selected by the Company's Board of Directors to implement the change in strategy, and her predecessor CEO (and the Company's Executive Chairman) described her hiring as "exactly what [Walgreens] needs as the [C]ompany enters its next chapter." In the press release addressing Defendant Standley's appointment as President of Walgreens, the Company told investors that Standley would have responsibility for the development, growth and management of the business as the Company

entered "the rapidly evolving healthcare sector." And, in Walgreens' press release announcing the appointment of Defendant Driscoll as the Executive Vice President and President of Walgreens' specially-created U.S. Healthcare segment, Brewer described Driscoll as "play[ing] an important role in delivering on our vision to reimagine local healthcare" and explicitly highlighted that he would "oversee" VillageMD.

283. Tasked with the critical responsibility of overseeing the Company's strategic shift to healthcare, Defendants repeatedly assured investors during the Class Period that they were directly monitoring Walgreens' transition, and particularly, the development of Walgreens' partnership with VillageMD. For instance, on the first day of the Class Period, Brewer affirmed that "[w]e've been actively working on our new health care initiative" and that Walgreens' "revitalized strategy" would be "underpinned by an intensified focus on outstanding execution[.]" During investor conferences in January 2022 and 2023, Defendant Brewer told the market that, "[w]e are working closely with VillageMD[,]" "[o]ur strategy is working," "[w]e are energized and focused on reimagining health care[,]" and "WBA's transformation is underway[.]" Moreover, in March 2023, Defendant Driscoll stressed to investors that in his role running the U.S. Healthcare division, he personally saw that "the [V]illage model works"—"we've seen it work[ing][.]" The fact that the Individual Defendants were specifically hired to, and tasked with, the responsibility of implementing and monitoring Walgreens' strategic transition into healthcare—and their strident admissions that they were "relentlessly" focused on its execution—strongly supports scienter.

284. ***Defendants Received Regular Reports on VillageMD, Closely Tracked Its Key Performance Metrics Through a Variety of Software Systems, and Internally Discussed the Underperformance.*** The Individual Defendants knew throughout the Class Period that VillageMD

was underperforming expectations and not generating anticipated prescription uplift or other purported synergies because the Company meticulously tracked the performance of VillageMD's clinics. As confirmed by multiple former employees, Defendants had access to, monitored, and analyzed a host of operational and financial metrics evidencing the performance of co-located clinics, including comparisons in number of prescriptions filled in stores with vs. without co-located clinics, and the number of prescribers at each co-located clinic. As CW 13 explained, "Walgreens was closely watching how every single site was performing," and had software that was "very precise" – for example, in tracking the number of inbound prescriptions and outbound prescriptions, "with and without VillageMD" – which enabled the Individual Defendants to evaluate the key synergy for the partnership. CW 18 confirmed that everyone at Walgreens from the "[Director] level and up… absolutely" had access to key performance indicators, including the number of patients seen in each store per day and the number of pharmacy fills by VillageMD patients, on at least a monthly basis. CW 21 likewise stated that everyone at Walgreens from at least the vice president level and above had access to VillageMD's operational metrics, and could see whether targets were being met in terms of patient volumes. Thus, Defendants were fully aware of data showing VillageMD's underperformance during the Class Period, creating a strong inference that their false and misleading statements were made with scienter.

285. Moreover, as detailed in Section IV.E.4.a. above, Walgreens' senior executives, including the Individual Defendants, regularly discussed the progress of the VillageMD rollout and the pervasive underperformance of clinics. As confirmed by multiple former employees, there were weekly, monthly, quarterly, and annual meetings—both within and between the companies, including at the C-Suite and Board-levels—where VillageMD's underperformance was regularly discussed and reported on. As CW 13 explained, Walgreens and VillageMD "were definitely

meeting level-to-level, CEO to CEO, VP to VP, the people responsible for different parts of the initiative and organization, always sharing every detail." CW 12 confirmed that VillageMD C-Suite executives had regular meetings with Walgreens' C-Suite executives, including Defendants Brewer, Kehoe, and Driscoll, where the significant problems with the VillageMD rollout were discussed "in great detail." In fact, VillageMD's underperformance was so "widely known" that, according to CW 9, Defendants Brewer and Kehoe discussed VillageMD "struggling, underperforming, and not meeting targets" at a Company-wide leadership meeting held in mid-2022—i.e., roughly the same time that Walgreens internally decided to abandon the rollout. In these circumstances it would be implausible to suggest that Defendants did not how the clinics were performing.

286. ***Defendants Regularly Updated Investors Regarding the Pace, Scale, and Status of the VillageMD Clinic Rollout***. During the Class Period, Defendants specifically told investors to use the "number of co-located VillageMD clinics and [the] number of total VillageMD clinics" as "key performance indicators" for measuring the Company's core operating performance, and in particular, the success of the VillageMD clinic rollout. The Company's SEC filings and press releases during the Class Period underscored that "the Company's management has evaluated its results of [Walgreens'] operations using these metrics[.]" During the Class Period, Defendants repeatedly updated investors on these key performance metrics, including a steady stream of at least nine press releases issued from November 2021 through August 2023, that announced Walgreens' opening of new VillageMD clinics in multiple markets across the country, including in Texas, Arizona, Florida, New Hampshire, Massachusetts, Nevada, Colorado, and Illinois. In these press releases, Defendants also frequently detailed the number of co-located clinics and standalone clinics that VillageMD had opened to date, and reiterated the same clinic count projections

Defendants first revealed at the start of the Class Period even as late as September 21, 2023—namely, that Walgreens was "poised for explosive growth" because it remained "on track" to open 600 co-located VillageMD clinics by 2025 and 1,000 by 2027. Defendants' regular updates on the progress, pace, and scale of the VillageMD clinic rollout (including the opening of enough medical clinics to penetrate markets in three-fifths of the United States), supports a strong inference that Defendants were informed of how the clinics they spoke about were actually performing.

287. ***The Individual Defendants Refused To Provide Performance Metrics for VillageMD and Orchestrated the VillageMD/Summit Acquisition To Conceal VillageMD's failure.*** Defendants touted the Company's "transformational" shift to healthcare and publicly tallied the raw number of VillageMD clinic openings on a consistent basis, but declined to provide financial or operational metrics regarding the actual performance of VillageMD. For instance, the Individual Defendants provided high-level assurances that the initiative was "working" and resulting in a sufficient increase in prescription volume to negate market pressures on the Company's retail pharmacy business, but refused to answer analysts' repeated inquiries for metrics that would help quantify the script uplift—stating only that "we're absolutely convinced on script up mix" and promising to provide "a more comprehensive update in the future." (Tellingly, they never did.)

288. After determining to wind down the rollout of co-located clinics in mid-2022, rather than coming clean that the strategy was not working as planned, Defendants instead sought to conceal VillageMD's dismal performance by causing VillageMD to acquire Summit Health and City MD, and funding $3.5 billion of the purchase price. As multiple former employees described, the reason why the Individual Defendants orchestrated the merger was to mask the severe underperformance of VillageMD's co-located clinics, as Summit Health and CityMD were already

profitable businesses. Accordingly, after the VillageMD/Summit Acquisition, Walgreens began consolidating the combined performance of VillageMD and Summit into the Company's financial results, which significantly increased VillageMD's ability to make positive adjusted EBITDA contributions and catapulted VillageMD's clinic count such that "VillageMD ended the quarter with 729 locations, including Summit Health and CityMD." Defendants' refusal to provide performance metrics for VillageMD and Walgreens' funding of the VillageMD/Summit Acquisition to conceal the drastic underperformance of VillageMD provide strong circumstantial evidence of scienter.

289. ***The Abrupt and Widespread Executive Departures Are Highly Probative of Scienter***. Towards the end of the Class Period, as the Company was forced to report disappointing financial results and decreased projections driven by "a slower profit ramp" at VillageMD's clinics, Walgreens announced the abrupt departure of numerous C-Suite executives. The number and timing of their departures is telling, as is the market's harsh reaction.

290. In connection with the VillageMD/Summit Acquisition's close in January 2023, Defendants proclaimed that the U.S. Healthcare segment "is now expected to achieve positive adjusted EBITDA by the end of fiscal year 2023." In Walgreens' Q3 2023 Earnings Release on June 27, 2023, however, the Company was forced to disclose an adjusted EBITDA ***loss*** of $113 million, and an adjusted operating ***loss*** of $172 million for U.S. Healthcare in the quarter, each of which Defendants attributed to underperformance at VillageMD. In the Q3 2023 Earnings Release, Walgreens also slashed its fiscal 2023 EPS guidance by 20%, from $4.45 to $4.65 per share to $4.00 to $4.05 per share. Just one month later, Walgreens issued a press release abruptly announcing that CFO Kehoe would be leaving the Company without any planned replacement, which analysts such as UBS noted came as a "surprise to many investors," as Walgreens "is

currently in the midst of an operational transformation around healthcare delivery (i.e., VillageMD/Summit), with Kehoe playing a major role in the strategic rollout."

291. Shortly thereafter, the next shoe dropped when Walgreens issued a press release announcing the sudden departure of CEO Brewer on September 1, 2023. This complete exit from the Company by the very individual selected a mere two years earlier by the Walgreens Board of Directors to implement its Long-term Growth Plan and strategic shift to healthcare – once again without any planned replacement, was condemned by the market. Analysts at Deutsche Bank, for example, wrote that the "departure of the two key executives comes at possibly the worst time" as the Company is transitioning to a primary-care-based model, and complained that Walgreens "continues to lose momentum in the turnaround of [] its Health business as a result of the vacuum at the top of its leadership structure."

292. Walgreens also announced the departure or "transitions" of multiple other executives, including Driscoll transitioning from his role as President of U.S. Healthcare to a "senior advisory role." That the suspicious and abrupt departures of Defendants Brewer, Kehoe, Driscoll, and multiple other executives all came shortly after Walgreens was forced to reveal that the U.S. Healthcare segment would not, in fact, turn EBITDA positive in fiscal 2023, and was a year or more behind targets, strengthens the inference of scienter.

## VIII. LOSS CAUSATION

293. During the Class Period, shares of Walgreens publicly-traded common stock traded on the NASDAQ. The market for shares of Walgreens common stock was open, well-developed and efficient at all relevant times. Throughout the Class Period, Defendants' materially false or misleading statements alleged in § VI. above created and/or maintained artificial inflation in the price of Walgreens common stock. Defendants engaged in a scheme to deceive the market, and in a course of conduct that operated as a fraud or deceit on Class Period purchasers of Walgreens

common stock, by failing to disclose and misrepresenting the adverse facts detailed herein. When the facts misrepresented and concealed by Defendants' prior materially false or misleading statements gradually became apparent to the market, the price of Walgreens common stock fell precipitously, as the prior artificial inflation created and/or maintained by Defendants' materially false or misleading statements dissipated. As a result of their purchases of Walgreens common stock during the Class Period, Plaintiffs and other Class members suffered economic loss, i.e., damages, under federal securities laws.

294. By issuing materially false or misleading statements, Defendants presented a misleading picture of Walgreens' business. Defendants' materially false or misleading statements caused Walgreens' common stock to trade at artificially inflated levels throughout the Class Period.

295. Indeed, Walgreens' common stock reached a Class Period high of $54.33 on January 11, 2022, before losing over 77% of its value to close at $12.19 per share at the end of the Class Period, wiping out approximately $30 billion in market capitalization.

296. The artificial inflation created and/or maintained by Defendants' alleged misrepresentations and omissions was removed from the price of Walgreens common stock in direct response to information made public in the corrective disclosures alleged in this Section, through which facts that partially corrected Defendants' prior misrepresentations and omissions of material fact were revealed.

297. First, before the markets opened on June 27, 2023, Walgreens announced its financial results for the fiscal third quarter of fiscal 2023, ended May 31, 2023, which came in below both the Company's projections and analysts' expectations, and included a substantial cut to fiscal 2023 guidance. That same day, the price of Walgreens common stock fell $2.95 per share

on extraordinarily high trading volume—falling from $31.59 per share on June 26, 2023 down to $28.64 per share on June 27, 2023—constituting a stock drop of over 10%.

298. Second, after the close of markets on July 27, 2023, Walgreens announced that CFO Kehoe was leaving the Company. The next trading day, the price of Walgreens common stock fell another $0.83 per share—falling from $30.63 per share on July 27, 2023 down to $29.80 per share on July 28, 2023 on unusually high trading volume—constituting a stock drop of nearly 3%.

299. Third, before the markets opened on September 1, 2023, Walgreens announced that CEO Brewer was leaving the Company. That same day, the price of Walgreens common stock fell another $1.88 per share on extraordinarily high trading volume—falling from $25.31 per share on August 31, 2023 down to $23.43 per share on September 1, 2023—constituting a stock drop of over 7%.

300. Fourth, on January 4, 2024, before the markets opened, Walgreens issued a press release announcing weak earnings for the first quarter of fiscal 2024, ended November 30, 2023, and that the Company was "focusing on swift actions to right-size costs and increase cashflow, with a balanced approach to capital allocation priorities." On this news, the price of Walgreens common stock fell $1.31 per share, or over 5%, from a closing price of $25.57 per share on January 3, 2024, to a closing price of $24.26 per share on January 4, 2024, on extraordinarily high trading volume.

301. Fifth, on June 27, 2024, Walgreens issued a press release announcing disappointing financial results for the fiscal third quarter of 2024, ended May 31, 2024. On that day, *The Wall Street Journal* published an article prior to the market open featuring an interview with Defendant Wentworth in which he admitted that Walgreens was exiting the healthcare business, as providing primary healthcare was "a strategy that we are no longer pursuing." In addition, Defendants also

revealed that Walgreens' overall business was in freefall and would require it to close upwards of 2,000 underperforming Walgreens stores. On this news, the price of Walgreens common stock dropped $3.47 per share, or over 22%, on record trading volume, falling from a closing price of $15.66 per share on June 26, 2024, to a closing price of $12.19 per share on June 27, 2024.

302. As detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of Walgreens common stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Walgreens' shares fell precipitously, as the prior artificial inflation came out of the price.

## IX. PRESUMPTION OF RELIANCE

303. At all relevant times, the market for the Company's common stock was an open, efficient and well-developed market for the following reasons, among others:

a) Walgreens' common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) As a regulated issuer, Walgreens filed periodic reports with the SEC and the NASDAQ;

c) Walgreens regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) Walgreens was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and

certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace.

304. As a result of the foregoing, the market for Walgreens' common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock. All investors who purchased the Company's common stock during the Class Period suffered similar injury through their purchase of Walgreens' common stock at artificially inflated prices, and a presumption of reliance applies.

305. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Walgreens' business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

306. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not

adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

307. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Walgreens who knew that such statement was false when made.

## XI. CLASS ACTION ALLEGATIONS

308. Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Walgreens common stock between October 14, 2021 and June 26, 2024, inclusive (the "Class"), and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Walgreens at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

309. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Walgreens' shares were actively traded on the NASDAQ. As of the start of the Class Period, the Company had more than 7 million shares outstanding. While the exact number of Class members is unknown to Plaintiffs at this time, and

can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

310. Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

311. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that conflict with those of the Class.

312. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Walgreens;

d) whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Walgreens;

e) whether the market price of Walgreens shares during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

313. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## XII. CLAIMS FOR RELIEF

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

314. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

315. Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Walgreens shares; and (iii) cause Plaintiffs and other members of the Class to purchase Walgreens shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

316. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Walgreens shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

317. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Walgreens' business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Walgreens' business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Walgreens and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

318. Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as

a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

319. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Walgreens' operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

320. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Walgreens shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock

trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiffs and the other members of the Class purchased Walgreens shares during the Class Period at artificially inflated prices and were damaged thereby.

321. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of the truth regarding the problems that Walgreens was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased their Walgreens shares, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

322. By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

323. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

324. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

325. The Individual Defendants acted as controlling persons of Walgreens within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and

intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

326. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

327. As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XIII. PRAYER FOR RELIEF

328. WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding all damages and other remedies available under the Exchange Act in favor of Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c) Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Awarding such other and further relief as this Court deems appropriate.

## XIV. JURY DEMAND

329. Plaintiffs demand a trial by jury.

Dated: December 20, 2024

Respectfully submitted,

By: */s/ Peter S. Lubin*
**LUBIN AUSTERMUEHLE, P.C.**
Peter S. Lubin (Bar No. 6185789)
Patrick D. Austermuehle (Bar No. 6299005)
17W220 22nd Street, Suite 410
Oakbrook Terrace, IL 60181
Tel.: (630) 333-0333
Email: peter@l-a.law
Email: patrick@l-a.law

**LAW OFFICE OF TERRENCE BUEHLER**
Terrence Buehler (Bar No. 6181738)
417 North Marion Street
Oak Park, IL 60302
Tel.: (312) 371-4385
Email: tbuehler@tbuehlerlaw.com

*Liaison Counsel for the Class*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
Morgan M. Embleton (*pro hac vice* forthcoming)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com

Email: membleton@zlk.com

-and-

Adam M. Apton (admitted *pro hac vice*)
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Counsel for Lead Plaintiff Christopher G. Collins and Lead Counsel for the Class*

**SAXENA WHITE P.A.**
David R. Kaplan (*pro hac vice* forthcoming)
Emily R. Bishop (*pro hac vice* forthcoming)
505 Lomas Santa Fe Dr., Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
Email: dkaplan@saxenawhite.com
ebishop@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice* forthcoming)
Marco A. Dueñas (*pro hac vice* forthcoming)
10 Bank Street, Suite 180
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
Email: ssinger@saxenawhite.com
mduenas@saxenawhite.com

-and-

Lester Hooker (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
Email: lhooker@saxenawhite.com

*Counsel for Plaintiff the Fire & Police Employees' Retirement System of the City of Baltimore and Additional Counsel for the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Carol V. Gilden (Bar No. 6185530)
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Tel.: (312) 629-3737
Fax: (312) 357-0369
Email: cgilden@cohenmilstein.com

*Liaison Counsel for Plaintiff the Fire & Police Employees' Retirement System of the City of Baltimore*

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: *<u>/s/ Peter S. Lubin</u>*